## JUDGE SULLIVAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**12 CV    3723**

LORELEY FINANCING (JERSEY) NO. 3
LIMITED; LORELEY FINANCING (JERSEY)
NO. 5 LIMITED; LORELEY FINANCING
(JERSEY) NO. 15 LIMITED; LORELEY
FINANCING (JERSEY) NO. 28 LIMITED; and
LORELEY FINANCING (JERSEY) NO. 30
LIMITED

                    Plaintiffs,

            v.

WELLS FARGO SECURITIES, LLC; WELLS
FARGO SECURITIES INTERNATIONAL
LIMITED, WELLS FARGO BANK, N.A.;
HARDING ADVISORY LLC; STRUCTURED
ASSET INVESTORS, LLC; OCTANS II CDO
LTD; OCTANS II CDO LLC; SAGITTARIUS
CDO I LTD; SAGITTARIUS CDO I LLC;
LONGSHORE CDO FUNDING 2007-3 LTD.; and
LONGSHORE CDO FUNDING 2007-3 LLC,

                    Defendants.

Civil Action No. _____



### NOTICE OF REMOVAL

Defendant Wells Fargo Bank, N.A., as successor-in-interest to Wachovia Bank, N.A.

(collectively referred to as "WFB" or the "Bank"), by its attorneys, hereby files this Notice of

Removal of the above-captioned action and states the grounds for removal as follows:

**Overview**

1.      This action is removable under the Edge Act, 12 U.S.C. § 632, because defendant WFB is a national banking association and the claims asserted arise out of international banking transactions or other international financial operations of WFB.

2.      Namely, the claims arise out of investments in collateralized debt obligations co-issued by Cayman Islands limited liability companies (the "Cayman Islands CDOs" or the "CDOs") and marketed by the United Kingdom affiliate of a national bank.  The plaintiffs—entities organized under the laws of the Channel Islands—made these CDO investments upon the advice of an affiliated German Bank.

**Procedural History**

3.      On November 1, 2011, plaintiffs Loreley Financing (Jersey) No. 3 Limited, Loreley Financing (Jersey) No. 5 Limited, Loreley Financing (Jersey) No. 15 Limited, Loreley Financing (Jersey) No. 28 Limited and Loreley Financing (Jersey) No. 30 Limited (collectively, "Plaintiffs") initiated this action by filing in the Supreme Court of the State of New York, County of New York, a Summons with Notice pursuant to Section 305(b) of the New York Civil Practice Law and Rules ("CPLR").  (Exhibit 1.)

4.      On March 1, 2012, Plaintiffs filed Affidavits of Service for defendants: Longshore CDO Funding 2007-3, Ltd. (Exhibit 2); Sagittarius CDO I, Ltd. (Exhibit 3); Longshore CDO Funding 2007-3, LLC (Exhibit 4); Octans II CDO LLC (Exhibit 5); Sagittarius CDO I LLC (Exhibit 6); and Harding Advisory LLC (Exhibits 7 & 8).  Also on March 1, 2012, Plaintiffs filed an Affirmation of Service for defendants Wells Fargo Securities LLC, Wells Fargo Securities International Ltd., and WFB.  (Exhibit 9.)

5.      Plaintiffs filed a Supplemental Summons with Notice on March 14, 2012. (Exhibit 10.)

6.      By stipulation dated March 16, 2012, WFB and other defendants in this action agreed to accept service of the Supplemental Summons with Notice, expressly reserving all rights and defenses.  (Exhibit 11.)

7.      On March 19, 2012, defendant Harding Advisory LLC served and filed a notice of appearance.  (Exhibit 12.)

8.      On March 26, 2012, WFB and other defendants in this action served upon Plaintiffs their Demand for Complaint pursuant to CPLR § 3012.  (Exhibit 13.)

9.      On April 9, 2012, Plaintiffs filed and served the Complaint.  (Exhibit 14.)

10.     By Stipulation dated April 27, 2012, Plaintiffs, WFB, and other defendants in this action agreed that the deadline within which defendants must answer or otherwise plead in response to the Complaint would be extended to June 29, 2012.  (Exhibit 15.)

11.     As of the date of this Notice of Removal, none of the defendants has answered or otherwise responded to the Complaint.

12.     Further, as of the date of this Notice of Removal, there has been no substantive activity in this action concerning the merits of the Complaint, including dispositive motion practice or discovery.

**Allegations of the Complaint**

13.     The Complaint purports to assert claims against WFB for fraud, rescission, conspiracy, aiding and abetting, fraudulent conveyance and unjust enrichment.  All six causes of

action are based on the following allegations of fact, which are assumed true solely for purposes of this Notice of Removal:[1]

    a.  Plaintiffs are companies organized and existing under the laws of the Bailwick of Jersey, Channel Islands, with their place of business in St. Helier, Jersey. (Cmplt. ¶¶ 9-13.)

    b.  Plaintiffs invested more than $163 million in three CDOs commonly known as Octans, Sagittarius and Longshore. (Cmplt. ¶ 1.) The investments were recommended by Plaintiffs' investment advisor, IKB Deutsche Industriebank AG, a German bank, and/or its former affiliate IKB Credit Asset Management GmbH (together, "IKB"). (Cmplt. ¶ 33.)

    c.  The Bank or its affiliate, Wachovia Capital Markets, LLC ("WCM"), the predecessor-in-interest of defendant Wells Fargo Securities, LLC (*see* Cmplt. ¶¶ 2, 43, 59-60), acquired the Cayman Islands CDOs' notes from special purpose entities that were organized under the laws of either the Cayman Islands or the State of Delaware. Defendants Octans II CDO, Ltd., Sagittarius CDO I, Ltd., and Longshore CDO Funding 2007-3, Ltd. are Cayman Islands limited liability companies with their principal place of business in George Town, Grand Cayman. (Cmplt. ¶¶ 14, 16, 18.) Defendants Octans II CDO LLC, Sagittarius CDO I LLC, and Longshore CDO Funding 2007-3 LLC are Delaware limited liability

---

[1] The Wells Fargo Defendants do not admit any of the allegations of the Complaint or that those allegations state valid claims upon which relief can be granted. The Wells Fargo Defendants expressly reserve all rights and defenses including but not limited to the defenses of lack of personal jurisdiction and failure to state a claim upon which relief can be granted.

companies with their principal place of business in Newark, Delaware.  (Cmplt. ¶¶ 15, 17, 19.)

    d.   WCM marketed the Cayman Islands CDOs' notes through its agent Wachovia Securities International Limited ("WSIL"), a U.K. limited liability company with its principal place of business in London.  (Cmplt. ¶ 21.)  WSIL is the predecessor-in-interest of Wells Fargo Securities International Limited.  (*Id.*)

    e.   Either the Bank, WCM or WSIL—the Complaint fails to specify which, referring to the three simply as "Wachovia"—represented to Plaintiffs' investment advisor IKB that defendant Harding Advisory LLC would serve as the collateral manager for the Octans CDO and defendant Structured Asset Investors, LLC, an affiliate of WCM, would serve as the collateral manager for the Sagittarius and Longshore CDOs.  (Cmplt. ¶¶ 3, 6, 72-73, 89-90, 127-29.)

**<u>Edge Act Jurisdiction</u>**

14.    The Edge Act provides in relevant part as follows:

> [A]ll suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking…or out of other international or foreign financial operations . . . shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits….

12 U.S.C. § 632.

15.    As national banking associations, both WFB and its predecessor-in-interest Wachovia Bank are "corporations organized under the laws of the United States" within the meaning of 12 U.S.C. § 632.  *See* 12 U.S.C. § 21, *et seq*.

16.     The claims asserted in the Complaint are alleged to arise from international banking transactions and the international financial operations of the Bank in at least the following respects:

   a.   First, the Complaint alleges that the Bank acted as the "warehouse financing provider" for all three CDOs, including the Cayman Islands LLCs that issued securities for each.  (Cmplt. ¶ 22.)  As warehouse financing provider for all three CDOs, the Bank allegedly funded the acquisition of investment assets for the CDOs, and held those assets on its balance sheet until they were conveyed to the CDOs at closing.  (*See* Cmplt. ¶ 32.)

   b.   Second, the Complaint alleges that the Bank acted as the "initial credit default swap counterparty" for the Cayman Islands CDOs.  (Cmplt. ¶ 22.)  In that capacity, the Bank allegedly purchased credit protection directly from the Cayman Islands issuers through credit default swaps.  (*See* Cmplt. ¶ 32.)

   c.   Third, the Complaint alleges that the Bank sold cash assets to all three Cayman Island CDOs.  (Compl., ¶¶ 7, 159-164 (Longshore); ¶¶ 74-76, 140, 177-78 (Sagittarius); ¶¶ 74-76, 177 (Octans)).

   d.   Fourth, the Complaint alleges that the Bank purchased synthetic assets (*i.e.*, credit default swaps) from all three Cayman Islands CDOs.  (Cmplt. ¶¶ 233, 239, 245.)

   e.   Fifth, the Complaint alleges that Plaintiffs purchased securities issued by all three Cayman Islands CDOs (*see* Cmplt. ¶¶ 119 (Octans), 152 (Sagittarius), 169 (Longshore)), which purchases were made overseas pursuant to private placement transactions.

6

    f.    Sixth, the Complaint alleges that the Bank acted as the "liquidity provider" for the Octans and Sagittarius CDOs.  (Cmplt. ¶ 22.)  As liquidity provider, the Bank allegedly obligated itself to the Cayman Islands CDOs to pay the CDOs' counterparty in the event the CDOs had insufficient funds on hand to respond to a credit event involving a reference obligation as to which the CDOs had sold credit protection.

17.    The Complaint thus makes clear that Plaintiffs' claims arise out of international banking transactions and international financial operations of the Bank.

18.    Because Plaintiffs assert claims that are alleged to arise from international banking transactions and the international financial operations of the Bank, this Court has original jurisdiction over this action under the Edge Act.

**Procedural Requirements**

19.    This Notice of Removal is timely under the Edge Act, because the Edge Act expressly allows a covered lawsuit to be removed at any time prior to trial.  12 U.S.C. § 632 ("[A]ny defendant in any [covered lawsuit] may at any time before the trial thereof, remove such suit[] from a State court into the district court of the United States for the proper district . . . .").

20.    Copies of all process, pleadings and orders served upon the defendants or otherwise filed in this action are attached as Exhibits 1 through 15.

21.    A copy of this Notice of Removal is being served on Plaintiffs through their counsel of record.

22.    A copy of this Notice of Removal shall be filed with the Clerk of the Supreme Court of the State of New York, County of New York.

WHEREFORE, for the foregoing reasons, Defendant Wells Fargo Bank, N.A. gives notice of the removal of this action to this Court, and respectfully requests that it be placed on the docket and proceed in this Court.

Dated: May 10, 2012
       New York, New York

Jayant W. Tambe
Alex P. McBride
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

David C. Bohan
William M. Regan
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Telephone:(212) 940-8579
Facsimile: (212) 894-5549

*Counsel for Wells Fargo Bank, N.A*

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LORELEY FINANCING (JERSEY) NO. 3
LIMITED; LORELEY FINANCING (JERSEY)
NO. 5 LIMITED; LORELEY FINANCING
(JERSEY) NO. 15 LIMITED; LORELEY
FINANCING (JERSEY) NO. 28 LIMITED;
and LORELEY FINANCING (JERSEY) NO.
30 LIMITED,

                Plaintiffs,

                -v-

WELLS FARGO SECURITIES, LLC; WELLS
FARGO SECURITIES INTERNATIONAL
LIMITED; WELLS FARGO BANK, N.A.;
HARDING ADVISORY LLC; OCTANS II
CDO LTD.; OCTANS II CDO LLC;
SAGITTARIUS CDO I LTD.; SAGITTARIUS
CDO I LLC; LONGSHORE CDO FUNDING
2007-3, LTD.; and LONGSHORE CDO
FUNDING 2007-3 LLC

                Defendants.

Index No. _____

Date Purchased: November 1, 2011

**SUMMONS WITH NOTICE**

Plaintiffs designate New York County as
the place of trial.

The basis of venue is CPLR Article 5,
including CPLR 501 and 509.

TO THE PERSONS NAMED AS DEFENDANTS ABOVE:

      PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to appear in this action by serving upon the plaintiffs' attorneys, at the address set forth below, a notice of appearance or demand for the complaint within 20 days after the service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

      Should defendants fail to appear, judgment will be entered against defendants by default for the sum of (a) $163.3 million, (b) additional compensatory and punitive damages to be determined in a proceeding on damages pursuant to CPLR 3215, (c) interest on the foregoing, and (d) reasonable attorneys' fees and the disbursements, costs, and expenses of this action.

**Notice:**

The nature of this action is:

      This action arises out of plaintiffs' purchases of $163.3 million in various class of notes issued in connection with three collateralized debt obligations commonly known as Octans II

CDO ("Octans"), Sagittarius CDO I ("Sagittarius") and Longshore CDO Funding 2007-3 ("Longshore") as follows:

1. Octans:  Loreley Financing (Jersey) No. 5 Limited purchased and is the owner of $41 million Octans Class A-2 notes, $30 million Octans Class B notes, and $23 million Octans Class C-1 notes; and

2. Sagittarius: (a) Loreley Financing (Jersey) No. 15 Limited purchased and is the owner of $5 million Sagittarius Class A notes, and (b) Loreley Financing (Jersey) No. 28 Limited purchased and is the owner of $5 million Sagittarius Class B notes.

3. Longshore:  (a) Loreley Financing (Jersey) No. 30 Limited purchased and is the owner of $13.6 million of Longshore Class A-3 notes, (b) Loreley Financing (Jersey) No. 5 Limited purchased and is the owner of $37.7 million Longshore Class B notes, and (c) Loreley Financing (Jersey) No. 3 Limited purchased and is the owner of $8 million Longshore Class C notes;

Wells Fargo Securities, LLC (as successor to Wachovia Capital Markets, LLC), Wells Fargo Bank, N.A. (as successor to Wachovia Bank, N.A.), and Wells Fargo Securities International Limited (as successor to Wachovia Securities International Limited and Structured Asset Investors, LLC) (collectively, the "Wells Fargo Defendants") were responsible for the creation, marketing and sale of, and the selection of the underlying collateral assets for Longshore and Sagittarius.  The Wells Fargo Defendants, together with Defendant Harding Advisory LLC, were responsible for the creation, marketing and sale of, and the selection of the underlying collateral assets for Octans.  Defendants made material misrepresentations to the plaintiffs, omitted material facts, conspired to defraud plaintiffs, were responsible for fraudulent conveyances, aided and abetted others' frauds, and were unjustly enriched in connection with plaintiffs' investments in Longshore, Octans and Sagittarius.  Plaintiffs assert causes of action against defendants for rescission, fraud, conspiracy to defraud, fraudulent conveyance, aiding and abetting fraud and unjust enrichment.

The relief sought by plaintiffs is (1) rescission, in whole or in part, of the purchases of each of the above-described notes by the plaintiffs; (2) an order requiring defendants to return to plaintiffs the purchase prices they paid for the above-described notes, less any benefit to the plaintiffs; (3) an award of damages in an amount to be determined at trial, but in no event less than $163.3 million, together with interest thereon since the date of the purchases of the above-described notes by plaintiffs; (4) an order requiring disgorgement and restitution of all ill-gotten gains, profits, and fees unjustly obtained by defendants, in an amount to be determined at trial; (5) imposition of a constructive trust over the monies wrongfully obtained by defendants; (6) an award of punitive damages; (7) an award of reasonable attorneys' fees and the disbursements, costs, and expenses of this action; (8) prejudgment interest and post-judgment interest; and (9) such other and further relief as the Court deems to be just and proper.

Dated: New York, NY
          November 1, 2011

_/s/ Marc E. Kasowitz_____
Marc E. Kasowitz
Sheron Korpus
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

James M. Ringer
MEISTER SEELIG & FEIN LLP
140 East 45th Street, 19th Floor
New York, NY 10017
(212) 655-3500

*Attorneys for Plaintiffs Loreley Financing (Jersey) No. 3; Loreley Financing (Jersey) No. 5; Loreley Financing (Jersey) No. 15; Loreley Financing (Jersey) No. 28; Loreley Financing (Jersey) No. 30*

**Defendants' Addresses:**

Wells Fargo Securities, LLC
301 South College Street, Suite 800
Charlotte, North Carolina 28288-0630

Wells Fargo Securities International Limited
1 Plantation Place, 30 Fenchurch Street
London EC3M 3BD, United Kingdom

Wells Fargo Bank, N.A.
101 North Phillips Street,
Sioux Falls, SD 57104

Harding Advisory LLC
2 World Financial Center, 36th Floor
New York, New York 10281

Longshore CDO Funding 2007-3, Ltd.
c/o Deutsche Bank (Cayman) Limited
PO Box 1984
171 Elgin Ave., Boundary Hall
Cricket Square, Grand Cayman
Cayman Islands

Longshore CDO Funding 2007-3 LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

Octans II CDO Ltd.
c/o Maples and Calder Ltd.
PO Box 309
Ugland House
South Church Street
George Town, Grand Cayman
Cayman Islands

Octans II CDO LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

Sagittarius CDO I Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT, Queensgate House

113 South Church Street
George Town, Grand Cayman
Cayman Islands

Sagittarius CDO I LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LORELEY FINANCING (JERSEY) NO. 3
LIMITED, et al.;

            Plaintiffs.

            -v-

WELLS FARGO SECURITIES, LLC, et al.

            Defendants.

Index No. 653037/2011

**AFFIDAVIT OF SERVICE UPON
LONGSHORE CDO FUNDING
2007-3, LTD.**

      I, Patricia Dawkins, Process Server, do hereby make oath and do solemnly swear that

1. I am a non-party to this action over the age of 21 years and an adult resident of the Cayman Islands, which is a territory of the United Kingdom;

2. I am employed as a legal assistant by Broadhurst LLC, a law firm whose business address is 40 Linwood Street, George Town, Grand Cayman, Cayman Islands, and I am authorized to serve legal process in the Cayman Islands in the instant matter;

3. On or about February 2, 2012, I was instructed by Kyle Broadhurst, an attorney admitted to practice law in the Cayman Islands and employed by Broadhurst LLC, in turn acting upon the instructions of Legal Language Services, an international litigation support firm located in Leawood, Kansas, in turn acting upon the instructions of Plaintiffs' attorneys with the US law firm of Kasowitz, Benson, Torres & Friedman, to serve upon Defendant Longshore CDO Funding 2007-3, Ltd. ("Longshore") the following documents, a copy of which is attached hereto as Exhibit A:

- Hague Service Convention *"Notice"*
- Hague Service Convention *"Summary"*
- *Summons With Notice*

4. According to the Cayman Islands' Registrar of Companies, Longshore's registered office is c/o Deutsche Bank (Cayman) Ltd., Boundary Hall, Cricket Square, 171 Elgin Avenue, George Town, Grand Cayman, Cayman Islands (See Cayman Islands Registrar of Companies Search Report, attached hereto as Exhibit B);

5. On the 2nd day of February 2012, at approximately 10:23 am. I personally traveled to the offices of Deutsche Bank (Cayman) Ltd. where I met with a receptionist, an Asian female; I told her that I had documents for service upon Longshore and handed her the above-referenced documents along with Broadhurst LLC's cover letter; she left to give the documents and letter to David Dyer, Director of Deutsche Bank (Cayman) Ltd.; when she returned she said that Mr. Dyer had accepted the documents and had signed the cover letter, attached hereto as Exhibit A, confirming receipt.

6. I believe service upon Longshore CDO Funding 2007-3, Ltd. to have been effected in accordance with a method prescribed by the internal laws of the Cayman Islands for civil matters within this jurisdiction and thus in accordance with Article 10(b) of the *Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*; and

7. All information herein given accords with the rules and customary procedures applicable and operative in the Cayman Islands at the time of effecting service.

I declare under penalty of perjury under the laws of the United States and the Cayman Islands that the foregoing statements are true and accurate to the best of my knowledge and belief.

Patricia Dawkins, Process Server

Sworn before me in George Town                    )

Grand Cayman, Cayman Islands                     )

This 17th day of February 2012                       )

Notary Public

# EXHIBIT A

# COPY OF DOCUMENTS SERVED

**NOTICE**
*(recommended by the Fourteenth Session of
Hague Conference of October, 1980)*

**identité et adresse du destinataire**
*identity and address of the addressee*

---

LONGSHORE CDO FUNDING 2007-3, LTD.
*in care of* Deutsche Bank (Cayman) Limited
Boundary Hall, Cricket Square
171 Elgin Avenue
P.O. Box 1984
George Town
Grand Cayman KY1-1104
CAYMAN ISLANDS
**-OR-**
Wherever the defendant may be found in the Cayman Islands

---

**TRÈS IMPORTANT**

LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS. LES "ELÉMENTS ESSENTIELS DE L'ACTE" VOUS DONNENT QUELQUES INFORMATIONS SUR SA NATURE ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MÊME DU DOCUMENT. IL PEUT ÊTRE NÉCESSAIRE DE DEMANDER UN AVIS JURIDIQUE.

SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITÉ D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE SOIT DANS VOTRE PAYS SOIT DANS LE PAYS D'ORIGINE DU DOCUMENT.

LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITÉS D'OBTENIR L'ASSISTANCE JUDICIAIRE OU LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ÊTRE ADRESSÉES :

Legal Services for New York City
350 Broadway
New York, New York  10013
U.S.A.
Tel. 1.212.431.7200

**IMPORTANT**

THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND OBLIGATIONS. THE "SUMMARY OF THE DOCUMENT TO BE SERVED" WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD, HOWEVER, READ THE DOCUMENT ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.

IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.

ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:

Legal Services for New York City
350 Broadway
New York, New York  10013
U.S.A.
Tel. 1.212.431.7200

Index: 653037/2011

## SUMMARY OF THE DOCUMENT TO BE SERVED
### *ELEMENTS ESSENTIELS DE L'ACTE*

Convention on the service abroad of judicial and extrajudicial documents in civil or commercial
matters, signed at The Hague, November 15, 1965.
*Convention relative à la signification et à la notification à l'étranger des actes judiciaires et extrajudiciares
en matière civile ou commerciale, signée à La Haye, le 15 Novembre 1965.*

(article 5, fourth paragraph)
*(article 5, alinéa 4)*

Name and address of the requesting authority: Karina Shreefer, Esq.
*Nom et adresse de l'autorité requérante :*   LEGAL LANGUAGE SERVICES
8014 State Line Road, Suite 110, Leawood, Kansas 66208, U.S.A.
Tel. 1.913.341.3167

Particulars of the parties*:
*Identité des parties :*   LORELEY FINANCING (JERSEY) NO. 3 LIMITED, et al., *Plaintiffs*
WELLS FARGO SECURITIES, LLC; WELLS FARGO SECURITIES INTERNATIONAL LIMITED; WELLS FARGO BANK, N.A.;
HARDING ADVISORY LLC; OCTANS II CDO LTD.; OCTANS II CDO LLC; SAGITTARIUS CDO I LTD.; SAGITTARIUS CDO I LLC;
**LONGSHORE CDO FUNDING 2007-3, LTD.**; and LONGSHORE CDO FUNDING 2007-3 LLC, *Defendants*

### JUDICIAL DOCUMENT**
### *ACTE JUDICIAIRE*

Nature and purpose of the document:
*Nature et objet de l'acte :*   To give notice to the Defendant of the commencement of a civil claim against it
and to summon it to answer or otherwise respond.

Nature and purpose of the proceedings and, where appropriate, the amount in dispute:
*Nature et objet de l'instance, le cas échéant, le montant du litige :*   A civil action has been commenced against the Defendant.

Date and place for entering appearance**:
*Date et lieu de la comparution :*   Within thirty (30) days after service of the Summons (not counting the day of service itself) before the Clerk
of the Supreme Court of the State of New York, County of New York located at: 60 Centre Street, New York, New York 10007, U.S.A.

Court which has given judgment**:
*Juridiction qui a rendu la décision :*   N/A

Date of judgment**:
*Date de la décision :*   N/A

Time limits stated in the document**:
*Indication des délais figurant dans l'acte :*   Defendant is summoned to appear in this action by serving upon Plaintiff's Attorney (Kasowitz,
Benson, Torres & Friedman LLP and Meister Seeling & Fein LLP) a notice of appearance or demand for the complaint within thirty (30) days
after service of the Summons (not counting the day of service itself). If Defendant fails to appear, judgment will be entered against it by
default.

### EXTRAJUDICIAL DOCUMENT**
### *ACTE EXTRAJUDICIAIRE*

Nature and purpose of the document:
*Nature et objet de l'acte :*   N/A

Time limits stated in the document**:
*Indication des délais figurant dans l'acte :*   N/A

---

\*   If appropriate, identity and address of the person interested in the transmission of the document.
*S'il y a lieu, identité et adresse de la personne intéressée de la transmission de l'acte.*
\*\* Delete if inappropriate.
*Rayer les mentions inutiles.*

★U.S. Government Printing Office: 1990-262-211/15302

FILED: NEW YORK COUNTY CLERK 11/01/2011

NYSCEF DOC. NO. 1

INDEX NO. 653037/2011

RECEIVED NYSCEF: 11/01/2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| LORELEY FINANCING (JERSEY) NO. 3 LIMITED; LORELEY FINANCING (JERSEY) NO. 5 LIMITED; LORELEY FINANCING (JERSEY) NO. 15 LIMITED; LORELEY FINANCING (JERSEY) NO. 28 LIMITED; and LORELEY FINANCING (JERSEY) NO. 30 LIMITED, | Index No. _____ <br><br> Date Purchased: November 1, 2011 <br><br> **SUMMONS WITH NOTICE** |

Plaintiffs,

-v-

WELLS FARGO SECURITIES, LLC; WELLS
FARGO SECURITIES INTERNATIONAL
LIMITED; WELLS FARGO BANK, N.A.;
HARDING ADVISORY LLC; OCTANS II
CDO LTD.; OCTANS II CDO LLC;
SAGITTARIUS CDO I LTD.; SAGITTARIUS
CDO I LLC; LONGSHORE CDO FUNDING
2007-3, LTD.; and LONGSHORE CDO
FUNDING 2007-3 LLC

Defendants.

Plaintiffs designate New York County as
the place of trial.

The basis of venue is CPLR Article 5,
including CPLR 501 and 509.

TO THE PERSONS NAMED AS DEFENDANTS ABOVE:

PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to appear in this
action by serving upon the plaintiffs' attorneys, at the address set forth below, a notice of
appearance or demand for the complaint within 20 days after the service of this Summons (not
counting the day of service itself), or within 30 days after service is complete if the Summons is
not delivered personally to you within the State of New York.

Should defendants fail to appear, judgment will be entered against defendants by default
for the sum of (a) $163.3 million, (b) additional compensatory and punitive damages to be
determined in a proceeding on damages pursuant to CPLR 3215, (c) interest on the foregoing,
and (d) reasonable attorneys' fees and the disbursements, costs, and expenses of this action.

**Notice:**

The nature of this action is:

This action arises out of plaintiffs' purchases of $163.3 million in various class of notes
issued in connection with three collateralized debt obligations commonly known as Octans II

CDO ("Octans"), Sagittarius CDO I ("Sagittarius") and Longshore CDO Funding 2007-3 ("Longshore") as follows:

1. Octans:  Loreley Financing (Jersey) No. 5 Limited purchased and is the owner of $41 million Octans Class A-2 notes, $30 million Octans Class B notes, and $23 million Octans Class C-1 notes; and

2. Sagittarius: (a) Loreley Financing (Jersey) No. 15 Limited purchased and is the owner of $5 million Sagittarius Class A notes, and (b) Loreley Financing (Jersey) No. 28 Limited purchased and is the owner of $5 million Sagittarius Class B notes.

3. Longshore:  (a) Loreley Financing (Jersey) No. 30 Limited purchased and is the owner of $13.6 million of Longshore Class A-3 notes, (b) Loreley Financing (Jersey) No. 5 Limited purchased and is the owner of $37.7 million Longshore Class B notes, and (c) Loreley Financing (Jersey) No. 3 Limited purchased and is the owner of $8 million Longshore Class C notes;

Wells Fargo Securities, LLC (as successor to Wachovia Capital Markets, LLC), Wells Fargo Bank, N.A. (as successor to Wachovia Bank, N.A.), and Wells Fargo Securities International Limited (as successor to Wachovia Securities International Limited and Structured Asset Investors, LLC) (collectively, the "Wells Fargo Defendants") were responsible for the creation, marketing and sale of, and the selection of the underlying collateral assets for Longshore and Sagittarius.  The Wells Fargo Defendants, together with Defendant Harding Advisory LLC, were responsible for the creation, marketing and sale of, and the selection of the underlying collateral assets for Octans.  Defendants made material misrepresentations to the plaintiffs, omitted material facts, conspired to defraud plaintiffs, were responsible for fraudulent conveyances, aided and abetted others' frauds, and were unjustly enriched in connection with plaintiffs' investments in Longshore, Octans and Sagittarius.  Plaintiffs assert causes of action against defendants for rescission, fraud, conspiracy to defraud, fraudulent conveyance, aiding and abetting fraud and unjust enrichment.

The relief sought by plaintiffs is (1) rescission, in whole or in part, of the purchases of each of the above-described notes by the plaintiffs; (2) an order requiring defendants to return to plaintiffs the purchase prices they paid for the above-described notes, less any benefit to the plaintiffs; (3) an award of damages in an amount to be determined at trial, but in no event less than $163.3 million, together with interest thereon since the date of the purchases of the above-described notes by plaintiffs; (4) an order requiring disgorgement and restitution of all ill-gotten gains, profits, and fees unjustly obtained by defendants, in an amount to be determined at trial; (5) imposition of a constructive trust over the monies wrongfully obtained by defendants; (6) an award of punitive damages; (7) an award of reasonable attorneys' fees and the disbursements, costs, and expenses of this action; (8) prejudgment interest and post-judgment interest; and (9) such other and further relief as the Court deems to be just and proper.

Dated:  New York, NY
        November 1, 2011

_/s/ Marc E. Kasowitz_____
Marc E. Kasowitz
Sheron Korpus
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

James M. Ringer
MEISTER SEELIG & FEIN LLP
140 East 45th Street, 19th Floor
New York, NY 10017
(212) 655-3500

*Attorneys for Plaintiffs Loreley Financing (Jersey) No.
3; Loreley Financing (Jersey) No. 5; Loreley Financing
(Jersey) No. 15; Loreley Financing (Jersey) No. 28;
Loreley Financing (Jersey) No. 30*

**Defendants' Addresses:**

Wells Fargo Securities, LLC
301 South College Street, Suite 800
Charlotte, North Carolina 28288-0630

Wells Fargo Securities International Limited
1 Plantation Place, 30 Fenchurch Street
London EC3M 3BD, United Kingdom

Wells Fargo Bank, N.A.
101 North Phillips Street,
Sioux Falls, SD 57104

Harding Advisory LLC
2 World Financial Center, 36th Floor
New York, New York 10281

Longshore CDO Funding 2007-3, Ltd.
c/o Deutsche Bank (Cayman) Limited
PO Box 1984
171 Elgin Ave., Boundary Hall
Cricket Square, Grand Cayman
Cayman Islands

Longshore CDO Funding 2007-3 LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

Octans II CDO Ltd.
c/o Maples and Calder Ltd.
PO Box 309
Ugland House
South Church Street
George Town, Grand Cayman
Cayman Islands

Octans II CDO LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

Sagittarius CDO I Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT, Queensgate House

113 South Church Street
George Town, Grand Cayman
Cayman Islands

Sagittarius CDO I LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

5

# EXHIBIT B

# CAYMAN ISLANDS REGISTRAR OF COMPANIES REPORT



**CAYMAN ISLANDS**

## Search Report

-----------------------------------------------------------------------------------------------------

Entity Name:  LONGSHORE CDO FUNDING 2007-3, LTD.

Jurisdiction:  Cayman Islands

File Number:  167807

Formation Date:  18-May-2006
Registration Date:  18-May-2006

Entity Type:  Company:EXEMPT

Registered Office:  DEUTSCHE BANK (CAYMAN) LIMITED
PO Box 1984
171 Elgin Ave., Boundary Hall,
Cricket Square, Grand Cayman,
Cayman Islands


Status:  ACTIVE
Status Date:  18-May-2006

-----------------------------------------------------------------------------------------------------

- INFORMATION REGARDING THE CORPORATE RECORDS AND REGISTERS ARE
  NOT AVAILABLE FOR PUBLIC INSPECTION.
- THIS REPORT DOES NOT CONFIRM THAT THE ENTITY IS IN GOOD STANDING.

# EXHIBIT C

# SIGNED LETTER CONFIRMING RECEIPT



**BROADHURST** LLC
ATTORNEYS-AT-LAW

<u>**DELIVERED BY HAND**</u>

February 2, 2012

LONGSHORE CDO FUNDING 2007-3, LTD
In Care of Deutsche Bank (Cayman) Limited
Boundary Hall, Cricket Square
171 Elgin Avenue
P.O. Box 1984
George Town Grand Cayman KY1-1104
CAYMAN ISLANDS

Dear Sirs,

**Re:**   *Loreley Financing (Jersey) No. 3 et al. v. Wells Fargo Securities, LLC, et al*

We have been instructed with respect to the service of the following documents upon you:

1. Hague Service Convention *"Notice";*
2. Hague Service Convention *"Summary";*
3. Summons with Notice.

The documents have been attached to this letter. We would be grateful if you would confirm receipt by executing this letter appended hereto.

Yours sincerely,
**Broadhurst LLC**

Kyle Broadhurst

DAVID DYER        10:23am
                  2/2/12

P.O. Box 2503, Grand Cayman KY1-1104, Cayman Islands | Tel: (345) 949-7237 | Fax: (345) 949-7725

# EXHIBIT 3

Case 2011 NY Slip Op 3... Document 1... Filed 05/10/12   Page 33 of 140

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LORELEY FINANCING (JERSEY) NO. 3
LIMITED, et al.;

              Plaintiffs.

              -v-

WELLS FARGO SECURITIES, LLC, et al.

              Defendants.

Index No. 653037/2011

**AFFIDAVIT OF SERVICE UPON
SAGITTARIUS CDO I LTD.**

I, Patricia Dawkins, Process Server, do hereby make oath and do solemnly swear that

1.  I am a non-party to this action over the age of 21 years and an adult resident of the Cayman Islands, which is a territory of the United Kingdom;

2.  I am employed as a legal assistant by Broadhurst LLC, a law firm whose business address is 40 Linwood Street, George Town, Grand Cayman, Cayman Islands, and I am authorized to serve legal process in the Cayman Islands in the instant matter;

3.  On or about February 2, 2012, I was instructed by Kyle Broadhurst, an attorney admitted to practice law in the Cayman Islands and employed by Broadhurst LLC, in turn acting upon the instructions of Legal Language Services, an international litigation support firm located in Leawood, Kansas, in turn acting upon the instructions of Plaintiffs' attorneys with the US law firm of Kasowitz, Benson, Torres & Friedman, to serve upon Defendant Sagittarius CDO I Ltd. ("Sagittarius") the following documents, a copy of which is attached hereto as Exhibit A:

    •  Hague Service Convention "*Notice*"
    •  Hague Service Convention "*Summary*"
    •  *Summons With Notice*

4.  According to the Cayman Islands' Registrar of Companies, Sagittarius's registered office is c/o Maples Finance Services Ltd., Queensgate House, 113 South Church Street Town, Cayman Islands. (See Cayman Islands Registrar of Companies Search Report, attached hereto as Exhibit B); however, Maples Finance Services Limited, has moved and is now located at Boundary Hall, Cricket Square, 171 Elgin Avenue, George Town, Grand Cayman, Cayman Islands.

5.  On the 2nd day of February 2012, at approximately 10.30 a.m., I personally traveled to the offices of Maples Finance Services Limited, a department of Maples and Calder, where I met with Carrie Burton, the director of Sagittarius who confirmed her identity with me; I told Ms. Burton that I had documents for service upon Sagittarius; Ms. Burton said that Maples Finance Services Limited had resigned as agent due to non-payment of fees to the Cayman Islands Registrar of Companies but since the resignation had not been submitted to the Registrar, she would accept service of process on behalf of Sagittarius; I  handed her the above-referenced documents, which she accepted, and she signed Broadhurst LLC's cover letter, attached hereto as Exhibit C, confirming receipt;

6.  Ms. Burton is a Caucasian female, 5'8" in height, and is in her mid 40's;

7.  I believe service upon Sagittarius CDO I Ltd. to have been effected in accordance with a method prescribed by the internal laws of the Cayman Islands for civil matters within this jurisdiction and thus in accordance with Article 10(b) of the *Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*; and

8.  All information herein given accords with the rules and customary procedures applicable and operative in the Cayman Islands at the time of effecting service.

I declare under penalty of perjury under the laws of the United States and the Cayman Islands that the foregoing statements are true and accurate to the best of my knowledge and belief.

Patricia Dawkins, Process Server

Sworn before me in George Town       )

Grand Cayman, Cayman Islands     )

This _17th_ day of February 2012      )

Notary Public

# EXHIBIT A

# COPY OF DOCUMENTS SERVED

**NOTICE**
*(recommended by the Fourteenth Session of*
*Hague Conference of October, 1980)*

**identité et adresse du destinataire**
*identity and address of the addressee*

> SAGITTARIUS CDO I LTD.
> *in care of its registered agent*
> Maples Finance Limited
> P.O. Box 1093 GT
> Queensgate House
> 113 South Church Street
> George Town
> Grand Cayman
> CAYMAN ISLANDS
> **-OR-**
> Wherever the defendant may be found in the Cayman Islands

**TRÈS IMPORTANT**

LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS. LES "ÉLÉMENTS ESSENTIELS DE L'ACTE" VOUS DONNENT QUELQUES INFORMATIONS SUR SA NATURE ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MÊME DU DOCUMENT. IL PEUT ÊTRE NÉCESSAIRE DE DEMANDER UN AVIS JURIDIQUE.

SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITÉ D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE SOIT DANS VOTRE PAYS SOIT DANS LE PAYS D'ORIGINE DU DOCUMENT.

LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITÉS D'OBTENIR L'ASSISTANCE JUDICIAIRE OU LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ÊTRE ADRESSÉES :

Legal Services for New York City
350 Broadway
New York, New York  10013
U.S.A.
Tel. 1.212.431.7200

**IMPORTANT**

THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND OBLIGATIONS. THE "SUMMARY OF THE DOCUMENT TO BE SERVED" WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD, HOWEVER, READ THE DOCUMENT ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.

IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.

ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:

Legal Services for New York City
350 Broadway
New York, New York  10013
U.S.A.
Tel. 1.212.431.7200

Index: 653037/2011

## SUMMARY OF THE DOCUMENT TO BE SERVED
*ELEMENTS ESSENTIELS DE L'ACTE*

Convention on the service abroad of judicial and extrajudicial documents in civil or commercial
matters, signed at The Hague, November 15, 1965.
*Convention relative à la signification et à la notification à l'étranger des actes judiciaires et extrajudiciares*
*en matière civile ou commerciale, signée à La Haye, le 15 Novembre 1965.*

**(article 5, fourth paragraph)**
*(article 5, alinéa 4)*

Name and address of the requesting authority: Karina Shreefer, Esq.
*Nom et adresse de l'autorité requérante :*    LEGAL LANGUAGE SERVICES

8014 State Line Road, Suite 110, Leawood, Kansas 66208, U.S.A.

Tel. 1.913.341.3167

Particulars of the parties*:
*Identité des parties :*    LORELEY FINANCING (JERSEY) NO. 3 LIMITED, et al., *Plaintiffs*

WELLS FARGO SECURITIES, LLC; WELLS FARGO SECURITIES INTERNATIONAL LIMITED; WELLS FARGO BANK, N.A.;

HARDING ADVISORY LLC; OCTANS II CDO LTD.; OCTANS II CDO LLC; **SAGITTARIUS CDO I LTD.**; SAGITTARIUS CDO I LLC;

LONGSHORE CDO FUNDING 2007-3, LTD.; and LONGSHORE CDO FUNDING 2007-3 LLC, *Defendants*

### JUDICIAL DOCUMENT**
*ACTE JUDICIAIRE*

Nature and purpose of the document:
*Nature et objet de l'acte :*    To give notice to the Defendant of the commencement of a civil claim against it

and to summon it to answer or otherwise respond.

Nature and purpose of the proceedings and, where appropriate, the amount in dispute:
*Nature et objet de l'instance, le cas échéant, le montant du litige :*    A civil action has been commenced against the Defendant.

Date and place for entering appearance**:
*Date et lieu de la comparution :*    Within thirty (30) days after service of the Summons (not counting the day of service itself) before the Clerk

of the Supreme Court of the State of New York, County of New York located at: 60 Centre Street, New York, New York 10007, U.S.A.

Court which has given judgment**:
*Juridiction qui a rendu la décision :*    N/A

Date of judgment**:
*Date de la décision :*    N/A

Time limits stated in the document**:
*Indication des délais figurant dans l'acte :*    Defendant is summoned to appear in this action by serving upon Plaintiff's Attorney (Kasowitz,

Benson, Torres & Friedman LLP and Meister Seeling & Fein LLP) a notice of appearance or demand for the complaint within thirty (30) days

after service of the Summons (not counting the day of service itself).  If Defendant fails to appear, judgment will be entered against it by
default.

### EXTRAJUDICIAL DOCUMENT**
*ACTE EXTRAJUDICIAIRE*

Nature and purpose of the document:
*Nature et objet de l'acte :*    N/A

Time limits stated in the document**:
*Indication des délais figurant dans l'acte :*    N/A

---

\*   If appropriate, identity and address of the person interested in the transmission of the document.
   *S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte.*
\*\*   Delete if inappropriate.                               **\*U.S. Government Printing Office: 1990-262-211/15302**
   *Rayer les mentions inutiles.*

FILED: NEW YORK COUNTY CLERK 11/01/2011

INDEX NO. 653037/2011

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 11/01/2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| LORELEY FINANCING (JERSEY) NO. 3 LIMITED; LORELEY FINANCING (JERSEY) NO. 5 LIMITED; LORELEY FINANCING (JERSEY) NO. 15 LIMITED; LORELEY FINANCING (JERSEY) NO. 28 LIMITED; and LORELEY FINANCING (JERSEY) NO. 30 LIMITED, | Index No. _____ |

Plaintiffs,

-v-

WELLS FARGO SECURITIES, LLC; WELLS
FARGO SECURITIES INTERNATIONAL
LIMITED; WELLS FARGO BANK, N.A.;
HARDING ADVISORY LLC; OCTANS II
CDO LTD.; OCTANS II CDO LLC;
SAGITTARIUS CDO I LTD.; SAGITTARIUS
CDO I LLC; LONGSHORE CDO FUNDING
2007-3, LTD.; and LONGSHORE CDO
FUNDING 2007-3 LLC

Defendants.

Date Purchased: November 1, 2011

**SUMMONS WITH NOTICE**

Plaintiffs designate New York County as
the place of trial.

The basis of venue is CPLR Article 5,
including CPLR 501 and 509.

TO THE PERSONS NAMED AS DEFENDANTS ABOVE:

     PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to appear in this action by serving upon the plaintiffs' attorneys, at the address set forth below, a notice of appearance or demand for the complaint within 20 days after the service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

     Should defendants fail to appear, judgment will be entered against defendants by default for the sum of (a) $163.3 million, (b) additional compensatory and punitive damages to be determined in a proceeding on damages pursuant to CPLR 3215, (c) interest on the foregoing, and (d) reasonable attorneys' fees and the disbursements, costs, and expenses of this action.

**Notice:**

The nature of this action is:

     This action arises out of plaintiffs' purchases of $163.3 million in various class of notes issued in connection with three collateralized debt obligations commonly known as Octans II

CDO ("Octans"), Sagittarius CDO I ("Sagittarius") and Longshore CDO Funding 2007-3 ("Longshore") as follows:

1. Octans:  Loreley Financing (Jersey) No. 5 Limited purchased and is the owner of $41 million Octans Class A-2 notes, $30 million Octans Class B notes, and $23 million Octans Class C-1 notes; and

2. Sagittarius: (a) Loreley Financing (Jersey) No. 15 Limited purchased and is the owner of $5 million Sagittarius Class A notes, and (b) Loreley Financing (Jersey) No. 28 Limited purchased and is the owner of $5 million Sagittarius Class B notes.

3. Longshore:  (a) Loreley Financing (Jersey) No. 30 Limited purchased and is the owner of $13.6 million of Longshore Class A-3 notes, (b) Loreley Financing (Jersey) No. 5 Limited purchased and is the owner of $37.7 million Longshore Class B notes, and (c) Loreley Financing (Jersey) No. 3 Limited purchased and is the owner of $8 million Longshore Class C notes;

Wells Fargo Securities, LLC (as successor to Wachovia Capital Markets, LLC), Wells Fargo Bank, N.A. (as successor to Wachovia Bank, N.A.), and Wells Fargo Securities International Limited (as successor to Wachovia Securities International Limited and Structured Asset Investors, LLC) (collectively, the "Wells Fargo Defendants") were responsible for the creation, marketing and sale of, and the selection of the underlying collateral assets for Longshore and Sagittarius.  The Wells Fargo Defendants, together with Defendant Harding Advisory LLC, were responsible for the creation, marketing and sale of, and the selection of the underlying collateral assets for Octans.  Defendants made material misrepresentations to the plaintiffs, omitted material facts, conspired to defraud plaintiffs, were responsible for fraudulent conveyances, aided and abetted others' frauds, and were unjustly enriched in connection with plaintiffs' investments in Longshore, Octans and Sagittarius.  Plaintiffs assert causes of action against defendants for rescission, fraud, conspiracy to defraud, fraudulent conveyance, aiding and abetting fraud and unjust enrichment.

The relief sought by plaintiffs is (1) rescission, in whole or in part, of the purchases of each of the above-described notes by the plaintiffs; (2) an order requiring defendants to return to plaintiffs the purchase prices they paid for the above-described notes, less any benefit to the plaintiffs; (3) an award of damages in an amount to be determined at trial, but in no event less than $163.3 million, together with interest thereon since the date of the purchases of the above-described notes by plaintiffs; (4) an order requiring disgorgement and restitution of all ill-gotten gains, profits, and fees unjustly obtained by defendants, in an amount to be determined at trial; (5) imposition of a constructive trust over the monies wrongfully obtained by defendants; (6) an award of punitive damages; (7) an award of reasonable attorneys' fees and the disbursements, costs, and expenses of this action; (8) prejudgment interest and post-judgment interest; and (9) such other and further relief as the Court deems to be just and proper.

Dated: New York, NY
        November 1, 2011

  /s/ Marc E. Kasowitz
Marc E. Kasowitz
Sheron Korpus
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

James M. Ringer
MEISTER SEELIG & FEIN LLP
140 East 45th Street, 19th Floor
New York, NY 10017
(212) 655-3500

*Attorneys for Plaintiffs Loreley Financing (Jersey) No. 3; Loreley Financing (Jersey) No. 5; Loreley Financing (Jersey) No. 15; Loreley Financing (Jersey) No. 28; Loreley Financing (Jersey) No. 30*

**Defendants' Addresses:**

Wells Fargo Securities, LLC
301 South College Street, Suite 800
Charlotte, North Carolina 28288-0630

Wells Fargo Securities International Limited
1 Plantation Place, 30 Fenchurch Street
London EC3M 3BD, United Kingdom

Wells Fargo Bank, N.A.
101 North Phillips Street,
Sioux Falls, SD 57104

Harding Advisory LLC
2 World Financial Center, 36th Floor
New York, New York 10281

Longshore CDO Funding 2007-3, Ltd.
c/o Deutsche Bank (Cayman) Limited
PO Box 1984
171 Elgin Ave., Boundary Hall
Cricket Square, Grand Cayman
Cayman Islands

Longshore CDO Funding 2007-3 LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

Octans II CDO Ltd.
c/o Maples and Calder Ltd.
PO Box 309
Ugland House
South Church Street
George Town, Grand Cayman
Cayman Islands

Octans II CDO LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

Sagittarius CDO I Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT, Queensgate House

113 South Church Street
George Town, Grand Cayman
Cayman Islands

Sagittarius CDO I LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

# EXHIBIT B

# CAYMAN ISLANDS REGISTRAR OF COMPANIES REPORT



**CAYMAN ISLANDS**

### Search Report

----------------------------------------------------------------------------------

Entity Name:          SAGITTARIUS CDO I LTD.

Jurisdiction:         Cayman Islands

File Number:          174673

Formation Date:       26-Sep-2006
Registration Date:    26-Sep-2006

Entity Type:          Company:EXEMPT

Registered Office:    MAPLESFS LIMITED
                      PO Box 1093
                      QUEENSGATE HOUSE,
                      113 SOUTH CHURCH STREET,
                      CAYMAN ISLANDS


Status:               ACTIVE
Status Date:          26-Sep-2006

----------------------------------------------------------------------------------

-   INFORMATION REGARDING THE CORPORATE RECORDS AND REGISTERS ARE
    NOT AVAILABLE FOR PUBLIC INSPECTION.
-   THIS REPORT DOES NOT CONFIRM THAT THE ENTITY IS IN GOOD STANDING.

# EXHIBIT C

# SIGNED LETTER CONFIRMING RECEIPT


**BROADHURST** LLC
ATTORNEYS-AT-LAW

<u>**DELIVERED BY HAND**</u>

February 2, 2012

SAGITTARIUS CDO I LTD.
In care of its registered agent
Maples Finance Limited
P.O. Box 1093 GT
Queensgate House
113 South Church Street
George Town Grand Cayman
CAYMAN ISLANDS

Dear Sirs,

**Re:** *Loreley Financing (Jersey) No. 3 et al. v. Wells Fargo Securities, LLC, et al*

We have been instructed with respect to the service of the following documents upon you:

1. Hague Service Convention *"Notice"*;
2. Hague Service Convention *"Summary"*;
3. Summons with Notice.

The documents have been attached to this letter. We would be grateful if you would confirm receipt by executing this letter appended hereto.

Yours sincerely,
**Broadhurst LLC**

Kyle Broadhurst

Accept however please note we have resigned our
services due to non-payment of our fees. Will follow
up with M+C re filing of resignation documents with
Register of companies

Carrie Bunton
Feb 2/2012

# EXHIBIT 4

Index No.  653037/2011

| | |
|---|---|
| LORELEY FINANCING (JERSEY) NO. 3 LIMITED | Calendar No. |
| *Plaintiff(s) Petitioner(s)* | |
| *against* | *l~ AFFIDAVIT* |
| WELLS FARGO SECURITIES, LLC  et al | *OF* |
| *Defendant)s) Respondent(s)* | *SERVICE* |

STATE OF DELAWARE, COUNTY OF: NEW CASTLE                          Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at  Wilmington, DE

On  2/21/12                          at 2:50 pm   .M., at  C/O REGISTERED AGENT DONALD J. PUGLISI 850 LIBRARY AVE. STE. 204 NEWARK, DE 19711
deponent served the within
☐ summons and complaint
☐ subpoena duces tecum
☐ citation          ☒ SUMMONS WITH NOTICE
on
LONGSHORE CDO FUNDING 2007-3 LLC          ☒ defendant  ☐ witness   hereinafter called   therein
                                                           ☐ -espondent               the recipient   lamed

**INDIVIDUAL** 1. ☐   by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION** 2. ☒   a DELAWARE                          corporation, by delivering thereat a true *copy of each* to DONALD J. PUGLISI
personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be  PROCESS AGENT- AUTHORIZED PERSON                          thereof

**SUITABLE AGE PERSON** 3. ☐   by delivering thereat a true copy *of each* to                          a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC.** 4. ☐   by affixing a true copy of *each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4** 5A. ☒   Deponent talked to                          at said premises who stated that recipient ☐ lived ☐ worked there.
Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at                          and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4** 5B. ☐   Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at                          in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION** ☐

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ Male | ☒ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☐ Female | ☐ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☐ 131-160 Lbs. |
| | ☐ Brown Skin | ☒ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [- I Over 6' | | ☒ Over 200 Lbs. |

☐   Other identifying features:

**WITNESS FEES** ☐   $                          the authorizing traveling expenses  ☐ was paid (tendered) to the recipient
and one days' witness fee:                          ☐ was mailed to the witness with subpeona copy.

**MILITARY SERVICE** ☐   I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore* ordinary *civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on   2/21/12

                                        License No.

                          KEVIN S. DUNN
                          PO BOX 1360 WILMINGTON, DE 19899

MELISSA HARMON
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires 12/29/2015

# EXHIBIT 5

**FILED: NEW YORK COUNTY CLERK 03/01/2012**
NYSCEF DOC. NO. 41 SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK

INDEX NO. 653037/2011
RECEIVED NYSCEF: 03/01/2012

Case 1:12-cv-03723-PAC   Document 1   Filed 05/10/12   Page 51 of 140

INDEX NO. 653037/2011

Index No.  653037/2011

| | |
|---|---|
| LORELEY FINANCING (JERSEY) NO. 3 LIMITED | Calendar No. |
| _Plaintiff(s) Petitioner(s)_ | |
| _against_ | ~ AFFIDAVIT OF SERVICE |
| WELLS FARGO SECURITIES, LLC et al | |
| _Defendant)s) Respondent(s)_ | |

STATE OF DELAWARE, COUNTY OF: NEW CASTLE        Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at  Wilmington, DE

On  2/21/12                    at  2:50 pm    .M., at  C/O REGISTERED AGENT DONALD J. PUGLISI 850 LIBRARY AVE. STE. 204 NEWARK, DE 19711

deponent served the within

- ☐ summons and complaint
- ☐ subpoena duces tecum
- ☐ citation
- ☒  SUMMONS WITH NOTICE

on

OCTANS II CDO LLC        ☒ defendant    ☐ witness    hereinafter called  therein
                          ☐ -espondent              the recipient  lamed

**INDIVIDUAL**
1. ☐    by delivering a true copy _of each_ to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION**
2. ☒    a DELAWARE                    corporation, by delivering thereat a true _copy of each_ to  DONALD J. PUGLISI personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be  PROCESS AGENT- AUTHORIZED PERSON        thereof

**SUITABLE AGE PERSON**
3. ☐    by delivering thereat a true copy _of each_ to                            a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC.**
4. ☐    by affixing a true copy of _each_ to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4**
5A. ☒    Deponent talked to                        at said premises who stated that recipient ☐ lived ☐ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at                            and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4**
5B. ☐    Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at                            in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION**
☐

| ☒ Male | ☒ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
|---|---|---|---|---|---|---|
| ☐ Female | ☐ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☐ 131-160 Lbs. |
| | ☐ Brown Skin | ☒ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. | [- I Over 6' | ☒ Over 200 Lbs. |

☐    Other identifying features:

**WITNESS FEES**
☐    $                    the authorizing traveling expenses    ☐ was paid (tendered) to the recipient
                and one days' witness fee:            ☐ was mailed to the witness with subpeona copy.

**MILITARY SERVICE**
☐    I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient _wore ordinary civilian clothes and no military_ uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on    2/21/12

License No.

KEVIN S. DUNN
PO BOX 1360 WILMINGTON, DE 19899

MELISSA HARMON
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires 12/29/2015

# EXHIBIT 6

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK

Index No. 653037/2011

| | |
|---|---|
| LORELEY FINANCING (JERSEY) NO. 3 LIMITED | Calendar No. |
| | *Plaintiff(s) Petitioner(s)* |
| *against* | ~ *AFFIDAVIT OF SERVICE* |
| WELLS FARGO SECURITIES, LLC et al | *Defendant(s) Respondent(s)* |

STATE OF DELAWARE, COUNTY OF: NEW CASTLE Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at Wilmington, DE

On 2/21/12 at 2:50 pm .M., at C/O REGISTERED AGENT DONALD J. PUGLISI 850 LIBRARY AVE. STE. 204 NEWARK, DE 19711
deponent served the within

☐ summons and complaint
☐ subpoena duces tecum
☐ citation
☒ SUMMONS WITH NOTICE

on SAGITTARIUS CDO I LLC

☒ defendant ☐ witness hereinafter called the recipient
☐ -espondent therein named

**INDIVIDUAL 1.** ☐ by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION 2.** ☒ a DELAWARE corporation, by delivering thereat a true *copy of each* to DONALD J. PUGLISI personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be PROCESS AGENT- AUTHORIZED PERSON thereof

**SUITABLE AGE PERSON 3.** ☐ by delivering thereat a true copy *of each* to a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC. 4.** ☐ by affixing a true copy of *each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4 5A.** ☒ Deponent talked to at said premises who stated that recipient ☐ lived ☐ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4 5B.** ☐ Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION** ☐

| | | | | | |
|---|---|---|---|---|---|
| ☒ Male | ☒ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☐ Female | ☐ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☐ 131-160 Lbs. |
| | ☐ Brown Skin | ☒ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. | [- I Over 6' | ☒ Over 200 Lbs. |

Other identifying features:

☐

**WITNESS FEES** ☐ $ the authorizing traveling expenses ☐ was paid (tendered) to the recipient
and one days' witness fee: ☐ was mailed to the witness with subpeona copy.

**MILITARY SERVICE** ☐ I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on 2/21/12

License No.

KEVIN S. DUNN
PO BOX 1360 WILMINGTON, DE 19899

MELISSA HARMON
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires 12/29/2015

# EXHIBIT 7

## AFFIDAVIT OF SERVICE

State of New York          County of New York          Supreme Court

Index Number: 653037/2011

Plaintiff:
**LORELEY FINANCING (JERSEY) NO. 3 LIMITED, et al**

vs.

Defendant:
**WELLS FARGO SECURITIES, LLC, et al**

For:
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
21st Floor
New York, NY  10019-6799

Received these papers to be served on **HARDING ADVISORY LLC, 55 MADISON AVENUE, MORRISTOWN, NJ.**

I, Manuel Bayo, being duly sworn, depose and say that on the **28th day of February, 2012** at **3:48 pm, I:**

Served HARDING ADVISORY LLC by personally delivering Summons With Notice to Maria Gomez, Agent, who stated that she was authorized to accept on behalf of the above named Entity.

Said documents were conformed with index number and date of filing endorsed thereon.

**Description** of Person Served:  Age: 35,  Sex: F,  Race/Skin Color: Hispanic,  Height: 5'6",  Weight: 130,  Hair: Black,  Glasses: N

I am over the age of 18, am not a party in the above action, and am a Certified Process Server, in good standing, in the jurisdiction in which the process was served.

Subscribed and Sworn to before me on the 29th day
of February, 2012 by the affiant who is personally
known to me.

Tina A. McCarthy
Notary Public, State of New York
No. 01MC6115830
Qualified in Bronx County
Commission Expires 09/13/2012

**Manuel Bayo**
Process Server

Our Job Serial Number: CSU-2020102740
Ref: 09438007

Copyright © 1992-2011 Database Services, Inc. - Process Server's Toolbox V6.4w

# EXHIBIT 8

# AFFIDAVIT OF SERVICE

| State of New York | County of New York | Supreme Court |
|---|---|---|

Index Number: 653037/2011
Date Filed: _____

Plaintiff:
**Loreley Financing (Jersey) No. 3 Limited; Loreley Financing (Jersey) No. 5 Limited; Loreley Financing (Jersey) No. 15 Limited; Loreley Financing (Jersey) No. 28 Limited ; and Loreley Financing (Jersey) No. 30 Limited,**

vs.

Defendant:
**Wells Fargo Securities, LLC, et al.,**

**State of New York, County of Albany)ss.:**

For:
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019

Received these papers to be served on **Harding Advisory LLC**.

I, J.R. O'Rourke, being duly sworn, depose and say that on the **28th day of February, 2012** at **2:30 pm, I:**

Served the within named **LIMITED LIABILITY COMPANY** by delivering two true copies of the **Summons with Notice pursuant to section 303 LLCL together with statutory service fee in the amount of $40.00** to Donna Christie as Business Document Specialist I of The New York State Department of State, 99 Washington Avenue, Albany, NY 12207, the New York State Department of State being the **Registered Agent** of record of the within named limited liability company, in compliance with state statutes.

Said documents were conformed with index number and date of filing was endorsed thereon.

**Description** of Person Served: Age: 49, Sex: F, Race/Skin Color: White, Height: 5' 4", Weight: 160, Hair: Lt. Brown, Glasses: Y

I certify that I am over the age of 18, have no interest in the above action, and am a Process Server in good standing in the jurisdiction in which the process was served.

Subscribed and Sworn to before me on the 29th day of February, 2012 by the affiant who is personally known to me.

_____

NOTARY PUBLIC

**J.R. O'Rourke**
Process Server

PATRICIA A. BURKE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU4922372
Qualified in Albany County
My Commission Expires February 28,

Our Job Serial Number: 2012000614
Ref: 2739

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6.3x

# EXHIBIT 9

FILED: NEW YORK COUNTY CLERK 03/01/2012
Case 1:12-cv-03723-PAC   Document 1   Filed 05/10/12   Page 59 of 140

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| LORELEY FINANCING (JERSEY) NO. 3 LIMITED; LORELEY FINANCING (JERSEY) NO. 5 LIMITED; LORELEY FINANCING (JERSEY) NO. 15 LIMITED; LORELEY FINANCING (JERSEY) NO. 28 LIMITED; and LORELEY FINANCING (JERSEY) NO. 30 LIMITED, | Index No. 653037/2011 |
| Plaintiffs, | **AFFIRMATION OF SERVICE** |
| -v- | |
| WELLS FARGO SECURITIES, LLC; WELLS FARGO SECURITIES INTERNATIONAL LIMITED; WELLS FARGO BANK, N.A.; HARDING ADVISORY LLC; OCTANS II CDO LTD.; OCTANS II CDO LLC; SAGITTARIUS CDO I LTD.; SAGITTARIUS CDO I LLC; LONGSHORE CDO FUNDING 2007-3, LTD.; and LONGSHORE CDO FUNDING 2007-3 LLC | |
| Defendants. | |

SHERON KORPUS, an attorney duly admitted to practice before the Courts of the State of New York, hereby affirms, under the penalty of perjury, the following:

1.     I am a member of the firm of Kasowitz, Benson, Torres & Friedman LLP, one of the attorneys for Plaintiffs.

2.     On February 23, 2012, Barbara H. Wright, Senior Company Counsel at Wells Fargo & Co., accepted service by e-mail of the Summons and Notice filed by Plaintiffs in this

case on behalf of Defendants Wells Fargo Securities, LLC, Wells Fargo Securities International

Limited and Wells Fargo Bank, N.A.


Dated: New York, NY
        March 1, 2012


                              Sheron Korpus

# EXHIBIT 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| LORELEY FINANCING (JERSEY) NO. 3 LIMITED; LORELEY FINANCING (JERSEY) NO. 5 LIMITED; LORELEY FINANCING (JERSEY) NO. 15 LIMITED; LORELEY FINANCING (JERSEY) NO. 28 LIMITED; and LORELEY FINANCING (JERSEY) NO. 30 LIMITED,<br><br>        Plaintiffs,<br><br>        -v-<br><br>WELLS FARGO SECURITIES, LLC; WELLS FARGO SECURITIES INTERNATIONAL LIMITED; WELLS FARGO BANK, N.A.; HARDING ADVISORY LLC; STRUCTURED ASSET INVESTORS, LLC; OCTANS II CDO LTD.; OCTANS II CDO LLC; SAGITTARIUS CDO I LTD.; SAGITTARIUS CDO I LLC; LONGSHORE CDO FUNDING 2007-3, LTD.; and LONGSHORE CDO FUNDING 2007-3 LLC<br><br>        Defendants. | Index No. 653037/2011<br><br>Date Originally Purchased and Filed: November 1, 2011<br><br>Date Supplemental Summons and Notice Filed: March 14, 2012<br><br>**SUPPLEMENTAL SUMMONS WITH NOTICE**<br><br>Plaintiffs designate New York County as the place of trial.<br><br>The basis of venue is CPLR Article 5, including CPLR 501 and 509. |

TO STRUCTURED ASSET INVESTORS, LLC:

        PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to appear in this action by serving upon the plaintiffs' attorneys, at the address set forth below, a notice of appearance or demand for the complaint within 20 days after the service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

        Should defendants fail to appear, judgment will be entered against defendants by default for the sum of (a) $163.3 million, (b) additional compensatory and punitive damages to be determined in a proceeding on damages pursuant to CPLR 3215, (c) interest on the foregoing, and (d) reasonable attorneys' fees and the disbursements, costs, and expenses of this action.

**Notice**:

The nature of this action is:

This action arises out of plaintiffs' purchases of $163.3 million in various class of notes issued in connection with three collateralized debt obligations commonly known as Octans II CDO ("Octans"), Sagittarius CDO I ("Sagittarius") and Longshore CDO Funding 2007-3 ("Longshore") as follows:

1. <u>Octans</u>:  Loreley Financing (Jersey) No. 5 Limited purchased and is the owner of $41 million Octans Class A-2 notes, $30 million Octans Class B notes, and $23 million Octans Class C-1 notes; and

2. <u>Sagittarius</u>: (a) Loreley Financing (Jersey) No. 15 Limited purchased and is the owner of $5 million Sagittarius Class A notes, and (b) Loreley Financing (Jersey) No. 28 Limited purchased and is the owner of $5 million Sagittarius Class B notes.

3. <u>Longshore</u>:  (a) Loreley Financing (Jersey) No. 30 Limited purchased and is the owner of $13.6 million of Longshore Class A-3 notes, (b) Loreley Financing (Jersey) No. 5 Limited purchased and is the owner of $37.7 million Longshore Class B notes, and (c) Loreley Financing (Jersey) No. 3 Limited purchased and is the owner of $8 million Longshore Class C notes;

Wells Fargo Securities, LLC (as successor to Wachovia Capital Markets, LLC), Wells Fargo Bank, N.A. (as successor to Wachovia Bank, N.A.), and Wells Fargo Securities International Limited (as successor to Wachovia Securities International Limited and Structured Asset Investors, LLC) (collectively, the "Wells Fargo Defendants") were responsible for the creation, marketing and sale of, and the selection of the underlying collateral assets for Longshore and Sagittarius.  The Wells Fargo Defendants, together with Defendant Harding Advisory LLC, were responsible for the creation, marketing and sale of, and the selection of the underlying collateral assets for Octans.  Defendants made material misrepresentations to the plaintiffs, omitted material facts, conspired to defraud plaintiffs, were responsible for fraudulent conveyances, aided and abetted others' frauds, and were unjustly enriched in connection with plaintiffs' investments in Longshore, Octans and Sagittarius.  Plaintiffs assert causes of action against defendants for rescission, fraud, conspiracy to defraud, fraudulent conveyance, aiding and abetting fraud and unjust enrichment.

The relief sought by plaintiffs is (1) rescission, in whole or in part, of the purchases of each of the above-described notes by the plaintiffs; (2) an order requiring defendants to return to plaintiffs the purchase prices they paid for the above-described notes, less any benefit to the plaintiffs; (3) an award of damages in an amount to be determined at trial, but in no event less than $163.3 million, together with interest thereon since the date of the purchases of the above-described notes by plaintiffs; (4) an order requiring disgorgement and restitution of all ill-gotten gains, profits, and fees unjustly obtained by defendants, in an amount to be determined at trial; (5) imposition of a constructive trust over the monies wrongfully obtained by defendants; (6) an award of punitive damages; (7) an award of reasonable attorneys' fees and the disbursements, costs, and expenses of this action; (8) prejudgment interest and post-judgment interest; and (9) such other and further relief as the Court deems to be just and proper.

Dated: New York, NY
        March 14, 2012

_/s/ Marc E. Kasowitz_

Marc E. Kasowitz
Sheron Korpus
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

James M. Ringer
MEISTER SEELIG & FEIN LLP
140 East 45th Street, 19th Floor
New York, NY 10017
(212) 655-3500

*Attorneys for Plaintiffs Loreley Financing (Jersey) No.
3; Loreley Financing (Jersey) No. 5; Loreley Financing
(Jersey) No. 15; Loreley Financing (Jersey) No. 28;
Loreley Financing (Jersey) No. 30*

**Defendants' Addresses:**

Wells Fargo Securities, LLC
301 South College Street, Suite 800
Charlotte, North Carolina 28288-0630

Wells Fargo Securities International Limited
1 Plantation Place, 30 Fenchurch Street
London EC3M 3BD, United Kingdom

Wells Fargo Bank, N.A.
101 North Phillips Street,
Sioux Falls, SD 57104

Harding Advisory LLC
2 World Financial Center, 36th Floor
New York, New York 10281

Structured Asset Investors, LLC
301 South College Street, Suite 800
Charlotte, North Carolina 28288-0600

Longshore CDO Funding 2007-3, Ltd.
c/o Deutsche Bank (Cayman) Limited
PO Box 1984
171 Elgin Ave., Boundary Hall
Cricket Square, Grand Cayman
Cayman Islands

Longshore CDO Funding 2007-3 LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

Octans II CDO Ltd.
c/o Maples and Calder Ltd.
PO Box 309
Ugland House
South Church Street
George Town, Grand Cayman
Cayman Islands

Octans II CDO LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

Sagittarius CDO I Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT, Queensgate House
113 South Church Street
George Town, Grand Cayman
Cayman Islands

Sagittarius CDO I LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

# EXHIBIT 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LORELEY FINANCING (JERSEY) NO. 3
LIMITED; LORELEY FINANCING (JERSEY)
NO. 5 LIMITED; LORELEY FINANCING
(JERSEY) NO. 15 LIMITED; LORELEY
FINANCING (JERSEY) NO. 28 LIMITED;
and LORELEY FINANCING (JERSEY) NO.
30 LIMITED,

                   Plaintiffs,

                   -v-

WELLS FARGO SECURITIES, LLC; WELLS
FARGO SECURITIES INTERNATIONAL
LIMITED; WELLS FARGO BANK, N.A.;
HARDING ADVISORY LLC; STRUCTURED
ASSET INVESTORS, LLC; OCTANS II CDO
LTD.; OCTANS II CDO LLC; SAGITTARIUS
CDO I LTD.; SAGITTARIUS CDO I LLC;
LONGSHORE CDO FUNDING 2007-3, LTD.;
and LONGSHORE CDO FUNDING 2007-3
LLC

                   Defendants.

Index No.  653037/2011

**STIPULATION FOR**
**ACCEPTANCE OF SERVICE**

     IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto

through their undersigned counsel, as follows:

     1.    The undersigned counsel for defendants Wells Fargo Securities, LLC, Wells

Fargo Securities International Limited, Wells Fargo Bank, N.A. and Structured Asset Investors,

LLC (hereinafter the "Wells Fargo Defendants") acknowledges service of the Supplemental

Summons and Notice dated March 14, 2012, on behalf of the Wells Fargo Defendants.

     2.    The Wells Fargo Defendants will either file a notice of appearance or serve on

plaintiffs a written demand for a complaint no later than March 26, 2012.

Dated: New York, NY
      March 16, 2012

Marc E. Kasowitz
Sheron Korpus
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

James M. Ringer
MEISTER SEELIG & FEIN LLP
140 East 45th Street, 19th Floor
New York, NY 10017
(212) 655-3500

*Attorneys for Plaintiffs Loreley Financing (Jersey) No.
3; Loreley Financing (Jersey) No. 5; Loreley Financing
(Jersey) No. 15; Loreley Financing (Jersey) No. 28;
Loreley Financing (Jersey) No. 30*

David C. Bohan
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661-3693
(312) 902-5200

*Attorneys for Defendants Wells Fargo Securities, LLC,
Wells Fargo Securities International Limited, Wells
Fargo Bank, N.A. and Structured Asset Investors, LLC*

# EXHIBIT 12

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

LORELEY FINANCING (JERSEY) NO. 3
LIMITED; LORELEY FINANCING
(JERSEY) NO. 5 LIMITED; LORELEY
FINANCING (JERSEY) NO. 15
LIMITED; LORELEY FINANCING
(JERSEY) NO. 28 LIMITED; and
LORELEY FINANCING (JERSEY) NO.
30 LIMITED,

Index No. 653037-2011

                    Plaintiffs,

          v.

**NOTICE OF APPEARANCE**

WELLS FARGO SECURITIES, LLC;
WELLS FARGO SECURITIES
INTERNATIONAL LIMITED; WELLS
FARGO BANK, N.A.; HARDING
ADVISORY LLC; OCTANS II CDO
LTD.; OCTANS II CDO LLC;
SAGITTARIUS CDO I LTD.;
SAGITTARIUS CDO I LLC;
LONGSHORE CDO FUNDING 2007-3,
LTD.; and LONGSHORE CDO
FUNDING 2007-3 LLC

                    Defendants.

          PLEASE TAKE NOTICE THAT the defendant Harding Advisory LLC

hereby appears in this action.

Dated: March 19, 2012

Steven F. Molo
Kelly M. Daley
Andrew M. Bernie
MoloLamken LLP
540 Madison Avenue
New York, NY 10022
Telephone:   (212) 607-8160
Facsimile:    (212) 607-8161

*Attorneys for Defendant Harding Advisory LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2012, the foregoing Notice of Appearance was served via the New York State Courts Electronic Filing System on the following:

Mark E. Kasowitz
Sheron Korpus
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

*Attorneys for Plaintiffs Loreley Financing (Jersey) No. 3; Loreley Financing (Jersey) No. 5; Loreley Financing (Jersey) No. 15; Loreley Financing (Jersey) No. 28; Loreley Financing (Jersey) No. 30*

Andrew M. Bernie

# EXHIBIT 13

Case 1:12-cv-03723-PAC   Document 1   Filed 05/10/12   Page 75 of 140

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LORELEY FINANCING (JERSEY) NO. 3
LIMITED; LORELEY FINANCING (JERSEY)
NO. 5 LIMITED; LORELEY FINANCING
(JERSEY) NO. 15 LIMITED; LORELEY
FINANCING (JERSEY) NO. 28 LIMITED;
and LORELEY FINANCING (JERSEY) NO.
30 LIMITED,

              Plaintiffs,

              -v-

WELLS FARGO SECURITIES, LLC; WELLS
FARGO SECURITIES INTERNATIONAL
LIMITED; WELLS FARGO BANK, N.A.;
HARDING ADVISORY LLC; STRUCTURED
ASSET INVESTORS, LLC; OCTANS II CDO
LTD.; OCTANS II CDO LLC; SAGITTARIUS
CDO I LTD.; SAGITTARIUS CDO I LLC;
LONGSHORE CDO FUNDING 2007-3, LTD.;
and LONGSHORE CDO FUNDING 2007-3
LLC

              Defendants.

Index No. 653037/2011

**DEMAND FOR COMPLAINT**

Defendants Wells Fargo Securities, LLC, Wells Fargo Securities International Limited,

Wells Fargo Bank, N.A. and Structured Asset Investors, LLC, pursuant to CPLR § 3012(b),

hereby demand service of the Complaint in the above-captioned matter on their attorneys, Katten

Muchin Rosenman LLP, 575 Madison Avenue, New York, New York 10022, attention David C.

Bohan, Esq. and William M. Regan, Esq.

Dated: New York, NY
       March 26, 2012

_William M Regan_
William M. Regan
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
(212) 940-6541

David C. Bohan
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661-3693
(312) 902-5200

*Attorneys for Defendants Wells Fargo Securities, LLC,
Wells Fargo Securities International Limited, Wells
Fargo Bank, N.A. and Structured Asset Investors, LLC*

# EXHIBIT 14

Case 1:12-cv-03723-PAC   Document 1   Filed 05/10/12   Page 78 of 140

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| LORELEY FINANCING (JERSEY) NO. 3 LIMITED; LORELEY FINANCING (JERSEY) NO. 5 LIMITED; LORELEY FINANCING (JERSEY) NO. 15 LIMITED; LORELEY FINANCING (JERSEY) NO. 28 LIMITED; and LORELEY FINANCING (JERSEY) NO. 30 LIMITED<br><br>Plaintiffs,<br><br>-v-<br><br>WELLS FARGO SECURITIES, LLC; WELLS FARGO SECURITIES INTERNATIONAL LIMITED; WELLS FARGO BANK, N.A.; HARDING ADVISORY LLC; STRUCTURED ASSET INVESTORS, LLC; OCTANS II CDO LTD; OCTANS II CDO LLC; SAGITTARIUS CDO I LTD; SAGITTARIUS CDO I LLC; LONGSHORE CDO FUNDING 2007-3, LTD.; and LONGSHORE CDO FUNDING 2007-3 LLC,<br><br>Defendants. | Index  No. 653037/2011<br><br><br><br>**COMPLAINT** |

Plaintiffs Loreley Financing (Jersey) No. 3 Limited ("LFJ 3"), Loreley Financing (Jersey) No. 5 Limited ("LFJ 5"), Loreley Financing (Jersey) No. 15 Limited ("LFJ 15"), Loreley Financing (Jersey) No. 28 Limited ("LFJ 28"), and Loreley Financing (Jersey) No. 30 Limited ("LFJ 30") (collectively "Plaintiffs") by and through their undersigned counsel, by way of Complaint against defendants Wells Fargo Securities, LLC ("WFS"), Wells Fargo Securities International Limited ("WFSI"), and Wells Fargo Bank, N.A. ("WFB," and together with WFS and WFSI, "Wells Fargo" or the "Wells Fargo Defendants"), Harding Advisory LLC ("Harding"), Structured Asset Investors, LLC ("SAI," and together with Harding, the "Managers"); Octans II CDO, Ltd. ("Octans Ltd.") and Octans II CDO LLC ("Octans LLC")

(collectively "Octans"); Sagittarius CDO I, Ltd. ("Sagittarius Ltd.") and Sagittarius CDO I LLC ("Sagittarius LLC") (collectively "Sagittarius"); Longshore CDO Funding 2007-3, Ltd. ("Longshore Ltd.") and Longshore CDO Funding 2007-3 LLC ("Longshore LLC") (collectively "Longshore," and together with Octans and Sagittarius, the "Issuers"), respectfully allege on knowledge as to themselves and their own actions, and on information and belief as to all other matters, as follows:

## SUMMARY OF THE ACTION

1.     This action arises out of Plaintiffs' investments of over $163 million in three collateralized debt obligations ("CDOs"), commonly known as Octans, Sagittarius and Longshore.

2.     The Octans and Sagittarius CDOs were two of several deals that have come to be known as the "Constellation CDOs."  Octans and Sagittarius were arranged by Wachovia Capital Markets, LLC, Wachovia Securities International Limited, and Wachovia Bank, N.A. (collectively "Wachovia"; the predecessors-in-interest of, respectively, WFS, WFSI, and WFB) at the behest of a short[1] investor, Magnetar Capital LLC ("Magnetar"), that sought to profit from the decline of the United States subprime residential mortgage market.  Unbeknownst to Plaintiffs, Magnetar exerted substantial influence over the structure and underlying collateral pools of the Octans and Sagittarius CDOs, while at the same time betting massively that the collateral would default.  Wachovia worked together with the Managers to effectuate Magnetar's scheme and to hide its strategy from long investors like Plaintiffs.

---

[1] An investor who takes a "long" position in a security stands to gain when the security performs or increases in value; by contrast, an investor who stands to profit when the security fails to perform or falls in value is referred to as having a "short" position or to be "short" that security.

3.      Wachovia and the Managers lured Plaintiffs into investing in the Octans and Sagittarius CDOs by falsely marketing them as legitimate investments designed for long investors.  Defendants falsely represented that the collateral assets in these CDOs' portfolios were carefully and independently selected by the Managers in the interest of the overall success of the CDOs.  In reality, however, Defendants knew – but did not disclose to Plaintiffs – that Magnetar exerted veto power over asset selection and was using that considerable influence to further its "long-short" trading strategy, which has since become known as the "Magnetar Trade."  To implement this now-infamous scheme, Magnetar took a "long" position in the Constellation CDOs by investing in their "equity" tranches, which bore the highest risk but in return stood to earn the highest interest payments.  Simultaneously, and unbeknownst to the Plaintiffs and other long investors in the Constellation CDOs, Magnetar took a massive short position *via* credit default swaps ("CDS"), betting *against* those very same deals.  These undisclosed short bets were usually at least twice as big as Magnetar's equity investment; in the case of Octans, they were more than three times as large.  In other words, the collateral pools of Sagittarius and Octans – which were supposed to have been selected by independent collateral managers for the benefit of the Plaintiffs and other long investors – were in reality being selected for the benefit of a short investor (*i.e.*, Magnetar) who stood to profit tremendously if the collateral failed.

4.      In order to reap the millions of dollars in fees generated by these CDOs, Wachovia participated in this scheme and permitted Magnetar to control structural features of the Octans and Sagittarius deals.  Wachovia ensured that Magnetar's investment in the "equity" tranches (which would ordinarily receive no cash flow during times of market distress) would

receive cash flow regardless of market conditions, thereby funding Magnetar's short positions and diverting cash from Plaintiffs as the deals collapsed.

5.      Defendants also loaded Octans and Sagittarius with assets bought at above-market prices, while simultaneously causing the CDOs (and therefore, their investors, including Plaintiffs) to sell short positions in the CDOs to Magnetar at below-market rates, and thus to receive less cash in return for those sales than would have been obtained in open-market *bona fide* trades.  This was despite explicit representations in the offering documents for both Octans and Sagittarius that all purchases of collateral assets were to be conducted in an "arm's-length" manner at fair terms from the perspective of the CDOs.

6.      Right around the time Sagittarius was closing, Wachovia began marketing the Longshore CDO to Plaintiffs.  In marketing materials and deal documents, Wachovia presented Longshore as a legitimate investment vehicle whose assets would be selected and managed by an independent collateral manager, SAI, for the benefit of the CDO's long investors.  In particular, Wachovia specifically represented that Longshore's assets would be selected by SAI pursuant to its rigorous collateral selection process and would be acquired on an "arm's-length basis" and at "fair market prices."  These representations were materially false and misleading.

7.      Unknown to Plaintiffs, Wachovia had secretly designed Longshore as a vehicle for offloading assets that were stuck on Wachovia's books after a previous CDO it was arranging had failed to close.  Although the cancelled CDO's assets had substantially decreased in value since Wachovia had originally acquired them, Wachovia and SAI caused Longshore to purchase these assets for its portfolio not at their current market value but rather at their original, much higher prices.  Wachovia and SAI never disclosed to potential investors, including Plaintiffs, that Longshore was, in reality, Wachovia's private dumping ground for rapidly deteriorating assets.

Wachovia's actions resulted in a Securities and Exchange Commission investigation and consent order requiring Wells Fargo to pay penalties.

8.      But for Defendants' fraudulent conduct, Plaintiffs would not have invested in the Octans, Sagittarius and Longshore CDOs.  To recover the more than $163 million they paid for these fraudulent investments, Plaintiffs assert claims for fraud, conspiracy to defraud, aiding and abetting fraud, fraudulent conveyance, and unjust enrichment.

## THE PARTIES

### I.      The Plaintiffs

9.      Plaintiff LFJ 3 is a company organized and existing under the laws of Jersey, Channel Islands, located at 26 New Street, St. Helier, Jersey JE2 3RA, Channel Islands.  Plaintiff LFJ 3 invested in $8 million of Class C Notes issued in connection with the Longshore CDO.

10.      Plaintiff LFJ 5 is a company organized and existing under the laws of Jersey, Channel Islands, located at 26 New Street, St. Helier, Jersey JE2 3RA, Channel Islands.  Plaintiff LFJ 5 invested in $41 million of Class A-2 Notes, $30 million of Class B Notes, and $23 million of Class C-1 Notes issued in connection with the Octans CDO, as well as $37.6 million of Class B Notes issued in connection with the Longshore CDO.

11.      Plaintiff LFJ 15 is a company organized and existing under the laws of Jersey, Channel Islands, located at 26 New Street, St. Helier, Jersey JE2 3RA, Channel Islands.  Plaintiff LFJ 15 invested in $5 million of Class A Notes issued in connection with the Sagittarius CDO.

12.      Plaintiff LFJ 28 is a company organized and existing under the laws of Jersey, Channel Islands, located at 26 New Street, St. Helier, Jersey JE2 3RA, Channel Islands.  Plaintiff LFJ 28 invested in $5 million of Class B Notes issued in connection with the Sagittarius CDO.

13.    Plaintiff LFJ 30 is a company organized and existing under the laws of Jersey, Channel Islands, located at 26 New Street, St. Helier, Jersey JE2 3RA, Channel Islands.  Plaintiff LFJ 30 invested in $13.5 million Class A-3 Notes issued in connection with the Longshore CDO.

## II.    The Defendants

### A.    The Issuers

14.    Defendant Octans II CDO, Ltd. is a Cayman Islands limited liability company with its principal place of business located at c/o Maples Finance Limited, Queensgate House, P.O. Box 1093GT, South Church Street, George Town, Grand Cayman, Cayman Islands.  Octans II CDO, Ltd. is the issuer of the Octans Notes sold to Plaintiff LFJ 5.

15.    Defendant Octans II CDO LLC is a Delaware corporation with its principal place of business located at c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711.  Octans II CDO LLC is the co-issuer of the Octans Notes sold to Plaintiff LFJ 5.

16.    Defendant Sagittarius CDO I, Ltd. is a Cayman Islands limited liability company with its principal place of business located at c/o Maples Finance Limited, Queensgate House, P.O. Box 1093GT, South Church Street, George Town, Grand Cayman, Cayman Islands. Sagittarius CDO I, Ltd. is the issuer of the Sagittarius Notes sold to Plaintiffs LFJ 15 and LFJ 28.

17.    Defendant Sagittarius CDO I LLC is a Delaware corporation with its principal place of business located at c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711.  Sagittarius CDO I LLC is the co-issuer of the Sagittarius Notes sold to Plaintiffs LFJ 15 and LFJ 28.

18.    Longshore CDO Funding 2007-3, Ltd. is a Cayman Islands limited liability company with its principal place of business located at c/o Deutsche Bank (Cayman) Limited, P.O. Box 1984 GT, Elizabethan Square, George Town, Grand Cayman, Cayman Islands.

Longshore CDO Funding 2007-3, Ltd. is the issuer of the Longshore Notes sold to Plaintiffs LFJ 3, LFJ 5, and LFJ 30.

19.     Longshore CDO Funding 2007-3 LLC is a Delaware corporation with its principal place of business located at c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711.   Longshore CDO Funding 2007-3 LLC is the co-issuer of the Longshore Notes sold to Plaintiffs LFJ 3, LFJ 5, and LFJ 30.

### B.     The Banks

20.     Defendant WFS is the successor by merger of Wachovia Capital Markets, LLC. WFS is a limited liability company existing under the laws of the State of Delaware, with its principal place of business located at 301 South College Street, Suite 800, Charlotte, North Carolina 28288-0630.  Wachovia Capital Markets, LLC was the initial purchaser of the Notes issued by Octans, Sagittarius, and Longshore.

21.     Defendant WFSI is the successor by merger of Wachovia Securities International Limited.  WFSI is a limited liability company existing under the laws of England and Wales, with its principal place of business located at 1 Plantation Place, 30 Fenchurch Street, London EC3M 3BD, United Kingdom.  Wachovia Securities International Limited was the agent of Wachovia Capital Markets, LLC for the sale of the Sagittarius and Longshore Notes.

22.     Defendant WFB is the successor by merger of Wachovia Bank, N.A.  WFB is a national banking association existing under the laws of the United States of America, with its principal place of business located 101 North Phillips Street, Sioux Falls, South Dakota 57104. Wachovia Bank, N.A., was, *inter alia*, the initial credit default swap counterparty for the Octans, Sagittarius and Longshore transactions, the liquidity provider for Octans and Sagittarius, and the warehouse financing provider for Octans, Sagittarius, and Longshore.

C.    **The Collateral Managers**

23.    Defendant Harding is a limited liability company existing under the laws of the State of Delaware, with is principal place of business located 55 Madison Avenue, 4th Floor, Morristown, New Jersey 07960.  Harding was the collateral manager for the Octans CDO.

24.    Defendant SAI is a limited liability company existing under the laws of the State of Delaware, with its principal place of business located at One Wells Fargo Center, 301 South College Street, Charlotte, North Carolina 28288-0001.  SAI was the collateral manager for the Sagittarius and Longshore CDOs.  At all relevant times, SAI was a wholly-owned subsidiary of Wachovia.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over Defendants pursuant to CPLR §§ 301 and 302. Venue in New York County is proper under CPLR §§ 501 and 509.

26.    Defendants WFS, WFSI and WFB (as successors-in-interest to Wachovia Capital Markets, LLC, Wachovia Capital Markets International, Limited, and Wachovia Bank, N.A.), SAI and Harding engage in, or during the relevant time period engaged in, a continuous and systematic course of business in New York and have offices in New York City.  Moreover, all Defendants transacted business within New York giving rise to Plaintiffs' causes of action and orchestrated the fraudulent scheme at issue in and from New York.

27.    The relevant documents governing the Octans Notes, Sagittarius Notes, and Longshore Notes provide for an express submission to the jurisdiction of the courts located in the State of New York, borough of Manhattan, in the city of New York.

28.    This action is appropriately assigned to the Commercial Division of the Supreme Court of the State of New York, County of New York, pursuant to the Rules of the Commercial

Division of the Supreme Court, as set forth in § 202.70 of the Uniform Rules for New York State Trial Courts.

## FACTUAL ALLEGATIONS

### I.   Facts Pertinent to all Claims

#### A.   Plaintiffs' Decision to Invest in CDOs

29.    Plaintiffs are special purpose entities formed to invest in CDOs on a long-term, buy-and-hold basis.

30.    A CDO is an investment vehicle that typically includes the formation of a special purpose entity, commonly referred to as the "issuer," that raises money by issuing securities to investors.  Generally, an arranging bank creates the issuer in order to acquire a portfolio of investment assets whose cash flow is the expected source of income for various classes, or "tranches," of debt securities that are marketed and sold to investors.[2]

31.    The investors in the CDO, which include noteholders and equity investors, are paid from the proceeds generated by the collateral.  Amounts are paid out to investors according to a defined priority (known as a "waterfall").  The most senior tranches of notes, which have the lowest risk of loss and highest credit rating, typically receive principal and interest first.  The junior tranches have the highest risk of loss and lowest credit rating (with the exception of the "equity" tranche, which typically is not rated).

---

[2] The assets in a CDO's portfolio can be comprised of cash assets (such as RMBS), synthetic assets, or both.  Synthetic assets include CDS contracts – transactions resembling an insurance contract whereby a "protection buyer" pays a "protection seller" periodic "premiums" (similar to insurance premiums) in return for the protection seller's promise to pay the protection buyer should certain "credit events" occur, such as events of payment default, loss, write-down, or a deterioration in ratings.  A CDO containing both cash and synthetic assets is referred to as a "hybrid" CDO.

32.     Banks that arrange CDOs typically perform multiple roles, including: (a) structuring and modeling the CDOs; (b) marketing and selling them to investors; (c) interfacing with ratings agencies to achieve the targeted ratings for the CDOs' tranches; (d) financing and facilitating the purchases of the cash collateral and holding that collateral on their own books prior to closing; and (e) facilitating hybrid structures by acting as the initial protection buyer for CDS included in the synthetic collateral pool.  Moreover, because the special purpose vehicle that serves as the deal's issuer does not have any employees of its own, the arranging banks usually act for the issuer and serve as the "initial purchasers," buying all of the notes from the issuer at closing and then selling them to investors.  For performing these functions, arranging banks typically receive millions of dollars in fees at closing.

33.     IKB Deutsche Industriebank AG, along with its former affiliate IKB Credit Asset Management GmbH (collectively, "IKB"), was contractually appointed as investment advisor to Plaintiffs.  Plaintiffs' investment advisor identified potential investments in CDOs and performed due diligence on behalf of Plaintiffs prior to making investment recommendations to them.

34.     At all relevant times, Defendants knew that IKB served as Plaintiffs' investment advisor and that IKB performed due diligence on and recommended CDO investments – including the investments at issue in this lawsuit – to Plaintiffs.

35.     Defendants represented to Plaintiffs that independent and experienced collateral managers would select and manage the collateral portfolios for the Octans, Sagittarius, and Longshore CDOs for the benefit of long investors such as Plaintiffs, whose profits are dependent on the success of the CDO.  The long investors typically pay the collateral manager a percentage of the notional value of the transaction (*i.e.*, the total deal issuance) as a fee.

36.     The collateral manager's role is material to a long investor's investment decision because the collateral manager is supposed to be responsible for the CDO's risk profile and performance through its selection of collateral.  For that reason, Plaintiffs' investment advisor conducted comprehensive due diligence on the collateral managers of the Octans, Sagittarius, and Longshore CDOs.  The collateral manager has a duty to analyze and select collateral with the best risk/return profile that fits the investors' eligibility criteria, to monitor the credit status of the individual underlying assets, to reinvest payment proceeds from maturing underlying assets, and to make allowed substitutions in the collateral to maximize long investors' profits.

37.     The performance of the collateral selected for a CDO is critical to the deal's success.  As Defendants were aware, neither Plaintiffs nor their investment advisor had close relationships with loan servicers or originators, or access to the loan-level information for the mortgages underlying the CDO deals in which Plaintiffs invested, and therefore could not conduct due diligence on a loan-by-loan basis, which was essential to valuing a CDO's collateral.  Therefore, the involvement of a qualified, independent collateral manager committed to identifying and selecting the highest quality and best mix of eligible collateral in the best interests of the CDO's long investors was a material factor in Plaintiffs' investment decisions and the recommendations of their investment advisor.  Plaintiffs sought out experienced and independent collateral managers who were committed to selecting and managing the collateral for the benefit of investors and the CDO's success.

38.     Moreover, a key factor in Plaintiffs' investment criteria was that the collateral manager, as well as the equity buyer, had interests that were aligned with those of the CDO's noteholders.

39.     Plaintiffs' investment decisions also were based on the ratings assigned to prospective CDO investments and their underlying collateral as indicators of the risks associated with potential investments.[3]  Like many other CDO investors, Plaintiffs focused on highly-rated tranches (primarily AAA and AA).[4]

**B.     Wachovia's Involvement in the RMBS and CDO Markets**

40.     Before its precipitous collapse in the Fall of 2008 and its acquisition at the end of that year by Defendant Wells Fargo, Wachovia had been a major figure in the U.S. banking industry.  During the periods relevant to this complaint, Wachovia – then the nation's fourth biggest bank holding company – was substantially involved in multiple levels of the subprime capital markets.

41.     Wachovia was one of the nation's largest commercial and consumer lenders. Whereas, prior to 2006, the bank's lending activities had been primarily directed toward commercial borrowers, Wachovia sought to capitalize on the residential real estate boom by rapidly expanding its consumer mortgage lending program, a goal which Wachovia achieved in October 2006 through its acquisition of Golden West Financial Corporation ("Golden West"), a major subprime lender and the nation's largest holder of payment-option adjustable rate mortgages (so-called "Pick-a-Pay" loans).  The result of this acquisition on Wachovia's balance sheet was dramatic.  In 2005, Wachovia held less than $95 billion in mortgage-backed consumer loans on its books; by the end of 2006, that number had more than doubled to over $225 billion,

---

[3] Ratings agencies typically assign credit ratings to the various tranches of a CDO (except for the equity tranche).  For the purposes of this complaint, and unless stated otherwise, any reference to a particular rating refers to the Standard & Poor's ratings categories.

[4] According to Standard & Poor's, a rating of "AAA" signifies an "[e]xtremely strong capacity to meet financial commitments," and a rating of "AA" signifies a "[v]ery strong capacity to meet financial commitments."  *See* Credit Ratings Definitions & FAQs, Standard & Poor's, http://www.standardandpoors.com/ ratings/definitions-and-faqs/en/us.

with the majority of the increase due to the addition of more than $120 billion in loans related to the Golden West acquisition.

42.     In addition to its role as one of the nation's largest originators of asset-backed commercial and consumer loans, Wachovia was also a major participant in structuring and underwriting fixed income investment products backed by pools of loans, such as commercial mortgage-backed securities ("CMBS") and residential mortgage-backed securities ("RMBS"). As reflected in the bank's public filings, over the course of 2006 and 2007, Wachovia sold or securitized over $113 billion in loans, including over $50 billion in consumer loans.

43.     Not only did Wachovia originate loans and securitize them into CMBS and RMBS, Wachovia was also a market leader in structuring and underwriting CDOs, with a primary focus on CDOs backed by CMBS and RMBS.  Thus, as the bank reported in a November 8, 2007 press release, Wachovia ranked third nationally in CDO issuances by volume in 2006 and the first three quarters of 2007, issuing nearly $46 billion in CDOs during that period.  Of those issuances, approximately $10 billion were CDOs backed primarily by subprime RMBS, including the Octans, Sagittarius, and Longshore CDOs that were fraudulently marketed and sold to Plaintiffs.

44.     Wachovia's multiple roles as an originator of subprime mortgages, an underwriter of RMBS, and an arranger of CDOs gave it a unique perspective and peculiar knowledge – unavailable to Plaintiffs and their investment advisor – concerning the condition of the United States housing market.  In particular, by no later than August 2006, Wachovia knew or should have known that subprime borrowers were missing increasing numbers of payments, resulting in higher delinquency and default rates.  In some instances, those missed payments occurred within the first three months of the mortgage loans being made, suggesting that increasing numbers of

mortgages were infected by fraud or otherwise had not met lenders' original underwriting guidelines.

### C.   Defendants' Knowledge of Plaintiffs' Investment Criteria

45.     Wachovia had a longstanding business relationship with Plaintiffs through their investment advisor.   Beginning in 2001, Plaintiffs' investment advisor recommended to Plaintiffs, as well as to other related investment entities, no fewer than 28 CDOs arranged by Wachovia; collectively, these investments totaled well over $2.3 billion.

46.     In an effort to market the Octans, Sagittarius, and Longshore CDOs to Plaintiffs, Wachovia promoted itself to Plaintiffs' investment advisor as a leader in structured finance CDOs, listing its track record with billions of dollars in structured credit transactions that either had already closed or were in the pipeline, and touting its strong partnerships with top collateral managers.   Wachovia represented that, given its expertise and relationships in this sector, it was ideally situated to offer CDOs that met Plaintiffs' investment objectives.

47.     Plaintiffs' investment advisor reviewed Plaintiffs' investment strategy and guidelines with Wachovia, Harding and SAI, in detail, during meetings, phone conversations, and in e-mails.   Defendants were also aware of Plaintiffs' investment program and criteria, as well as IKB's role as investment advisor to Plaintiffs.   Defendants were therefore well aware of Plaintiffs' objectives and requirements before Plaintiffs invested in the Octans, Sagittarius, and Longshore CDOs.   Moreover, Defendants knew how much importance Plaintiffs placed on having skilled and independent collateral managers in charge of collateral selection for the deals in which Plaintiffs invested.

48.     For example, representatives of SAI (including Jim Burke, manager of the Sagittarius CDO) met with representatives of Plaintiffs' investment advisor at the Asset Securitization Forum conference in Las Vegas, Nevada in January 2007.   SAI also visited the

offices of Plaintiffs' investment advisor in Düsseldorf, Germany during the "road show" for the Sagittarius deal.   At these meetings, SAI detailed its asset selection processes and market outlook, both of which were very important for Plaintiffs' investment decisions.

49.   In connection with the Octans CDO, representatives of Wachovia (including Walter Dolhare and Dash Robinson) and Harding (including Wing Chau, its founder and president) visited Plaintiffs' investment advisor in Düsseldorf, Germany.   At that meeting, Plaintiffs' investment advisor reviewed with Defendants Plaintiffs' investment objectives for CDOs of RMBS.   Wing Chau touted Harding's collateral selection processes and assured IKB that the Octans CDO would meet Plaintiffs' stringent investment criteria.

50.   Reflecting Defendants' knowledge of Plaintiffs' investment objectives and requirements, the marketing materials and disclosure documents for the Octans, Sagittarius, and Longshore CDOs stressed the experience and detailed investment process of the Managers for each transaction.   Defendants emphasized the Managers' qualifications, abilities, and procedures as collateral managers in an effort to appeal directly to Plaintiffs.

## II.   Defendants Feign the Creation of "Managed" CDOs to Mask Magnetar's Strategy to Short the U.S. Housing Market

### A.   The Magnetar CDO Shorting Scheme

51.   In collusion with various arranging banks and collateral managers, Magnetar orchestrated a series of at least 27 CDOs – known as the "Constellation" CDOs because they bear the names of astral entities – as vehicles to carry out an undisclosed long-short trading strategy.   In exchange for Magnetar's agreement to purchase the equity tranches of these CDOs,[5]

---

[5] The equity tranche of a CDO is subordinated (or "junior") to all other tranches.  The returns generated by a CDO on its collateral are distributed in order of seniority.  Thus, the equity tranche, as the junior-most tranche of a CDO, traditionally bears the most risk, since it is usually the first tranche that will experience losses if the CDO's assets do not perform as expected.  For this reason, CDOs' equity tranches are generally the hardest to place.  If a purchaser for the

the arranging banks allowed Magnetar to clandestinely influence the selection of collateral for the deals' portfolios.[6] Octans and Sagittarius were two of these fraudulent "Constellation" deals.

52.     As the arranging banks knew – but potential investors did not – the parameters Magnetar established for the deals were designed to maximize profits for Magnetar's long-short trading strategy.  Unknown to long investors, Magnetar would take a long position on the equity tranches of the Constellation CDOs at discounted prices while simultaneously taking a larger short position (at least double the amount of its long position) by buying protection via CDS contracts that would pay off massively when the CDOs' synthetic collateral failed.

53.     To maximize the likelihood that this long-short trading strategy would succeed, Magnetar dictated a mix of assets for the Constellation CDOs that was likely to generate several large cash distributions to its equity holding (*i.e.*, the long position) at the beginning that Magnetar could use to pay its CDS premiums until defaults entitled Magnetar to claim massive settlement payments under the CDS contracts it secretly purchased on the Constellation CDOs' synthetic collateral (*i.e.*, the short position).  Moreover, in deference to Magnetar, arranging banks caused the Constellation CDOs to sell both the equity and the CDS contracts to Magnetar at a discount.  The net result was that, whereas true long investors, such as Plaintiffs, stood to

---

equity tranche cannot be found, then the deal's arranger must either purchase the equity itself (and bear the attendant risk) or cancel the deal (and lose tens of millions of dollars in arranging and warehousing fees).  Thus, Magnetar's willingness to purchase the equity tranche of CDOs was a boon to arranging banks, like Wachovia, that were looking for ways to keep their lucrative CDO businesses going.  Indeed, Magnetar's long-short trading scheme became the engine that perpetuated the CDO businesses – by some estimates, the Constellation CDOs accounted for between 35% and 60% of the entire demand in 2006 and 2007 for subprime RMBS.

[6] *See Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States*, January 2011 (the "FCIC Final Report"), at 192; *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse*, Majority and Minority Staff Report, U.S. Senate Permanent Subcommittee on Investigations, April 13, 2011 ("Levin Report"), at 372-73.

profit only if the deal's collateral performed well, Magnetar's trade would yield huge profits if the collateral for the deals defaulted.

54.     As recounted in the FCIC Final Report and in the Levin Report, as well as a number of recent lawsuits and other public reports, Magnetar's influence over collateral selection took various forms.  In some cases, Magnetar provided lists of pre-approved assets for the collateral manager to choose from.  In others, Magnetar was granted a "veto" right over any asset selected for the CDO.[7]  In others still, Magnetar simply executed trades in the name of the collateral manager.[8]  In all cases, however, Magnetar's agreement to act as equity sponsor in these deals was contingent on the constitution of portfolios that would advance Magnetar's undisclosed long-short trading strategy.

55.     In addition to allowing Magnetar to dictate asset selection, arranging banks also deferred to Magnetar's demand that the Constellation CDOs contain structural features designed to facilitate – and pay for – Magnetar's undisclosed short positions.  In particular, these features enabled Magnetar to continue to receive cash payments on its equity investment which it could use to fund its larger short positions – via CDS contracts – on the Constellation CDOs' synthetic collateral.

56.     In short, the Constellation CDOs were constructed for the benefit of a specific investor (Magnetar) with a specific trading strategy at the expense of all other investors.  When the CDOs collapsed, as Magnetar predicted, hundreds of millions of dollars invested by senior noteholders would be used to pay out Magnetar's short bets against the CDOs it had created.

---

[7] *See In re Application of IKB Industriebank AG for an Order to Conduct Discovery for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782*, Civ. No. 1:11-0237 (N.D.N.Y.), Ex. H. Indeed, documents produced in other litigation show that Magnetar insisted that its veto right be recorded "behind the scenes and outside of the docs."  *Id.*, Ex. I.

[8] *See* FCIC Final Report, at 192.

B.     **Magnetar and Wachovia Collaborate in Arranging**
       **Constellation CDOs Designed to Magnetar's Specifications**

57.     Wachovia colluded with Magnetar, among other reasons, because it feared that its lucrative business of arranging CDOs of asset-backed securities was drying up.

58.     In 2006, based on information not available to investors, Wachovia learned that the collateral that went into these CDOs (primarily subprime RMBS) was rapidly becoming impaired.

59.     In order to maintain its CDO deal-flow (and to continue reaping the associated fees), Wachovia accepted Magnetar's offer to build CDOs to its specifications.  As Michael Henriques (a Deutsche Bank trader who would shortly thereafter go to work for Magnetar) put it in an August 25, 2006 e-mail to James Prusko (Magnetar's Senior Vice President and head of structured credit):

> Had a good call with wachovia on cdo short.  They are willing to do the structure I asked (just short bespoke mezz, write down structure, no triggers), but have not proposed fees yet.

60.     Wachovia's willingness to work with Magnetar on CDO vehicles, set up by Magnetar to short the residential mortgage market, led directly to Octans and Sagittarius.

61.     Magnetar knew of Wachovia's history of dealings with Plaintiffs' investment advisor.  Indeed, in an August 9, 2006 e-mail sent by Prusko to David Snyderman (a senior Magnetar employee), Prusko highlighted that Wachovia "claims [that] they have a strong relationship with IKB."

62.     Indeed, inducing Plaintiffs to invest in Constellation CDOs was a key aim of Wachovia and Magnetar in their collaborative efforts.  This was illustrated by an e-mail sent by Alex Rekeda of the bank Calyon (the arranger of several Constellation CDOs) to Prusko on October 9, 2006.  In explaining why the structure of Calyon's new Constellation deal had been

based directly on Wachovia's Octans CDO, Rekeda said, "We copied Octans because it's the only no-trigger deal, bought by IKB, so we decided not to reinvent the wheel."   Prusko responded, "No I understand.  Lets [sic] see if we can work with our German friends directly to find the most beneficial solution."

63.     Magnetar's investment strategy became the engine that perpetuated Wachovia's (and other banks') lucrative CDO businesses.  By some estimates, Magnetar deals accounted for between 35% and 60% of the entire mezzanine CDO market in 2006 and 2007.

64.     Wachovia knew Magnetar was not buying the equity in CDOs because it believed that the equity was a sound investment.  Wachovia knew, rather, that Magnetar's strategy was predicated on making enormous profits from the failure of the CDOs that it helped create.

65.     To implement its strategy, Magnetar used the cash payments it received as holder of the equity tranche to fund its short positions on the very same deals, during the (relatively) brief time between closing and the deal's collapse.

66.     Magnetar was net short the Constellation CDOs, (*i.e.*, the size of Magnetar's short positions exceeded the size of its long positions).  The ratios of Magnetar's short positions to its long positions varied from deal to deal, but could be as much as 6-to-1, or even more, net short. In other words, Magnetar was betting on the failure of the very deals it was creating.

67.     The propagation by Defendants and other banks and collateral managers of dozens of Constellation CDOs served as a "force multiplier" for Magnetar's long-short strategy. By controlling collateral selection for these CDOs, complicit banks and collateral managers such as Defendants injected poisonous Constellation CDO tranches into other Constellation CDOs. As a result, they magnified the impact of a default of any one Constellation CDO.

68.     The collateral pools of Constellation CDOs included both cash and synthetic investments in other Magnetar-sponsored Constellation deals.  These investments furthered Magnetar's fraudulent scheme by causing losses to cascade through the family of Constellation CDOs.  Wachovia actively facilitated Magnetar's scheme by arranging to have the CDOs that it sponsored purchase mezzanine tranches of other Constellation CDOs.

69.     For example, Wachovia and Harding ensured that the Octans CDO (in which Plaintiff LFJ 5 invested) included investments in four other Constellation CDOs:

| Constellation CDOs in the Octans Portfolio | Amount |
|---|---|
| Auriga | $7,000,000 |
| MKP Vela | $10,000,000 |
| Carina | $15,000,000 |
| Pyxis | $10,000,000 |
| Total: | $42,000,000 |

70.     In this manner, Wachovia created the appearance of demand for Constellation CDOs.  In actuality, there were very few real buyers.

### C.     Magnetar's Influence over Collateral Selection

71.     Wachovia and Magnetar knew that investors would not purchase CDOs created on the order of a short trader who controlled the deals' formation and selected the deals' collateral.  Defendants knew, however, that investors would purchase CDOs with the same collateral pool if they believed it had been vetted and selected by a skilled and independent collateral manager.

72.     Therefore, Wachovia and Magnetar enlisted "figurehead" managers that would do Magnetar's bidding.  In exchange for the opportunity to earn lucrative management fees, Defendants Harding and SAI, the collateral managers selected for the Octans and Sagittarius deals, abandoned their duty to independently vet and select collateral for the benefit of the deals'

long investors and instead collaborated with Wachovia to construct portfolios that would advance Magnetar's long-short trading strategy.

73.     Defendants falsely represented to CDO investors, including Plaintiffs, that qualified and independent collateral managers selected the collateral for the Octans and Sagittarius CDOs, and concealed Magnetar's influence over the deals' formation and the selection of collateral.

74.     Not only did Magnetar dictate which *assets* would be placed into the Constellation CDOs' portfolios, but it also controlled the *price* at which it would buy protection *via* CDS contracts on those assets.   At Magnetar's insistence, arranging banks, including Wachovia, did not charge Magnetar a "market price" for these short positions.   Rather, Magnetar's agreement to buy the CDOs' equity was conditioned on the arranging banks' agreement to provide massive shorting opportunities at below-market prices.

75.     Thus, without any market bidding, short positions on billions of dollars in sub-prime RMBS were loaded into Constellation CDOs.   These short positions could not have been placed on the open market (which had limited liquidity) without radically increasing the cost of protection.   The prices that Magnetar obtained on these short positions were inherently below market.

76.     Hence, the CDO sold short positions to Magnetar at below-market rates and received less cash in return for that sale of protection than would have been obtained in an open-market *bona fide* CDS trade.   Defendants thus compounded their fraud by not only secretly allowing Magnetar to select the deals' collateral, but also then selling the CDS protection to Magnetar at an artificially low price.

77.     Plaintiffs did not know and could not have known that (i) the CDO collateral pools included numerous CDS contracts selected by a short investor betting against the related deal, and (ii) the premiums on these CDS contracts were not set through market bids, but rather through an arrangement between an arranging bank and a short investor.

### D.     Magnetar's Control of Deal Features

78.     Magnetar funded its short positions with the cash flow it received from its equity holdings (and other subordinated tranches) in the CDOs it sponsored and controlled.  Arranging banks, including Wachovia, were required to insert these structural features as part of the *quid pro quo* for Magnetar's equity sponsorship of the CDOs.

79.     For example, CDOs traditionally contained tests for overcollateralization coverage (the "OC test") and interest coverage (the "IC test"), the purpose of which was to protect senior CDO tranches at times of deal distress, *i.e.*, at times when the deal's underlying collateral assets were not generating sufficient cash flow to meet those coverage tests.  When those tests were triggered, payments to the equity and more junior securities were restricted and redirected to senior noteholders.

80.     The Constellation CDOs, including the Octans and Sagittarius CDOs, eliminated or delayed and limited the applicability of these tests for the benefit of equity and junior security holders like Magnetar.  The concealed purpose for the "triggerless" aspect of these deals was to permit Magnetar to continue to receive cash payments (and to continue to fund its short positions) until each of the Constellation CDOs defaulted and liquidated.

81.     Although this feature of the CDOs was disclosed, Wachovia concealed the fact that Magnetar had insisted upon the absence of the OC and IC tests in order to better allow Magnetar to fund – in a relatively inexpensive way – its multi-billion dollar bet against the performance of each of the Constellation CDOs.

82.    Had Wachovia disclosed the true purpose of this feature, it would thereby have revealed the Magnetar shorting strategy and alerted Plaintiffs to the fraudulent design of the CDO transactions.

### III.    Through Material Misrepresentations and Omissions, Defendants Fraudulently Induced Plaintiffs into Investing over $163 million in Wachovia CDOs

83.    Defendants defrauded Plaintiffs in three different CDOs.  The seven tranches of notes purchased in these deals cost Plaintiffs a total of $163.1 million (face value).

| CDO | Purchaser | Manager | Class | Original Rating | Amount ($ millions) |
|---|---|---|---|---|---|
| Octans | LFJ 5 | Harding | A-2 | AAA | 41 |
| | LFJ 5 | Harding | B | AA | 30 |
| | LFJ 5 | Harding | C-1 | A | 23 |
| Sagittarius | LFJ 15 | SAI | A | AAA | 5 |
| | LFJ 28 | SAI | B | AA | 5 |
| Longshore | LFJ 30 | SAI | A-3 | AAA | 13.5 |
| | LFJ 5 | SAI | B | AAA | 37.6 |
| | LFJ 3 | SAI | C | AA | 8 |
| | | | | Total: | 163.1 |

### A.    Octans CDO

#### 1.    Defendants' Misrepresentations and Omissions Concerning Octans

84.    Wachovia aggressively marketed the Octans CDO to Plaintiffs.

85.    In or around August 2006, Wachovia approached Plaintiffs' investment advisor in an effort to persuade it to recommend to Plaintiffs investments in notes to be issued in connection with the Octans CDO.

86.    On or around August 29, 2006, Wachovia provided Plaintiffs' investment advisor with a term sheet for Octans with the knowledge and intention that it would be conveyed to Plaintiffs.  Wachovia later provided a revised term sheet to Plaintiffs' investment advisor, on or around September 20, 2006, with the knowledge and intention that it would be conveyed to

Plaintiffs (together with the August 29, 2006 term sheet, the "Octans Term Sheets").  Among other things, the Octans Term Sheets indicated that Octans would be "[m]anaged by Harding Advisory, LLC."

87.     On or around August 14, 2006, Wachovia provided Plaintiffs' investment advisor with a marketing presentation (the "Octans Marketing Book"), with the knowledge and intention that it would be conveyed to Plaintiffs.  That document provided an overview of the Octans deal features and contained a detailed description of Harding's asset selection and asset monitoring processes.  Approximately 40% of the Octans Marketing Book was devoted to touting Harding's experience, skill, and collateral selection processes.

88.     Both the Octans Term Sheets and the Octans Marketing Book represented that Harding would "[i]nvest in high quality assets with stable returns and superior capital preservation profiles" and "[m]aximize returns and minimize losses through rigorous upfront credit and structural analysis, as well as ongoing monitoring of asset quality and performance." Moreover, the Octans Marketing Book outlined the process Harding would purportedly employ in assembling the Octans collateral pool, emphasizing the loan-level analysis and expected loss modeling Harding allegedly would conduct.

89.     The Octans Marketing Book represented that Harding would select the CDO's collateral assets by:

> Performing a detailed loan-level analysis on LTV's, credit scores, debt-to-income ratios, lien status, geographic concentration, loan purpose, IO concentration, occupancy status and documentation level to assess the credit risk of the underlying asset pool.

> Stratifying the higher risk categories of the collateral pool (high LTVs, low credit scores, investment properties, IO loans) to further assess the ability of borrowers to repay debt.

> Evaluating the embedded prepayment options inherent in mortgage-related assets to determine the average life variability and duration drift of the securities under review.

90.    A preliminary offering circular was provided by Wachovia to Plaintiffs' investment advisor on or around September 5, 2006, which was later superseded by a final version dated October 12, 2006 (together, the "Octans Offering Circular").  In this document, Wachovia further stressed the importance of Harding to the CDO's performance:

> The performance of the portfolio of Collateral Debt Securities depends heavily on the skills of [Harding] in analyzing and selecting the Collateral Debt Securities.  As a result, the Issuer will be highly dependent on the financial and managerial experience of [Harding] and certain of the officers and employees of [Harding] to whom the task of selecting and monitoring the Collateral has been assigned or delegated.
>
> *        *        *        *
>
> As Collateral Manager, Harding Advisory will be responsible for selecting and monitoring the collateral …

### 2.    In Reality, Magnetar Designed Octans and Selected Its Collateral

91.    These representations by Wachovia and Harding were materially and knowingly false when made because Magnetar – in complicity with Wachovia and Harding, but invisibly to Plaintiffs – substantially controlled asset selection for Octans.

92.    Unbeknownst to Plaintiffs, Octans was conceived, from the start, as a vehicle for Magnetar's shorting strategy.

93.    On July 3, 2006, Wachovia Capital Markets LLC and Magnetar executed an equity purchase agreement.  The terms of the agreement, and the identity of the equity purchaser, were not disclosed to Plaintiffs.

94.    Harding was notable among collateral managers for its accommodating stance towards Magnetar's plan.  In a July 17, 2006 e-mail, Prusko praised Harding's "can-do attitude."

95.     Harding had indeed earned its reputation as one of Magnetar's most trusted collateral managers.   As shown below, by the time they began to work together on Octans, Harding and Magnetar had already collaborated on three CDOs.   Altogether, Harding served as collateral manager on six Constellation CDOs – more than any other collateral manager.

| Constellation CDOs Managed by Harding | Arranger | Closing Date |
|---|---|---|
| Dorado CDO | Merrill Lynch | January 6, 2006 |
| Octans I CDO | Merrill Lynch | September 26, 2006 |
| Octonion I CDO | Citigroup | March 6, 2006 |
| **Octans II CDO ("Octans")** | **Wachovia** | **October 12, 2006** |
| Octans III CDO | Citigroup | December 3, 2006 |
| Tigris CDO 2007-1 | Mizuho | March 15, 2007 |

96.     Harding was well aware of Magnetar's intentions for Octans.   On September 12, 2006, Prusko sent Wing Chau, Harding's founder and president, an e-mail with the subject line "Meeting Tomorrow!!"   The text of the e-mail read:

> I know this is short notice but very important.   The big guy himself, Alec Litowitz, will be in our NYC office tomorrow.   He would like to meet with you at 5PM to discuss your thoughts on the no trigger structure, how you would think about hedging, risks to strategy.   If you can come over then, would be greatly appreciated.

97.     Five minutes later, Chau responded: "Will make myself available."   Later that day, in another e-mail to Prusko, Chau stated: "stick w/ Harding, we get the job done right!"

98.     Wachovia and Harding did indeed "do the job right" for Magnetar by giving Magnetar undue influence over collateral selection.

99.     For instance, on August 8, 2006, during the ramp-up period for Octans, Prusko e-mailed Wachovia and Harding saying:

Id [sic] like to be copied on the whole approval/trade process and definitely would like to get an updated log each day that there is any trading.

We should also discuss CDO exposure as I will source the CDO CDS.

The next day, Chau responded to all, "Sounds good."

100.    Defendants never disclosed to Plaintiffs the fact that the collateral for Octans was selected pursuant to Magnetar's direction and its criteria.

101.    For example, Harding acceded to Magnetar's desire to include ABX index bonds in the Octans portfolio.  As Harding was aware, the ABX index had been developed in large part to facilitate shorting RMBS.  On September 18, 2006, Prusko sent Chau an e-mail saying, "We should buy the extra index, market getting killed."  Chau, aware that long investors were wary of CDOs investing in RMBS indices such as the ABX index, nonetheless accommodated Prusko, responding: "I hears ya, need to check with the structurers and syndicate as to how much index before investors balk."

102.    Moreover, as described above, the Octans portfolio contained over $42 million in investments in other Constellation CDOs – deals that Magnetar was betting on to default.

103.    Not only was Magnetar accorded undue (and undisclosed) influence over collateral selection for the Octans portfolio, it was also given an opportunity to gain extra profits by "shorting in"[9] to the CDO.  In other words, Magnetar would select weak synthetic assets that would further its plan to profit from the failure of Octans's collateral; it would then serve as the counterparty to the CDO on CDS contracts, profiting – at the expense of Octans – when the collateral failed.

---

[9] "Shorting in" to the CDO means that Wachovia and Harding allowed Magnetar to choose specific assets it wanted to buy protection on and then caused Octans to issue a CDS to Magnetar (through an intermediary, in order to conceal Magnetar's role) on those specific assets.

104.    Harding and Wachovia were well aware of this plan and helped Magnetar implement it.   For example, on September 18, 2006, Harding employee Xilun Chen sent Magnetar's Prusko an e-mail with the subject line "Obligor Concentrations on all Octans," asking: "[W]ould you please let us know if you plan on shorting any names into any of the [Octans] transactions?  We don't want to over commit to any names."

105.    On September 21, 2006, Chen sent Prusko, by e-mail, a list of shorting opportunities "we were able to source for you."   Knowing that Magnetar wanted to hide its involvement in shorting collateral into the CDO, Harding offered to participate in the concealment, with Chen setting out a plan whereby the counterparty would face Wachovia, and "you [Magnetar] can direct Wach[ovia] where to novate to."

106.    On September 28, 2006, Wachovia trader Grant Duff-Cole sent Prusko an e-mail with the subject line "Harding CDS trades for Octans II – 9/26/06."  The e-mail contained a list of trades Wachovia and Harding had carried out for the Octans CDO, including "a few trades we did on behalf of Magnetar."  The list included $85 million of CDS protection bought on behalf of Magnetar.

107.    Similarly, on October 23, 2006, Wing Chau sent an e-mail to Prusko asking "Do u want to buy protection on Carina [another Constellation CDO]."  Sensitive to Magnetar's desire for anonymity, Chau inquired: "Do u want lehman to face Wachovia on your behalf?"  Prusko responded: "Perfect".

108.    This scheme was carried out by Wachovia and Harding to deliberately lure Plaintiffs into purchasing the "long" side of a CDO transaction secretly controlled by the "short" side, Magnetar.  Wachovia and Harding concealed material information from Plaintiffs regarding (i) Magnetar's role in constructing and controlling the deal, and (ii) Wachovia and Harding's

agreement to arrange and manage the deal at Magnetar's behest in order to facilitate Magnetar's long-short strategy.

109.     Not only did Magnetar exercise control over collateral selection for Octans, it also dictated the structure of the deal.   Pursuant to Magnetar's demand, the equity purchase agreement signed on July 3, 2006 stipulated that "there shall not be any interest coverage tests or overcollateralization tests that have the effect of diverting or eliminating cash flows that would otherwise be paid to the Equity Securities during the first five years of the CDO."

110.     Even such attenuated tests as remained in the Octans structure were unacceptable to Magnetar.   On August 16, 2006, Prusko sent an e-mail to Wachovia employees, saying "I do not like the loss test as structured … [the test] Can NOT divert sub note cash flows."

111.     Wachovia also let Magnetar have its way on other deal features.   For example, in a September 11, 2006 e-mail, Prusko noted that Magnetar had some other "structural features" it would "like to incorporate" into Octans, including an additional – and undisclosed – "Magnetar Sourcing Fee" of 30 basis points (*i.e.*, 0.3% of the deal) that Magnetar would receive for proposing assets that it would short into the deal.   Michael Thompson, a managing director at Wachovia, responded the next day that "adding the Magnetar sourcing fee should work."   In short, Wachovia agreed that Magnetar would receive an additional fee for profiting off the sale of weak synthetic assets to the Octans CDO, making profits on its CDS contracts on Octans Notes even more likely.   None of this was disclosed to Plaintiffs.

112.     This manipulation of the structure of Octans enabled Magnetar to profit from substantial cash flows on its equity holdings until the CDO's collateral began to default, and Magnetar would reap massive profits.

113.     In addition to the over $40 million of synthetic assets that Magnetar shorted into the Octans collateral pool, Magnetar bought $208 million of CDS protection on the notes issued by Octans.  In total, Magnetar's short positions on Octans amounted to over a quarter of a billion dollars – well more than three times the size of its long equity position.

114.     Moreover, on information and belief, Magnetar purchased its equity investment at a significant discount from par price.  When this discount is factored in, the ratio of Magnetar's short to long investment is even greater.

115.     Again, Wachovia was not only aware of Magnetar's shorting activity, but actively facilitated it.  For example, on December 18, 2006, Wachovia trader Sergei Zarin asked, "Would Jim [Prusko] care to buy protection on the following constellation deals … Octans II."  Magnetar went on to buy protection on Octans from Wachovia.  In total, Wachovia sold directly to Magnetar CDS protection on Octans Notes totaling over $56 million.

### 3.     Plaintiff LFJ 5's Detrimental Reliance on Defendants' Misrepresentations and Omissions

116.     In reliance on Wachovia's and Harding's false representations and material omissions, Plaintiff LFJ 5 decided to invest in the Octans CDO.  Thereafter, LFJ 5 invested in Octans Class A-2, Class B, and Class C-1 Notes.

117.     On or around October 12, 2006, LFJ 5 bought from Wachovia Octans Class A-2, Class B, and Class C-1 Notes.

118.     As of that date, (i) the Octans Class A-2 Notes were rated AAA, (ii) the Octans Class B Notes were rated AA, and (iii) the Octans Class C-1 Notes were rated A.

119.     LFJ 5 invested in (i) Octans Class A-2 Notes with a face value of $41 million, (ii) Octans Class B Notes with a face value of $30 million, and (iii) Octans Class C-1 Notes with a face value of $23 million.

120.    As Wachovia and Harding anticipated, Octans experienced events of default well before its five-year reinvestment period had expired.  Specifically, on or around May 6, 2008, Octans experienced an event of default as to the Class A-2, Class B, and Class C-1 Notes.  As a result, the Octans Notes became virtually worthless.

121.    Likewise, Octans was downgraded to junk status within its reinvestment period. On or around February 22, 2008, S&P downgraded to the junk rating of (i) B- the Octans Class A-2 Notes, (ii) CCC the Octans Class B Notes, and (iii) CCC- the Octans II Class C-1.  The rapid ratings decline for all three of those classes of Notes continued: by July 2009, both Moody's and S&P had withdrawn their ratings altogether.

122.    Octans was such a successful fraud that, as noted above, another Magnetar collaborator, Alex Rekeda of the bank Calyon, based a subsequent Constellation deal on Octans. Since Octans was "the only no-trigger deal [] bought by IKB" it would serve as a useful template for subsequent attempts to induce Plaintiffs to invest in Constellation CDOs.

> **B.      Sagittarius CDO**
>
> > **1.      Defendants' Misrepresentations
> > and Omissions Concerning Sagittarius**

123.    In or around November 2006, Wachovia approached Plaintiffs' investment advisor in an effort to persuade it to recommend the purchase of notes issued in connection with the Sagittarius CDO to Plaintiffs.  The collateral for the Sagittarius CDO was to be selected and managed by Defendant SAI, a wholly-owned subsidiary of Wachovia.

124.    SAI, like Harding, knew that IKB acted as the investment advisor to Plaintiffs. SAI was also familiar with Plaintiffs' investment criteria; indeed, SAI's "conservative approach" was a major selling point for Plaintiffs in their decision to purchase notes issued by Sagittarius.

125.    At all times, SAI, as a subsidiary of Wachovia, shared premises with Wachovia, acted under Wachovia's direction, and worked closely with Wachovia to develop a close relationship with Plaintiffs' investment advisor, for the purpose of selling CDO investments to Plaintiffs.

126.    On or around December 19, 2006, Wachovia provided Plaintiffs' investment advisor with a term sheet for the Sagittarius CDO, with the knowledge and intention that it be conveyed to Plaintiffs.  Wachovia provided a revised term sheet to Plaintiffs' investment advisor in or around January 2007 and again on or around February 5, 2007 (the "Sagittarius Term Sheets"), also with the knowledge and intention that it would be conveyed to Plaintiffs.

127.    The Sagittarius Term Sheets indicated that Sagittarius was "[m]anaged by Structured Asset Investors, LLC" and included details regarding the priority of payments and structural subordination of the Sagittarius CDO.  The Sagittarius Term Sheets represented that "SAI's investment approach is to maximize returns and minimize losses through rigorous upfront credit and structural analysis as well as ongoing monitoring of asset quality and performance."

128.    In or around January 2007, Wachovia provided Plaintiffs' investment advisor with a marketing presentation for the Sagittarius CDO (the "Sagittarius Marketing Book"), with the knowledge and intention that it be conveyed to Plaintiffs.  The Sagittarius Marketing Book provided an overview of the Sagittarius CDO deal features and contained a detailed description of SAI's asset selection and asset monitoring processes.  Approximately 60% of the Sagittarius Marketing Book was devoted to touting SAI's experience, skill, and detailed collateral selection processes.  For instance, under the heading "CRE CDO Analysis – Collateral Analysis," Wachovia and SAI represented that the:

Nature of collateral (i.e. CMBS assets, Whole Loans, B-Notes, Mezzanine Loans, Preferred Interests) dictates the type of collateral analysis

– Fundamental real estate analysis

> Focus on property type, location, competitive nature, revenue / expense, occupancy, tenant mix, etc.

> The lower in the capitalization structure the more intense the real estate analysis

– Re-underwrite portfolio

– Competitive analysis of collateral within its trade area

– Competitive analysis of collateral versus similar deals

129.    A preliminary offering circular for Sagittarius was provided by Wachovia to Plaintiffs' investment advisor on or around September March 8, 2007, which was later superseded by the final offering circular for Sagittarius, dated March 12, 2007 (together, the "Sagittarius Offering Circular").  This document stressed that "[t]he Collateral Assets comprising the Collateral securing the Secured Notes will be selected by Structured Asset Investors, LLC ('SAI'), as collateral manager" and that "the Collateral Manager will select and manage the Collateral Assets."  Further, the Sagittarius Offering Circular represented that:

> The performance of the Collateral will be highly dependent on the financial and managerial expertise of the Collateral Manager.  The loss of the services of one or more of the individuals constituting the senior management team of the Collateral Manager could have a material adverse effect on the performance of the Collateral.

130.    The Sagittarius Offering Circular further represented that the portfolio for Sagittarius would not include any "security … linked to or based on any index referencing corporate debt obligations or asset-backed securities."

131.    Finally, the offering circular represented that the "[i]ssuer may not acquire any Collateral Asset unless such acquisition is made on an 'arm's-length basis' for fair market value."

### 2.    In Reality, Magnetar Designed Sagittarius and Selected Its Collateral

132.    These representations by Wachovia and SAI were materially and knowingly false when made because, *inter alia*, Magnetar – in complicity with Wachovia and SAI, but invisibly to Plaintiffs – substantially influenced asset selection for Sagittarius.

133.    This scheme was conducted by Magnetar, Wachovia and SAI to deliberately lure Plaintiffs into purchasing the "long" side of a CDO transaction secretly controlled by the "short" side, Magnetar.  Furthermore, Wachovia and SAI concealed material information from Plaintiffs regarding (i) Magnetar's role in constructing and controlling the deal, and (ii) Wachovia and SAI's agreement to arrange and manage the deal at Magnetar's behest in order to facilitate Magnetar's long-short strategy.

134.    Early on in the process of creating and marketing the Sagittarius CDO, Magnetar made it clear that it was to be given the central role in structuring the transaction and selecting the collateral.  For example, James Prusko of Magnetar sent an e-mail to Michael Thompson of Wachovia on September 19, 2006, saying that while he "didn't mean to kill [SAI] off," he "just wanted them to be more *user friendly*" (emphasis added).  Wachovia understood the message loud and clear.  Less than an hour later, Thompson replied, "we're working on that angle as we speak – lets [sic] talk tomorrow."

135.    Thereafter, collateral was selected for the Sagittarius collateral pool pursuant to Magnetar's direction and its criteria, with Magnetar exercising an effective veto over collateral selection.

136.    For example, on November 13, 2006, Wachovia trader Todd Cooper sent Prusko an e-mail, saying:

> Michael [Thompson] wanted me to forward the below list of names to you in connection with a BWIC[10] that SAI is running for Sagittarius.   Please let us know if you have any thoughts or concerns.  Thx.

137.    The ten assets listed on Cooper's e-mail showed that SAI was aiming to buy $100 million of RMBS securities.  Notably, two of the ten bonds – with a total value of $20 million – were issued by Countrywide Financial, one of the most infamous originators and securitizers of subprime mortgages.

138.    This BWIC list was evidently acceptable to Magnetar; Prusko replied "Lets [sic] test the waters!"

139.    Unsurprisingly, given Magnetar's long-short strategy, these collateral assets were among the weakest, low-quality eligible assets available.  For example, RMBS bonds issued by Countrywide Financial totaled over $118 million – one eighth of the total collateral.

140.    Moreover, despite the  explicit representation that all collateral would be acquired in arm's-length transactions for fair market value, the Sagittarius CDO was stocked with collateral acquired on terms that were by no means "arm's-length" and at prices significantly above fair market value.  Defendants caused the Sagittarius CDO to purchase cash assets for greater than their fair market value and to offer CDS referencing synthetic assets for spreads lower than the fair market rate.

141.    In addition to according Magnetar substantial – and undisclosed – influence over the selection of collateral, Wachovia and SAI allowed Magnetar undue control over the structure of the Sagittarius CDO.  Again, none of this was disclosed to Plaintiffs.

---

[10] "BWIC" stands for Bid Wanted In Competition.

142.    For example, on December 3, 2006, Prusko sent an e-mail to Wachovia with the subject line "Saggitarius [sic] and beyond..."  The e-mail attached deal documents from the Orion 2006-2 transaction, a Constellation CDO arranged by Magnetar with the help of the bank Calyon.  Prusko said: "This is our latest most innovative structure; we would like to use this as template."

143.    Magnetar made it clear that it would not tolerate the presence of the usual OC and IC tests that would inhibit Magnetar's equity cashflows before the CDO's intended collapse. Wachovia and SAI acceded to this demand.  On January 18, 2007, Todd Cooper of Wachovia sent Prusko an e-mail listing with the subject line "Sagittarius – SS Remaining Items."  Item number three on the list of outstanding issues was the application of an OC test.  Prusko responded that item three "[a]bsolutely doesn't work, has to be 6% actual losses, no haircuts." Wachovia accepted this.  While the absence of OC and IC tests was disclosed, the reason for their absence – the demand of an equity purchaser with a secret long-short trading strategy – was not.

144.    Magnetar would grow even bolder.  On January 25, 2007, Magnetar in-house counsel Susan Furman sent Dash Robinson of Wachovia an e-mail with an attachment entitled "Deal Terms.doc."  In the cover e-mail, Furman said:

> In connection with Sagittarius we have a sheet of deal requirements that we think it would be helpful to pass on to counsel in order to streamline the drafting process.  If our concerns are taken into consideration ahead of the drafting, we should save time on the back end.

145.    Among Magnetar's "deal requirements" was the "right to remove the Collateral Manager with cause and without cause" as well as "consent rights with respect to any successor Collateral Manager."

146.    Wachovia and SAI never disclosed to Plaintiffs that the equity purchaser (whose identity had not even been disclosed) had demanded the right to unilaterally fire and replace the collateral manager.

147.    Wachovia and SAI were fully aware of Magnetar's intentions in creating Sagittarius.   On March 14, 2007 Prusko sent Wachovia employees an e-mail attaching a document named "Saggit Long-Short.pdf."   The attachment was a graph setting out Magnetar's projected returns in different loss scenarios, making clear that Magnetar would profit not only if the CDO performed but also if it failed – in fact, the worse the CDO's collateral performed, the larger Magnetar's profit.   In the cover e-mail, Prusko was quite clear as to what he thought about the quality of Sagittarius: "It's not a pretty bond."

148.    Additionally, on information and belief, in order to accommodate Magnetar's preference for the ABX index, SAI proposed the inclusion of ABX index components into the Sagittarius portfolio, despite the representation in the offering memorandum that bonds linked to such indices were not eligible collateral.   In order to conceal what it was doing, SAI purchased ABX index components individually, rather than in a single trade.

149.    Shortly after Sagittarius closed, Magnetar bought at least $21.9 million worth of CDS protection on Sagittarius, awaiting the failure of the CDO's collateral, that it – with the help of Wachovia and SAI – had designed.

150.    Notwithstanding their knowledge of Magnetar's scheme, Wachovia and SAI persisted in aggressively marketing Sagittarius to Plaintiffs.

    3.    **Plaintiffs' Detrimental Reliance on**
            **Defendants' Misrepresentations and Omissions**

151.    In reliance on Wachovia and SAI's false representations and material omissions, Plaintiffs LFJ 15 and LFJ 28 decided to invest in the Sagittarius CDO Class A and Class B Notes.

152.    On or around March 15, 2007, LFJ 15 and LFJ 28 bought from Wachovia Sagittarius CDO Class A and Class B Notes.

153.    As of that date, (i) the Sagittarius CDO Class A Notes were rated AAA, and (ii) the Sagittarius CDO Class B Notes were rated AA.

154.    LFJ 15 invested in Sagittarius Class A Notes with a face value of $5 million, and LFJ 28 invested in Sagittarius Class B Notes with a face value of $5 million.

155.    As Wachovia and SAI anticipated, Sagittarius experienced events of default before its approximately five-year reinvestment period expired.  Specifically, on or around October 23, 2007, Sagittarius experienced an event of default as to both the Class A and Class B Notes.  As a result, the Sagittarius Notes became virtually worthless.

156.    Likewise, Sagittarius was downgraded to junk status within its reinvestment period.  Specifically, on or around December 6, 2007, S&P downgraded to a junk rating of CCC- the Sagittarius Class A and Class B Notes that LFJ 15 and LFJ 28 purchased.  The rapid ratings decline for both of those classes of notes continued, and by in or around July 2009, both Moody's and S&P had withdrawn their ratings altogether.

   **C.**    **Longshore CDO Funding 2007-3 Limited**

      **1.**    **Defendants' Misrepresentations
            and Omissions Concerning Longshore**

157.    On or about March 8, 2007, Wachovia provided Plaintiffs' investment advisor received a marketing book for the Longshore CDO (the "Longshore Marketing Book"), with the intention that it be passed on to Plaintiffs.  The Longshore Marketing Book touted the "high

collateral credit quality" of the CDO, and went into great detail about SAI's collateral selection and due diligence procedures.  For example, the marketing book stated:

**CDO Analysis – Structural Analysis and Manager Analysis**

- Selection of issuers taken very seriously
- Extensive on-site due diligence conducted by SAI
- All potential managers go through a rigorous screening process which includes a full underwrite of the manager
- On-site due diligence governed by a due diligence checklist and conducted by portfolio manager and credit analysts for SAI

158.    On March 27, 2007, Wachovia provided Plaintiffs' investment advisor with a preliminary offering memorandum for Longshore, which was later superseded by a final version dated April 25, 2007 (together, the "Longshore Offering Memorandum").  In this document, Defendants made the following representation:

> The Collateral Manager shall cause <u>any acquisition or sale of Collateral by the Issuer to be conducted on an arm's length basis</u> and otherwise in accordance with the requirements of the Advisers Act, and, <u>if effected with the Collateral Manager or one of its Affiliates</u>, or any fund or account for which the Collateral Manager or one of its Affiliates acts as an investment advisor, <u>on terms as favorable to the Issuer as would be the case if such Person were not so affiliated</u>[.]

(Emphasis added).

**2.      In Reality, Longshore Was a Vehicle for Wachovia to Divest Risky Assets from Its Own Balance Sheet**

159.    Unknown to potential long investors such as Plaintiffs, Longshore was a much riskier CDO than Wachovia and SAI had represented.  Rather than a secure investment with a carefully selected portfolio of high-quality collateral, Longshore was really a vehicle for Wachovia to get rid of RMBS assets that it knew – because of its superior knowledge of the subprime securities market – were set to face a quick and steep loss of value.

160.    In February 2007, Wachovia had been preparing two CDO transactions.  One of these ultimately became the Longshore CDO; the other transaction was never completed, but was instead aborted before closing (the "Cancelled CDO").   An affiliate of Wachovia served as warehouse provider for both deals.

161.    As the warehouse provider for the Cancelled CDO, Wachovia was faced with the issue of what to do with the assets that had been purchased for the deal but, due to the deal's cancellation, now remained in the warehouse and on Wachovia's books.  If these assets remained there, Wachovia would have to absorb the loss of those assets' falling value.

162.    At the time, based on its insider's knowledge of the mortgage market, Wachovia was aware of significant problems in the RMBS sector, including impending changes to the ratings methodologies used by ratings agencies, and consequent downgrades, that would cause major decreases in the value of RMBS assets.

163.    Instead of selling them on the open market, Wachovia transferred the assets – 28 cash RMBS securities and 12 synthetic securities – into the warehouse for the Longshore CDO at the same price at which these assets had originally been purchased months earlier for the Cancelled CDO.   Defendants failed to disclose this transfer to prospective investors in the Longshore CDO.

164.    Moreover, Defendants concealed from investors the fact that the value of the Cancelled CDO's assets had diminished substantially between the time they were purchased for that deal and the time they were sold to the Longshore CDO.  As a result, the prices paid by the Longshore CDO for the Cancelled CDO's assets were greater than their market value.  Contrary to Defendants' representations that all acquisitions for the CDO would be "on an arm's length

-40-

basis" and at fair market prices, the Cancelled CDO's assets were sold to Longshore for $4.6 million over their then-current market value.

165.    Wachovia's conduct with respect to Longshore was the subject of an investigation and subsequent legal action by the Securities and Exchange Commission (the "SEC").  The SEC charged Wells Fargo (as successor to Wachovia) with fraud in connection with its sale of Longshore notes to certain investors.   Wells Fargo settled the action (which also involved another CDO, not at issue here) for over $11 million.

166.    In its order, the SEC found that Wachovia had:

> avoided losses on some of these [Cancelled CDO's] assets by transferring 40 RMBS (28 cash and 12 synthetic) with a total notional value of approximately $250 million from the [Cancelled CDO's] Warehouse to the warehouse for Longshore 3 at the prices at which the assets had originally been acquired (the "acquisition cost").   That acquisition cost was approximately $4.6 million above the market prices at the time of the transfer because the market had moved in the period between the original acquisition of the assets and the time of the transfer.
>
> …
>
> [Wachovia] failed to specifically indicate that a portion of the collateral was previously acquired for the [Cancelled CDO's] Warehouse at then-current market prices and then transferred to the warehouse for Longshore 3 from an affiliate of SAI at their acquisition costs, which no longer represented market prices.[11]

167.    Moreover, the SEC found that Wachovia had knowingly misrepresented its collateral selection process for Longshore, selling the Longshore warehouse assets for prices well above their internal market valuations:

> Wachovia Capital Markets represented in the Offering Circular for Longshore [] that collateral acquired from affiliates of SAI would be acquired in transactions representative of transactions entered into "on an arm's-length basis" and "at fair market prices" (the

---

[11] "Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order" (the "SEC Order"), ¶ 22.

"Affiliate Transaction Disclosures").  Those representations were false and misleading because assets transferred from the [Cancelled CDO's] Warehouse were priced approximately $4.6 million above their then-current market prices as determined by Wachovia Capital Markets' internal marks on the assets.[12]

3.      **Plaintiffs' Detrimental Reliance on Defendants' Misrepresentations and Omissions**

168.    In reliance on Wachovia and SAI's false representations and material omissions, Plaintiffs LFJ 3, LFJ 5 and LFJ 30 decided to invest in the Longshore CDO Class A-3, B and C Notes.

169.    On or around April 23, 2007, LFJ 3, LFJ 5 and LFJ 30 bought from Wachovia Longshore CDO Class A-3, B, and C Notes.

170.    As of that date, (i) the Longshore CDO Class A-3 Notes were rated AAA, (ii) the Longshore CDO Class B Notes were rated AA; and (iii) the Longshore CDO Class C Notes were rated A.

171.    LFJ 3 invested in Longshore Class C Notes with a face value of $8 million, LFJ 5 invested in Longshore Class B Notes with a face value of $37.6 million, and LFJ 30 invested in Longshore Class A-3 Notes with a face value of $13.5 million.

172.    The above amounts are net of the recovery obtained by LFJs 3, 5 and 30 (amounting to $29,690.98, $145,696.28, and $53,010.77 respectively) resulting from settlement of the SEC's proceedings against Wells Fargo relating to Longshore.

173.    Longshore experienced events of default before its approximately five-year reinvestment period expired.  Specifically, on or around February 4, 2008, all classes of notes of Longshore experienced an event of default, including the Class A-3, the Class B, and Class C

---

[12] SEC Order, ¶ 23.

Notes purchased by LFJ 3, LFJ 5, and LFJ 30, respectively.  As a result, the Longshore Notes became virtually worthless.

174.    Likewise, Longshore was downgraded to junk status within its reinvestment period.  Specifically, on or around March 25, 2008, S&P downgraded the Longshore Class A-3, Class B and Class C Notes to the low junk ratings of CCC, CC and CC- , respectively.

175.    As alleged above, because the Longshore CDO paid substantially – approximately $4.6 million – more for the Cancelled CDO's assets than they were worth at the time of their transfer, the Longshore CDO did not receive fair consideration for those assets.

176.    Because the Longshore CDO did not receive fair consideration in these conveyances, the CDO was rendered insolvent, as it lacked sufficient assets to meet its obligations to investors.  Additionally, the conveyances left Longshore with insufficient capital to carry on business, and to meet obligations as they arose.

## IV.    Defendants Selected Collateral that Was Not Fair Consideration for the Obligations Undertaken by the CDOs, Leaving the CDOs Insolvent

177.    As alleged above, the assets that were transferred to the Octans, Sagittarius, and Longshore CDOs were significantly riskier than had been disclosed to Plaintiffs.  The RMBS cash assets that Defendants transferred to the CDOs systemically carried much more risk than had been disclosed, yet the CDOs paid more for those securities than they would have in open-market *bona fide* trades.  Similarly, the synthetic CDS were based on RMBS carrying significantly more risk than had been disclosed to Plaintiffs, yet the premiums received by the CDOs were not commensurate to such elevated risk levels, and were less than they would have been in open-market *bona fide* trades.  Therefore the CDOs did not receive fair consideration for those assets.

178.    Moreover, with respect to the Sagittarius and Longshore CDOs, Wachovia arranged for the CDOs to pay at or near the face price for all the assets comprising the collateral portfolio.  Wachovia did so despite being the fact that the market value of the assets was severely impaired at the time of the closing of the CDOs.  For example, at the closing of the Sagittarius CDO, the ABX 2006-2 (BBB-) index stood at 72%, suggesting that the value of that class of assets was 28% lower than face value.  As a result, Sagittarius's collateral was worth far less than the amount it paid Wachovia for it.

179.    Because the Octans, Sagittarius and Longshore CDOs did not receive fair consideration in these conveyances, the CDOs were rendered insolvent, as they lacked sufficient assets to meet their obligations to investors.   Additionally, the conveyances left Octans, Sagittarius and Longshore with insufficient capital to carry on business, and to meet obligations as they arose.

### V.    The Damages Caused by Defendants' Misconduct

180.    Prior to the above-described events of default for the notes Plaintiffs purchased, Defendants were aware of information regarding the higher risk of the assets securing those notes and actively concealed such information from Plaintiffs.

181.    As a result of the defaults that eventually did occur, the approximately $163.1 million in CDO notes that Plaintiffs purchased from Wachovia became virtually worthless.

182.    Prior to 2010, Plaintiffs did not know and could not reasonably have discovered the facts demonstrating Defendants had engaged in the fraudulent scheme alleged herein.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Common Law Fraud
### Against All Defendants)

183.    Plaintiffs repeat and reallege all of the foregoing paragraphs as if fully set forth herein.

184.    Wachovia (as arranger of the Octans, Sagittarius and Longshore CDOs); Harding (as collateral manager of the Octans CDO); and SAI (as collateral manager of the Sagittarius and Longshore CDOs), made representations to Plaintiffs concerning the collateral for those CDOs.

185.    These oral and written misrepresentations and omissions, as described in the preceding allegations, included representations concerning, *inter alia*, the safety and security of the Plaintiffs' investments in these CDOs; the identity and interests of the parties who selected the collateral assets for these CDOs; the role of the CDOs' collateral managers; the undisclosed role of Magnetar in the CDOs; the quality of the mortgage loans underlying the collateral for these CDOs; the representation that collateral would be acquired at "arm's length" and for "fair market value," when in reality the collateral comprised risky assets transferred to the CDOs at above-market prices; and the value, credit quality and risk of loss for the notes purchased by Plaintiffs in these CDOs.

186.    Defendants' representations were materially false and misleading when made. These representations were made intentionally or with reckless disregard for the truth.

187.    Defendants made these misrepresentations and omissions to Plaintiffs directly or *via* Plaintiffs' investment advisor with the knowledge that Plaintiffs would rely on them.

188.    Based upon their superior knowledge and expertise, their incomplete and misleading disclosures, and in light of the fact that Plaintiffs did not have access to material facts

that were uniquely within Defendants' knowledge, Defendants had an affirmative duty to provide full, complete, and accurate disclosure of these material facts.  Defendants intentionally failed to provide – or recklessly disregarded their obligation to provide – full, complete, and accurate disclosures of these material facts.

189.    Plaintiffs reasonably and justifiably relied to their detriment on Defendants' misrepresentations and omissions, and also Defendants' affirmative duty to provide full, complete, and accurate disclosures to Plaintiffs.

190.     Defendants' misrepresentations and omissions induced Plaintiffs to purchase the above-described Octans, Sagittarius, and Longshore Notes from Wachovia, which they would not have done had they known the truth.

191.    Wells Fargo is the successor-in-interest to each of the Wachovia entities and is liable for Wachovia's wrongdoing.

192.    As a direct and proximate result of those misrepresentations and omissions, Plaintiffs have suffered damages, and Defendants are liable to Plaintiffs in an amount in excess of $163.1 million plus interest.

193.    Because Defendants' conduct affected the public generally, and was gross and highly morally culpable, Plaintiffs are also entitled to punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Rescission of Contract Based
### Upon Fraud Against Wells Fargo)

194.    Plaintiffs repeat and reallege the preceding allegations as though set forth at length herein.

195.   Wachovia's representations with respect to the Octans, Sagittarius, and Longshore Notes purchased by Plaintiffs were material, incomplete, misleading and false when made. These misrepresentations and omissions were made intentionally or with reckless disregard for the truth.

196.   Wachovia made materially misleading and incomplete statements to induce Plaintiff LFJ 5 into investing $94 million in Octans Notes.

197.   Wachovia made materially misleading and incomplete statements to induce Plaintiffs LFJ 15 and LFJ 28 into investing $5 million each in Sagittarius Notes.

198.   Wachovia made materially misleading and incomplete statements to induce Plaintiffs LFJ 30, LFJ 5 and LFJ 3 into investing $13.5 million, $37.6 million, and $8 million in Longshore Notes, respectively.

199.   As alleged above, these statements included representations concerning, *inter alia*, the safety and security of the Plaintiffs' investments; the identity and interests of the parties who selected the collateral assets for these CDOs; the role of the CDOs' collateral managers; the undisclosed role of Magnetar in the CDOs; the quality of the mortgage loans underlying the collateral for these CDOs; the representation that collateral would be acquired at "arm's length" and for "fair market value," when in reality the collateral comprised risky assets transferred to the CDOs at above-market prices; and the value, credit quality and risk of loss for the notes purchased by Plaintiffs in these CDOs.

200.   Wachovia's misrepresentations and omissions were made to Plaintiffs directly or *via* Plaintiffs' investment advisor, with the knowledge that Plaintiffs would rely on such information when investing.   Defendants intentionally, deliberately, and maliciously lured

Plaintiffs into investing in the notes, knowing that they were selling something different than what they represented the CDOs to be.

201.    Based upon their superior knowledge and expertise, their incomplete and misleading disclosures, and in light of the fact that Plaintiffs did not have access to material facts that were uniquely within Wachovia's knowledge, Wachovia had an affirmative duty to provide full, complete, and accurate disclosure of these material facts.  Wachovia intentionally failed to provide, or recklessly disregarded its obligation to provide, full, complete, and accurate disclosures of these material facts.

202.    Plaintiffs reasonably and justifiably relied to their detriment on these misrepresentations and omissions, and also on Wachovia's affirmative duty to provide full, complete, and accurate disclosures to Plaintiffs.

203.    But for Wachovia's misrepresentations and omissions, Plaintiffs would never have agreed to invest in the CDO transactions at issue; Wachovia's misrepresentations and omissions therefore fraudulently induced Plaintiffs to purchase the notes from Wachovia.

204.    The notes that Plaintiffs bargained for were different from what Plaintiffs received from Wachovia.  Plaintiffs lack an adequate remedy at law.

205.    Wells Fargo is the successor-in-interest to each of the Wachovia entities and is liable for Wachovia's wrongdoing.

206.    As a result of the foregoing, Plaintiffs are entitled to a judgment rescinding the contract of sale and directing Wells Fargo to return the $163.1 million purchase price for the Octans Notes, Sagittarius Notes, and Longshore Notes, together with interest.

### THIRD CAUSE OF ACTION

**(Conspiracy to Defraud
Against All Defendants)**

207.    Plaintiffs repeat and reallege all of the foregoing paragraphs as if fully set forth herein.

208.    As alleged above, Defendants made material misrepresentations and omissions for the purpose of inducing Plaintiffs to purchase notes in the Octans, Sagittarius, and Longshore CDOs.  These misrepresentations were material, incomplete, misleading, and false when made.

209.    The material misrepresentations and omissions as described above constituted a fraud against Plaintiffs.

210.    The conduct of Wachovia and Harding in respect of the Octans CDO occurred pursuant to a common scheme and agreement in connection with the Octans CDO.  Their overt acts in furtherance of that agreement included, *inter alia¸* the material misrepresentations and omissions to LFJ 5 as described above.  Wachovia and Harding intentionally participated in this common scheme and agreement in furtherance of a plan or purpose to, *inter alia*, defraud LFJ 5, earn lucrative fees, and assist Magnetar's short-investment strategy as described above.

211.    The conduct of Wachovia and SAI in respect of the Sagittarius and Longshore CDOs occurred pursuant to a common scheme and agreement in connection with those CDOs.  Their overt acts in furtherance of that agreement included, *inter alia¸* the material misrepresentations and omissions to LFJs 3, 5, 15, 28 and 30 as described above.  Wachovia and SAI intentionally participated in this common scheme and agreement in furtherance of a plan or purpose to, *inter alia*, defraud LFJs 3, 5, 15, 28 and 30, earn lucrative fees, assist Magnetar's short-investment strategy with respect to the Sagittarius CDO, and to remove from Wachovia's books rapidly deteriorating assets with respect to the Longshore CDO, as described above.

212.     The object of the foregoing conspiracies was unlawful.

213.     Wells Fargo is the successor-in-interest to each of the Wachovia entities and is liable for Wachovia's wrongdoing.

214.     As a direct and proximate result of the foregoing conspiracies to commit fraud, Plaintiffs have suffered damages in an amount to be determined at trial, but no less than $163.1 million in connection with their purchase of notes in the Octans, Sagittarius and Longshore CDOs.

215.     Because Defendants' conduct affected the public generally, was gross and highly morally culpable, Plaintiffs are also entitled to punitive damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

**(Aiding and Abetting Fraud
Against All Defendants)**

216.     Plaintiffs repeat and reallege all of the foregoing paragraphs as if fully set forth herein.

217.     As alleged above, Plaintiffs were fraudulently induced into purchasing $163.1 million in notes in the Octans, Sagittarius and Longshore CDOs.

218.     Defendants each provided intentional and substantial assistance to one another to advance this fraud on Plaintiffs.

219.     As described above, Wachovia and Harding made materially misleading and incomplete statements to induce LFJ 5 into investing in the Octans CDO.  Wachovia and Harding falsely represented that Harding would select high-quality assets for inclusion in Octans, when in fact they knowingly and intentionally chose collateral assets that were likely to default and yield credit protection payments to short investor Magnetar.

220.    Wachovia  substantially  assisted  Harding's  fraud  by,  among  other  things, preparing the offering documents for Octans.

221.    Harding  substantially  assisted  Wachovia's  fraud  by,  among  other  things, participating in the preparation of offering documents for Octans.

222.    As  described  above,  Wachovia  and  SAI  made  materially  misleading  and incomplete  statements  to  induce  LFJs  15  and  28  into  investing  in  the  Sagittarius  CDO. Wachovia and SAI falsely represented that SAI would select high-quality assets for inclusion in Sagittarius, when in fact they knowingly and intentionally chose reference assets that were likely to default and yield credit protection payments to short investor Magnetar.

223.    As  described  above,  Wachovia  and  SAI  made  materially  misleading  and incomplete  statements  to  induce  LFJs  3,  5,  and  30  into  investing  in  the  Longshore  CDO. Wachovia and SAI falsely represented that SAI would ensure the selection of high-quality assets for  inclusion  in  Longshore,  when  in  fact  they  simply  recycled  assets  that  had  already  been warehoused by Wachovia for the Cancelled CDO, assets which Wachovia and SAI were aware were rapidly falling in value.

224.    Wachovia substantially assisted SAI's fraud by, among other things, preparing the offering documents for Sagittarius and Longshore.

225.    SAI substantially assisted Wachovia's fraud by, among other things, assisting in the preparation of offering documents for Sagittarius and Longshore.

226.    Plaintiffs would not have purchased the Octans, Sagittarius, or Longshore Notes had they known the truth.

227.    Plaintiffs' reliance on these misrepresentations and omissions was justified.

228.    Wells Fargo is the successor-in-interest to each of the Wachovia entities and is liable for Wachovia's wrongdoing.

229.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial, but no less than $163.1 million, in connection with their purchase of the Octans, Sagittarius and Longshore Notes.

230.    Because Defendants' conduct affected the public generally, was gross and highly morally culpable, Plaintiffs are also entitled to punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Fraudulent Conveyance Against All Defendants)

231.    Plaintiffs repeat and reallege all of the foregoing paragraphs as if fully set forth herein.

232.    LFJ 5 is a creditor of Octans, and Octans is a "debtor" to LFJ 5 within the meaning of the New York Debtor and Creditor Law (the "DCL").

233.    On information and belief, on or about October 12, 2006, Wachovia, acting through its warehouse lender Wachovia Bank, N.A., sold cash assets at above-market prices and synthetic assets (consisting of CDS) with below-market premiums to Octans (the "Octans Conveyance").

234.    The Octans Conveyance rendered the Octans CDO "insolvent" within the meaning of § 271 of the DCL.  By virtue of this insolvency, the Octans Conveyance was fraudulent as to creditors under § 273 of the DCL.

235.    The Octans Conveyance was made without "fair consideration" within the meaning of § 272 of the DCL at a time when Octans was engaged, or was about to be engaged, in a business or transaction for which the property remaining in Octans' hands after the

conveyance was "an unreasonably small capital" within the meaning of § 274 of the DCL. Consequently, the Octans Conveyance was fraudulent as to creditors (including Plaintiffs) under § 274 of the DCL.

236.   Wachovia knew that as a result of the Octans Conveyance, investors in Octans (including Plaintiffs) would fund short positions of Magnetar that were intended to drain Octans of its assets and defraud creditors (including Plaintiffs).  Knowing these facts, Wachovia (with the assistance of Magnetar) induced Octans to make the Octans Conveyance.

237.   As the Octans Conveyance, therefore, was made with actual intent "to hinder, delay, or defraud present or future creditors" and was fraudulent as to creditors under § 276 of the DCL, LFJ 5 is entitled to set it aside pursuant to § 278(a) of the DCL.

238.   LFJ 15 and LFJ 28 are creditors of Sagittarius, and Sagittarius is a "debtor" to LFJ 15 and LFJ 28 within the meaning of the DCL.

239.   On or about March 25, 2007, Wachovia, acting through Wachovia Bank, N.A., sold cash assets at above-market prices and synthetic assets (consisting of CDS) with below-market premiums to Sagittarius (the "Sagittarius Conveyance").

240.   The Sagittarius Conveyance rendered Sagittarius "insolvent" within the meaning of § 271 of the DCL.  By virtue of this insolvency, the Sagittarius Conveyance was fraudulent as to creditors under § 273 of the DCL.

241.   The Sagittarius Conveyance was made without "fair consideration" within the meaning of § 272 of the DCL at a time when Sagittarius was engaged, or was about to be engaged, in a business or transaction for which the property remaining in Sagittarius' hands after the conveyance was "an unreasonably small capital" within the meaning of § 274 of the DCL.

Consequently, the Sagittarius Conveyance was fraudulent as to creditors (including Plaintiffs) under § 274 of the DCL.

242.    Wachovia knew that as a result of the Sagittarius Conveyance, investors in Sagittarius (including Plaintiffs) would fund short positions of Magnetar that were intended to drain Sagittarius of its assets and defraud creditors (including Plaintiffs).  Knowing these facts, Wachovia (with the assistance of Magnetar) induced Sagittarius to make the Sagittarius Conveyance.

243.    As the Sagittarius Conveyance, therefore, was made with actual intent "to hinder, delay, or defraud present or future creditors" and was fraudulent as to creditors under § 276 of the DCL, LFJ 15 and LFJ 28 are entitled to set it aside pursuant to § 278(a) of the DCL.

244.    LFJs 3, 5, and 30 are creditors of Longshore, and Longshore is a "debtor" to LFJs 3, 5 and 30 within the meaning of the DCL.

245.    On or about April 26, 2007, Wachovia, acting through its warehouse lender Wachovia Bank, N.A., sold cash assets at above-market prices and synthetic assets (consisting of CDS) with below-market premiums to Longshore (the "Longshore Conveyance").

246.    The Longshore Conveyance rendered the Longshore CDO "insolvent" within the meaning of § 271 of the DCL.  By virtue of this insolvency, the Longshore Conveyance was fraudulent as to creditors under § 273 of the DCL.  Consequently, the Longshore Conveyance was made without "fair consideration" within the meaning of § 272 of the DCL at a time when Longshore was engaged, or was about to be engaged, in a business or transaction for which the property remaining in Longshore's hands after the conveyance was "an unreasonably small capital" within the meaning of § 274 of the DCL.

247.    The Longshore Conveyance was fraudulent as to creditors (including Plaintiffs) under § 274 of the DCL.

248.    Wachovia knew that as a result of the Longshore Conveyance, investors in Longshore (including Plaintiffs) would be paying for collateral assets worth significantly less than their purported value, thus defrauding creditors (including Plaintiffs).  Knowing these facts, Wachovia induced Longshore to make the Longshore Conveyance.

249.    As the Longshore Conveyance, therefore, was made with actual intent "to hinder, delay, or defraud present or future creditors" and was fraudulent as to creditors under § 276 of the DCL, LFJ 3, LFJ 5 and LFJ 30 are entitled to set it aside pursuant to § 278(a) of the DCL.

250.    On information and belief, Defendant Wachovia, and non-party Magnetar, knew that as a result of the conveyances, investors in the Octans and Sagittarius CDOs (including Plaintiffs) would fund short positions held by Magnetar, that were intended to drain the CDOs of their assets and defraud creditors (including Plaintiffs).  Knowing these facts, Defendants caused or induced the Octans and Sagittarius CDOs to make the conveyances.

251.    With regard to the Octans Conveyance, the Sagittarius Conveyance and the Longshore Conveyance, the Issuers, Managers, and Wachovia made these conveyances with the intent to hinder, delay, or defraud the Issuers' creditors, including Plaintiffs.

252.    In the alternative, at the time of each conveyance noted above, (i) the Issuers were either insolvent or were rendered insolvent thereby, (ii) were left with unreasonably small capital, and/or (iii) the Issuers and/or Wachovia intended or believed that the Issuers would incur debts beyond their ability to pay as they matured.

253.     As a result, the sales of credit protection by Octans and Sagittarius to Magnetar and the sales of securities to the Octans, Sagittarius and Longshore CDOs were fraudulent conveyances pursuant to §§ 270-81 of the DCL.

254.     Wells Fargo is the successor-in-interest to each of the Wachovia entities and is liable for Wachovia's wrongdoing.

255.     Consequently, Plaintiffs are entitled to a judgment setting aside and voiding each of the property transfers described as fraudulent conveyances and directing that the property transferred be made available to Plaintiffs for satisfaction of the judgment that will be rendered in this action, together with interest.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment Against All Defendants)

256.     Plaintiffs repeat and reallege all of the foregoing paragraphs as if fully set forth herein.

257.     On the basis of Defendants' misconduct as described above, Plaintiffs transferred the purchase price for the above-described notes issued in connection with the Octans, Sagittarius and Longshore CDOs, and thereby paid a portion of Wachovia's fees as arranger of those CDOs and the Managers' fees as putative collateral managers.

258.     Defendants have been unjustly enriched at Plaintiffs' expense by, *inter alia*, earning fees through their fraudulent conduct as described above.

259.     Wells Fargo is the successor-in-interest to each of the Wachovia entities and is liable for Wachovia's wrongdoing.

260.     Defendants unjustly retained their wrongfully obtained profits at the expense of Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully demand judgment as follows:

a.      Rescission of the contracts of sale between Wells Fargo and Plaintiffs, and Wells Fargo's return to Plaintiffs of the purchase price of the Octans Notes, Sagittarius Notes, and Longshore Notes;

b.      An award of damages to Plaintiffs from Defendants, including punitive damages, in an amount in excess of $163.1 million;

c.      Awarding Plaintiffs punitive damages as a result of Defendants' intentional, deliberate, malicious, willful, and wanton conduct as detailed above;

d.      An award of post-judgment interest to Plaintiffs with respect to each award of damages;

e.      Imposition of a constructive trust over Defendants for their ill-gotten fees and other gains and ordering restitution of such gains to Plaintiffs;

f.      A judgment setting aside and voiding each of the property transfers described as fraudulent conveyances and directing that the property transferred be made available to Plaintiffs for satisfaction of the judgment rendered in this action, together with interest;

g.      An award to Plaintiffs from Defendants of their costs and fees, including, to the extent applicable, attorneys' fees incurred by Plaintiffs in bringing this action; and

h.      Such other and further relief as the Court may deem just and proper.


Dated: New York, NY
       April 9, 2012

/s/ Marc E. Kasowitz
Marc E. Kasowitz
Sheron Korpus
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

James M. Ringer
MEISTER SEELIG & FEIN LLP
140 East 45th Street, 19th Floor
New York, NY 10017
(212) 655-3500

*Attorneys for Plaintiffs Loreley Financing (Jersey) No. 3 Limited; Loreley Financing (Jersey) No. 5 Limited; Loreley Financing (Jersey) No. 15 Limited; Loreley Financing (Jersey) No. 28 Limited; and Loreley Financing (Jersey) No. 30 Limited.*

# EXHIBIT 15

**SUPREME COURT FOR THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| LORELEY FINANCING (JERSEY) NO. 3 LIMITED; LORELEY FINANCING (JERSEY) NO. 5 LIMITED; LORELEY FINANCING (JERSEY) NO. 15 LIMITED; LORELEY FINANCING (JERSEY) NO. 28 LIMITED; and LORELEY FINANCING (JERSEY) NO. 30 LIMITED | Index No. 653037/2011 |
| Plaintiffs, | |
| v. | **STIPULATION EXTENDING TIME TO RESPOND TO THE COMPLAINT** |
| WELLS FARGO SECURITIES, LLC; WELLS FARGO SECURITIES INTERNATIONAL LIMITED, WELLS FARGO BANK, N.A.; HARDING ADVISORY LLC; STRUCTURED ASSET INVESTORS, LLC; OCTANS II CDO LTD; OCTANS II CDO LLC; SAGITTARIUS CDO I LTD; SAGITTARIUS CDO I LLC; LONGSHORE CDO FUNDING 2007-3 LTD.; and LONGSHORE CDO FUNDING 2007-3 LLC, | |
| Defendants. | |

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned herein, that the time by which Defendants may move, answer or otherwise respond to the Complaint is extended up to and including June 29, 2012. The parties have further agreed that Plaintiffs will have 45 days to oppose any motion to dismiss, and Defendants will have 14 days to reply.

Except as expressly set forth herein, the parties to this stipulation reserve all rights and defenses they may have, and entry into this stipulation shall not impair or otherwise affect such rights and defenses, including without limitation, any objection to jurisdiction of this Court or to venue.

This Stipulation may be modified by written agreement between counsel for the parties.

Dated:  April 27, 2011
        New York, New York


_____          _William M. Regan (signature)_
Sheron Korpus                        David C. Bohan
KASOWITZ, BENSON, TORRES &           William M. Regan
FRIEDMAN LLP                         KATTEN MUCHIN ROSENMAN LLP
1633 Broadway                        575 Madison Avenue
New York, New York 10019             New York, NY 10022-2585
Telephone: (212) 506-1969            Telephone:(212) 940-8579
Facsimile: (212) 500-3469            Facsimile: (212) 894-5549

*Attorneys for Loreley Financing (Jersey) No. 3*     *Attorneys for Wells Fargo Securities, LLC;*
*Limited; Loreley Financing (Jersey) No. 5*          *Wells Fargo Securities International Limited;*
*Limited; Loreley Financing (Jersey) No. 15*         *Wells Fargo Bank, N.A.*
*Limited; Loreley Financing (Jersey) No. 28*
*Limited; and Loreley Financing (Jersey) No.*
*30 Limited.*


                                     _____
                                     Steven Molo
                                     Andrew Bernie
                                     MOLOLAMKEN LLP
                                     540 Madison Avenue
                                     New York, NY 10022
                                     Telephone: (212) 607-8160
                                     Facsimile: (212) 607-8161

                                     *Attorneys for Harding Advisory LLC*

Dated:  April 27, 2011
       New York, New York

_____

Sheron Korpus
KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1969
Facsimile: (212) 500-3469

*Attorneys for Loreley Financing (Jersey) No. 3*
*Limited; Loreley Financing (Jersey) No. 5*
*Limited; Loreley Financing (Jersey) No. 15*
*Limited; Loreley Financing (Jersey) No. 28*
*Limited; and Loreley Financing (Jersey) No.*
*30 Limited.*

_____

David C. Bohan
William M. Regan
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Telephone:(212) 940-8579
Facsimile: (212) 894-5549

*Attorneys for Wells Fargo Securities, LLC;*
*Wells Fargo Securities International Limited;*
*Wells Fargo Bank, N.A.*

Steven Molo
Andrew Bernie
MOLOLAMKEN LLP
540 Madison Avenue
New York, NY 10022
Telephone: (212) 607-8160
Facsimile: (212) 607-8161

*Attorneys for Harding Advisory LLC*

2

Dated:  April 27, 2011
        New York, New York

*Sheron Korpus/jm*

Sheron Korpus
KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1969
Facsimile: (212) 500-3469

*Attorneys for Loreley Financing (Jersey) No. 3
Limited; Loreley Financing (Jersey) No. 5
Limited; Loreley Financing (Jersey) No. 15
Limited; Loreley Financing (Jersey) No. 28
Limited; and Loreley Financing (Jersey) No.
30 Limited.*

David C. Bohan
William M. Regan
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Telephone:(212) 940-8579
Facsimile: (212) 894-5549

*Attorneys for Wells Fargo Securities, LLC;
Wells Fargo Securities International Limited;
Wells Fargo Bank, N.A.*

Steven Molo
Andrew Bernie
MOLOLAMKEN LLP
540 Madison Avenue
New York, NY 10022
Telephone: (212) 607-8160
Facsimile: (212) 607-8161

*Attorneys for Harding Advisory LLC*

2