UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LORELEY FINANCING (JERSEY) NO. 3 LIMITED; LORELEY FINANCING (JERSEY) NO. 5 LIMITED; LORELEY FINANCING (JERSEY) NO. 15 LIMITED; LORELEY FINANCING (JERSEY) NO. 28 LIMITED; and LORELEY FINANCING (JERSEY) NO. 30 LIMITED,

Plaintiffs,

- v -

WELLS FARGO SECURITIES, LLC; WELLS FARGO SECURITIES INTERNATIONAL LIMITED; WELLS FARGO BANK, N.A.; HARDING ADVISORY LLC; STRUCTURED ASSET INVESTORS, LLC; OCTANS II CDO LTD; OCTANS II CDO LLC; SAGITTARIUS CDO I LTD; SAGITTARIUS CDO I LLC; LONGSHORE CDO FUNDING 2007-3, LTD.; and LONGSHORE CDO FUNDING 2007-3 LLC,

Defendants.

No. 12-CV-3723 (RJS)

**ECF Case**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT <u>PURSUANT TO FED. R. CIV. P. 12(b)(2) AND 12(b)(6)</u>**

# TABLE OF CONTENTS

SUMMARY OF ALLEGATIONS ..... 5

A. Wachovia's CDO Machine ..... 5

B. Defendants' Fraudulent Sale of CDOs to Plaintiffs ..... 5

1. Octans and Sagittarius ..... 5

2. The Longshore CDO ..... 8

ARGUMENT ..... 9

I. The Standard Applicable to Defendants' Motion ..... 9

II. The Complaint Asserts Well-Pled Claims for Common Law Fraud ..... 9

A. The Complaint is More Than Adequately Detailed ..... 12

B. Defendants Owed a Duty to Disclose ..... 15

C. The Generic Disclosures in the Transaction Documents Do Not Sanitize Defendants' Fraud ..... 19

D. Plaintiffs' Allegations Strongly Support a Reasonable Inference of Scienter ..... 21

1. The Complaint Pleads Facts Supporting a Reasonable Inference That Defendants Knowingly Misrepresented and Concealed Material Facts ..... 23

2. Alternatively The Complaint Also Pleads that Defendants Had Motive and Opportunity ..... 24

E. The Complaint Pleads Reasonable Reliance ..... 28

1. The Complaint Pleads Actual Reliance ..... 28

2. Plaintiffs' Reliance Was Reasonable ..... 30

F. Plaintiffs' Losses Were Caused by Defendants' Fraud ..... 34

III. Plaintiffs' Fraud Claims Are Timely ..... 38

IV. The Remedy of Rescission is Available and Appropriate ..... 39

V. The Complaint Asserts Viable Claims For Conspiracy and Aiding and Abetting ..... 40

VI. Plaintiffs' Fraudulent Conveyance Claims Are Supported By the Law and Facts ..... 40

VII. Plaintiffs' Unjust Enrichment Claims Are Proper ..... 44

VIII. The Court Has Personal Jurisdiction Over Defendant WSIL/WFSIL ..... 45

A. Specific Jurisdiction ..... 46

B. General Jurisdiction ..... 46

CONCLUSION ..... 50

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abbatiello v. Monsanto Co.*,
522 F. Supp. 2d 524 (S.D.N.Y. 2007)....................18

*Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009)....................13

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
No. 6500027/11, 2012 WL 1425264 (Sup. Ct. Apr. 23, 2012) ....................16, 17, 36

*Albany Motor Inn & Rest., Inc. v. Watkins*,
85 A.D.2d 797 (3d Dep't 1981)....................22

*Alki Partners, L.P.v. Windhorst*,
No. 11-cv-1071, 2012 WL 933979 (2d Cir. 2012)....................27, 28

*Allojet PLC v. Vantage Assoc.*,
No. 04 Civ. 05223(SAS), 2005 WL 612848 (S.D.N.Y. Mar. 15, 2005)....................49

*Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett*,
No. 05 Civ. 8988(GEL), 2007 WL 1732427 (S.D.N.Y. June 14, 2007)....................29

*Amusement Indus., Inc. v. Stern*,
693 F. Supp. 2d 327 (S.D.N.Y. 2010)....................19

*Application of Chase Manhattan Bank*,
191 F. Supp. 206 (S.D.N.Y. 1961)....................38

*Armstrong v. Virgin Records, Ltd.*,
91 F. Supp. 2d 628 (S.D.N.Y. 2000)....................46, 47

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................9

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*,
No. 03 Civ. 1537, 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003)....................33

*Bigio v. Coca-Cola Co.*,
97 Civ. 2858, 2010 WL 3377503 (S.D.N.Y. Aug. 23, 2010)....................38

*Black v. Chittenden*,
69 N.Y.2d 665 (N.Y. 1986)....................18

*Boyd v. Pickersgill & Le Cornu*,
[1999] JLR 284 ....................38

*Brodsky v. Nerud*,
68 A.D.2d 876 (2d Dep't 1979) ....................22

*Buller v. Giorno*,
28 A.D.3d 258 (1st Dep't 2006) ....................40

*Buxton Mfg. Co. v. Valiant Moving & Storage, Inc.*,
239 A.D.2d 452 (2d Dep't 1997) ....................19

*Caiola v. Citibank*,
295 F.3d 312 (2d Cir. 2002) ....................15, 30

*China Dev. Indus. Bank v Morgan Stanley & Co. Inc.*,
86 A.D.3d 435, 436 (1st Dep't 2011) ....................30

*Chrysler Capital Corp. v. Century Power Corp.*,
778 F. Supp. 1260 (S.D.N.Y. 1991) ....................44

*CIFG Assurance N. Am., Inc. v. Goldman, Sachs & Co.*,
No. 652286/2011, 2012 WL 1562718 (Sup. Ct. May 1, 2012) ....................34

*Conn. Nat'l Bank v. Fluor Corp.*,
808 F.2d 957 (2d Cir. 1987) ....................22

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991) ....................33

*Cromer Finance Ltd. v. Berger*,
137 F. Supp. 2d 452 (S.D.N.Y. 2001) ....................40

*Dandong v. Pinnacle Performance, Ltd.*,
10 Civ. 8086, 2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011) .................... passim

*DCA Food Indus., Inc.*,
470 F. Supp. 574, 585 (S.D.N.Y. 1979) ....................49

*Desser v. Schatz*,
182 A.D.2d 478 (1st Dep't 1992) ....................19

*DIMON Inc. v. Folium, Inc.*,
48 F. Supp. 2d 359 (S.D.N.Y. 1999) ....................32

*DiVittorio v. Equidyne Extractive Industries, Inc.*,
822 F.2d 1242 (2d Cir. 1987) ....................13

*Dodona I LLC v. Goldman, Sachs & Co.*,
847 F. Supp. 2d 624 (S.D.N.Y. 2012)........................................................................ passim

*Dorfman v. Marriott Int'l Hotels, Inc.*,
99 Civ. 10496, 2002 WL 14363 (S.D.N.Y. Jan. 3, 2002).........................................46, 48, 49

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)........................................................................................10

*Erick Van Egeraat Assoc. Architects B.V. v. NBBJ LLC*,
08 Civ. 7873 (JSR), 2009 WL 1209020 (S.D.N.Y. Apr. 29, 2009).......................................49

*Fid. Nat'l Title Ins. Co. v. JP Morgan Chase Bank*,
3:12-cv-540, 2012 WL 1682036 (N.D.N.Y. May 14, 2012) .................................................45

*Filler v. Hanvit Bank*,
156 F. Appx. 413 (2d Cir.2005)......................................................................................29

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
No. 09 Civ. 4050 (PKC), 2010 WL 3790810 (S.D.N.Y. 2010).............................................11

*Forman v. Davis*,
371 U.S. 178 (1962).....................................................................................................50

*Friedman v. Ocean Dreams, LLC*,
15 Misc.3d 1146A, 2007 WL 1687165 (Sup. Ct. 2007).......................................................45

*Frummer v. Hilton Hotels Int'l, Inc.*,
19 N.Y.2d 533 (N.Y. 1967) .....................................................................................47, 48

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)..........................................................................................22

*Gateway I Group v. Park Ave. Physicians, P.C.*,
62 A.D.3d 141 (2d Dep't 2009) .....................................................................................42

*Gelfand v. Tanner Motor Tours, Ltd.*,
385 F.2d 116 (2d Cir. 1967)..........................................................................................47

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*,
667 F. Supp. 2d 308 (S.D.N.Y. 2009)..............................................................................29

*Geren v. Quantum Chem. Corp.*,
832 F. Supp. 728 (S.D.N.Y. 1993) ..................................................................................44

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ........................................................................................24

*Granite Partners L.P. v. Bear Stearns & Co., Inc.*,
17 F. Supp. 2d 275 (S.D.N.Y. 1998)....................18

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
748 F.2d 729 (2d Cir. 1984)....................30

*Gundlach v. IBM Corp.*,
No. 11–CV–846 (CS), 2012 WL 1520919 (S.D.N.Y. May 1, 2012) ....................46

*Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets LLC*,
602529/08, 7622010 WL 2431613 (Sup. Ct. May 10, 2010) ....................32

*Hotel Capital LLC v. Wells Fargo Bank*,
35 Misc.3d 1218A, 2012 WL 1506120 (Sup. Ct. 2012)....................30

*Houbigant, Inc. v. Deloitte & Touche LLP*,
303 A.D.2d 92 (1st Dep't 2003) ....................22

*HSH Nordbank AG v. UBS AG*,
95 A.D.3d 1747 (4th Dep't 2009) ....................18, 31

*In re Ambac Fin. Grp., Inc.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010)....................37

*In re Beacon Assocs. Litig.*,
745 F. Supp. 2d 386 (S.D.N.Y. 2010)....................19

*In re Bernard L. Madoff Inv. Sec. LLC*,
445 B.R. 206 (Bankr. S.D.N.Y. 2011)....................42

*In re Direxion Shares ETF Trust*,
09 Civ. 8011 (KBF), 2012 WL 717967 (S.D.N.Y. Mar. 6, 2012)....................39

*In re Enron*,
No. 04 Civ. 1367 (NRB), 2005 WL 356985 (S.D.N.Y. Feb, 15, 2005) ....................41

*In re J.P. Jeanneret Assocs., Inc.*,
769 F. Supp. 2d 340 (S.D.N.Y. 2011)....................19

*In re Merrill Lynch & Co.*,
218 F.R.D. 76 (S.D.N.Y. 2003) ....................11

*In re Morgan Stanley Pass-Through Certs. Litig.*,
810 F. Supp. 2d 650 (S.D.N.Y. 2011)....................21

*In re NYSE Specialists Secs. Litig.*,
405 F. Supp. 2d 281 (S.D.N.Y. 2005)....................9

*In re Optimal U.S. Litig.*,
837 F. Supp. 2d 244 (S.D.N.Y. 2011)....................12

*In re Prudential Secs. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ....................19

*In re Sec. Capital Assurance Ltd. Secs. Litig.*,
No. 07 Civ 11086, 2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011)....................37

*In re Tower Auto. Sec. Litig.*,
483 F. Supp. 2d 327 (S.D.N.Y. 2007)....................27

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)....................43

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
822 F. Supp. 2d 368 (S.D.N.Y. 2011)....................29

*Int'l Telecom, Inc. v. Generadora Electrica del Oriente*,
00-CIV-8695 (WHP), 2002 WL 465291 (S.D.N.Y. Mar. 27, 2002)....................10

*Jay Dees Inc. v. Defense Tech. Sys., Inc.*,
No. 05 Civ. 6954, 2008 WL 4501652 (S.D.N.Y. Sept. 30, 2008)....................29

*JPMorgan Chase Bank ex rel. Mahonia Ltd. v. Liberty Mut. Ins.*,
189 F. Supp. 2d 24 (S.D.N.Y. 2002)....................31

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)....................27

*King County v. IKB Deutsche Industriebank AG*,
708 F. Supp. 2d 334 (S.D.N.Y. 2010)....................36

*King County v. IKB Deutsche Industriebank AG*,
712 F. Supp. 2d 104 (S.D.N.Y. 2010)....................48

*King County v. IKB Deutsche Industriebank AG*,
751 F. Supp. 2d 652 (S.D.N.Y. 2010)....................26, 28, 30

*King County v. IKB Deutsche Industriebank AG*,
09 Civ. 8387, 2012 WL 1592193 (S.D.N.Y. May 4, 2012)....................12, 13

*Koehler v. Bank of Bermuda Ltd.*,
101 F.3d 863 (2d Cir. 1996)....................15

*Krinsky v. Title Guarantee & Trust Co.*,
298 N.Y.S. 31 (App. Term 1937) ....................34

*Lake Minnewaska Mountain Houses, Inc. v. Rekis*,
259 A.D.2d 797 (3d Dep't 1999)....................44

*Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.*,
11-4443, 2012 WL 1352590, at *2 (2d Cir. April 19, 2012)....................27

*Lattanzio v. Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007)....................36

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)....................36

*Lippe v. Bairnco*,
249 F. Supp. 2d 357 (S.D.N.Y. 2003)....................43

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976)....................11

*Litwin v. Blackstone Grp. L.P.*,
634 F.3d 706 (2d Cir. 2011)....................11

*Loreley Financing (Jersey) No. 7 Ltd. v. Credit Agricole*,
No. 650673/2010 (Sup. Ct. June 13, 2011)....................10

*M & T Bank Corp. v. Gemstone CDO VII, Ltd.*,
23 Misc.3d 1105(A), 2009 WL 921381 (Sup. Ct. April 7, 2009)....................31

*Maersk, Inc. v. Neewra, Inc.*,
687 F. Supp. 2d 300 (S.D.N.Y. 2009)....................40

*Marine Midland Bank v. Murkoff*,
120 A.D.2d 122 (2d Dep't 1986)....................41

*Marine Midland Bank v. Zurich Ins. Co.*,
263 A.D.2d 382 (1st Dep't 1999)....................43

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
87 A.D.3d 287 (1st Dep't 2011)....................36

*MBIA Ins. Corp. v. Merrill Lynch & Co.*,
81 A.D.3d 419 (1st Dep't 2011)....................18, 32

*MBIA Ins. Corp. v. Royal Bank of Canada*,
28 Misc. 3d 1225(A), 2010 WL 3294302 (Sup. Ct. 2010)....................31

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
500 F.3d 171 (2d Cir. 2007)....................28

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp., LLC*,
19 A.D.3d 273 (1st Dep't 2005) ....................................................................................33

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs.*,
910 F. Supp. 913 (S.D.N.Y. 1995) ................................................................................41

*Nathel v. Siegal*,
592 F. Supp. 2d 452 (S.D.N.Y. 2008)...........................................................................28

*NTL Capital LLC v. Right Track Recording LLC*,
73 A.D.3d 410 (1st Dep't 2010) ..............................................................................41, 43

*Ostano Commerzanstalt v. Telewide Sys. Inc.*,
792 F.2d 763 (2d Cir. 1986) ........................................................................................19

*Ouaknine v. MacFarlane*,
897 F.2d 75 (2d Cir. 1990)...........................................................................................23

*P.T. Bank Cent. Asia v. ABN Amro Bank N.V.*,
301 A.D.2d 373 (1st Dep't 2003) ..........................................................................9, 31, 34

*Palmieri v. Estefan*,
793 F. Supp. 1182 (S.D.N.Y. 1992)..............................................................................47

*Panther Partners, Inc. v. Ikanos Communs., Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008)...........................................................................20

*Papworth v. Steel Hector & Davis*,
5:06-CV-1237, 2007 WL 2903944 (N.D.N.Y. Sept. 30, 2007) ......................................28

*Porina v. Marward Shipping Co.*,
521 F.3d 122 (2d Cir. 2008)..........................................................................................43

*Richman v. Goldman, Sachs Grp., Inc.*,
10 Civ. 3461, 2012 WL 2362539 (S.D.N.Y. June 21, 2012)..........................................16

*Ruotolo v. City of New York*,
514 F.3d 184 (2d Cir. 2008)............................................................................................9

*S. New Eng. Tel. Co. v. Global NAPs*,
624 F.3d 123 (2d Cir. 2010).....................................................................................45, 46

*Sabo v. Delman*,
3 N.Y.2d 155 (1957) ...............................................................................................33, 44

*SEC v. Goldman, Sachs & Co.*,
790 F. Supp. 2d 147 (S.D.N.Y. 2011)......................................................................16, 17

*Secs. Investor Protection Corp. v. BDO Seidman, LLP*,
222 F.3d 63 (2d Cir. 2000)....................................................29

*Seneca Wire & Mfg. Co. v. A. B. Leach & Co.*,
247 N.Y. 1 (1928)....................................................22

*Serino v. Lipper*,
47 A.D.3d 70 (1st Dep't 2007)....................................................28

*SRM Global Fund Ltd. Partnership v. Countrywide Finance Corp.*,
No. 09 Civ. 5064 (RMB), 2010 WL 2473595 (S.D.N.Y. June 17, 2010)....................................................18

*Staehr v. Hartford Fin. Servs. Grp.*,
547 F.3d 406 (2d Cir. 2008)....................................................33

*Steinhardt Grp., Inc. v. Citicorp*,
272 A.D.2d 255 (1st Dep't 2000)....................................................30

*Stephenson v. Citgo Grp. Ltd.*,
700 F. Supp. 2d 599 (S.D.N.Y. 2010)....................................................24

*Swersky v. Dreyer & Traub*,
219 A.D.2d 321 (1st Dep't 1996)....................................................17, 31

*Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*,
935 N.Y.S.2d 858 (Sup. Ct. 2012)....................................................37

*Tahini Invs. Ltd. v. Bobrowski*
470 N.Y.S.2d 431 (2d Dep't 1984)....................................................33

*Taylor & Jennings v. Bellino Bros. Constr. Co.*,
106 A.D.2d 779 (3d Dep't 1984)....................................................44

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
05 Civ. 1898 (SAS), 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005)....................................................34

*Tindle v. Birkett*,
171 N.Y. 520 (1902)....................................................19

*Titu-Serban Ionescu v. E. F. Hutton & Co.*,
434 F. Supp. 80 (S.D.N.Y. 1977)....................................................49

*Travelers Ins. Co. v. 633 Third Assocs.*,
973 F.2d 82 (2d Cir. 1992)....................................................41

*Turbon Int'l, Inc. v. Hewlett-Packard Co.*,
769 F. Supp. 2d 259 (S.D.N.Y. 2011)....................................................48

*Universal Computer Consulting, Inc. v. Pitcairn Enters., Inc.*,
No. 03-2398, 2005 WL 2077269 (E.D. Pa. Aug. 26, 2005) ....................................................44

*Urquhart v. Philbor Motors, Inc.*,
9 A.D.3d 458 (2d Dep't 2004) ....................................................34

*Viti v. Guardian Life Ins. Co. of Am.*,
817 F. Supp. 2d 214 (S.D.N.Y. 2011)....................................................9

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
751 F.2d 117 (2d Cir. 1984)....................................................48

*Waters v. GE Co.*,
No. 08 Civ. 8484(RJS), 2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010)....................................................36

*Wechsler v. Hoffman-LaRoche*,
198 Misc. 540 (Sup. Ct. 1950)....................................................19

*Welch v. TD Ameritrade Holding Corp.*,
No. 07 Civ. 6904 (RJS), 2009 WL 2356131 (S.D.N.Y July 27, 2009) ....................................................13

*Wexner v. First Manhattan Co.*,
902 F.2d 169 (2d Cir. 1990)....................................................10

*White v. Kolinsky*,
No. 10 Civ. 2252, 2011 WL 1899307 (D.N.J. May 18, 2011) ....................................................36

*Wilson v. Merrill Lynch & Co.*,
671 F.3d 120 (2d Cir. 2011)....................................................19

*Zaccaro v. Shah*,
746 F. Supp. 2d 508 (S.D.N.Y. 2010)....................................................9

**STATUTES AND OTHER AUTHORITIES**

Fed. R. Civ. P. 8....................................................42

Fed. R. Civ. P. 8(a) ....................................................9, 22, 38

Fed. R. Civ. P. 8(a)(2)....................................................9

Fed. R. Civ. P. 9(b) ....................................................9, 12

Fed. R. Civ. P. 12(b)(2)....................................................45

Fed. R. Civ. P. 12(b)(6)....................................................9, 11

Fed. R. Civ. P. 12(f) ..........11

Fed. R. Civ. P. 15(a)(2) ..........50

CPLR 301 ..........47

CPLR 302(a)(1) ..........46

New York Debtor and Creditor Law, Section 271 ..........41

New York Debtor and Creditor Law, Section 273 ..........42

New York Debtor and Creditor Law, Section 274 ..........42

New York Debtor and Creditor Law, Section 275 ..........42

New York Debtor and Creditor Law, Section 276 ..........43

Plaintiffs Loreley Financing (Jersey) Nos. 3, 5, 15, 28 and 30 Ltd. (hereinafter, "LFJ" followed by the relevant number and, collectively, "Loreley" or "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss Plaintiffs' complaint (the "Complaint") filed by defendants Wells Fargo Securities LLC, Wells Fargo Securities International Ltd., Wells Fargo Bank, N.A. (collectively, "Wells Fargo"), Harding Advisory LLC ("Harding"), Structured Asset Investors, LLC ("SAI"), and Longshore Funding 2007-3 Ltd. ("Longshore Ltd." and together with Wells Fargo, Harding, and SAI, "Defendants").

**PRELIMINARY STATEMENT**

The Complaint details, over the course of 260 paragraphs replete with citations to internal e-mails and other documents, fraudulent schemes whereby Defendants induced Plaintiffs to invest $163 million in three collateralized debt obligations ("CDOs") through a series of materially false representations and half-truths. Tacitly conceding that Plaintiffs' allegations are more than sufficient at the pleadings stage, Defendants attempt to try the merits of the case on a pre-answer, pre-discovery motion to dismiss. Alternately ignoring and gainsaying the well-pled allegations in the Complaint which are supposed to be accepted as true, Defendants raise a host of defenses and issues of fact which cannot be decided at this preliminary stage.

Two of the fraudulent CDOs, known as Octans II ("Octans") and Sagittarius I ("Sagittarius"), shared a common blueprint. Both were created by Wells Fargo's predecessor-in-interest, Wachovia Capital Markets, LLC, Wachovia Securities International Limited, and Wachovia Bank, National Association (collectively "Wachovia"), to meet the demands of a hedge fund, Magnetar Capital LLC ("Magnetar"), to create vehicles structured to support Magnetar's undisclosed net-short strategy. Wachovia could then continue to reap millions in profits as the arranging bank without regard for the interests of the other unsuspecting investors. Defendants clandestinely permitted Magnetar to hand-pick the collateral it wanted for the deals

for the very purpose of shorting it, and then structured the deals according to Magnetar's specifications so that Magnetar could finance its short bets virtually for free. Knowing that Plaintiffs would never invest in a deal that was designed and controlled by a short investor with interests directly adverse to theirs, Defendants lied and, in order to conceal Magnetar's role and manufacture an air of legitimacy, falsely represented that the collateral was selected by independent collateral managers in the interests of the deals' success.

With respect to the third CDO at issue, Longshore CDO Funding 2007-3 ("Longshore"), Wachovia and its affiliate, SAI, falsely represented that the CDO's collateral would be purchased for fair-market value in arms-length transactions, and selected by SAI using a rigorous screening process. In truth, Wachovia created Longshore to serve as its dumping ground for deteriorating subprime assets that it was stuck with and wanted to unload. Wachovia and SAI secretly caused Longshore to overpay for this cast-off collateral, purchasing the assets not at their fair-market value, but instead at the much higher price Wachovia had paid months earlier.

The Complaint meticulously details the facts alleged and supports them with citations to multiple credible sources, including (a) Defendants' own e-mails plainly showing their knowledge of and active participation in the fraudulent schemes alleged, and (b) findings of misconduct from a federal investigation into one of the very same deals (Longshore) at issue in this case. Although much more direct evidence no doubt remains peculiarly within Defendants' knowledge and possession, the Complaint is more than sufficient at the pleading stage to support a reasonable inference of the unlawful conduct alleged.

Defendants attack the Complaint by, for example, attempting to parse and re-characterize as innocuous the e-mails cited by Plaintiffs, but Defendants forget that on a motion to dismiss, where the authors of such e-mails have not yet been deposed, Plaintiffs are entitled to the benefit

of all reasonable inferences in their favor. Defendants' attempts to "spin" these communications in their favor is inappropriate and contrary to the standard that controls.

Similarly unavailing are Defendants' fact-based challenges to the reasonableness of Plaintiffs' reliance, such as their assertion that Plaintiffs are "sophisticated" investors and their emphasis on various boilerplate and generic disclaimers and disclosures in the CDOs' offering materials. Not only is it well-settled that the reasonableness of a plaintiff's reliance is unfit for resolution on a motion to dismiss, but Defendants' argument ignores Plaintiffs' allegations of Defendants' peculiar knowledge. However sophisticated Plaintiffs were generally, they could not have uncovered Defendants' fraud. Likewise, the stock disclaimers and disclosures upon which Defendants rely are ineffective in the face of their peculiar knowledge and, in any event, do not cover (nor could they have put Plaintiffs on notice of) Defendants' fraud.

Defendants also contend erroneously that the Complaint does not plead scienter adequately because it alleges that Defendants' fraud was motivated by nothing more than a "generic profit motive." In truth, the Complaint specifically alleges far more; it describes in detail Wachovia's unique perspective and involvement at multiple levels of the subprime capital markets, their extremely lucrative business of arranging CDOs, their growing exposure to deteriorating subprime assets, and their fear beginning in 2006 (based on their inside information) that the house of cards they built was about to collapse. In the cases of Octans and Sagittarius, Magnetar came along at precisely the right time for deal-hungry arrangers such as Wachovia and managers such as SAI and Harding, whose business model was based around managing CDOs. By agreeing to take the equity in the CDOs at a time when there were few other investors willing to do so, Magnetar allowed Defendants to perpetuate their CDO business. But, as their e-mails show, Defendants knew that Magnetar was in fact shorting the same CDOs,

and therefore intentionally concealed Magnetar's involvement in sponsoring, structuring and selecting collateral for those CDOs, using the supposed involvement of independent managers as a front. And in the case of Longshore, Wachovia and SAI stuffed the deal with depreciated assets selected for a different, aborted deal so that Wachovia could divest itself of risk and avoid realizing a substantial loss that it knew was imminent.

Finally, Defendants' arguments with respect to loss causation rely on an argument that has been rejected time and time again – *i.e.*, that Plaintiffs' losses were the result of the broader credit market crisis. Indeed, apart from the fact that this argument is fact-based and inappropriate for a motion to dismiss, it is premised on a convenient conflation of cause and effect. Defendants include the nation's third largest issuer of asset-backed CDOs during the relevant period, its wholly-owned, in-house collateral manager subsidiary, and Magnetar's go-to collateral manager of choice. This Court has previously rejected similar self-serving attempts by parties like Defendants to escape liability for fraud by invoking as a defense a financial crisis they played a substantial role in creating, and it should do so here as well. The simple fact is that Plaintiffs would not have invested in Octans, Sagittarius, or Longshore if the true facts had been disclosed as they were required to have been. No rational investor would.

Defendants' attacks on Plaintiffs' conspiracy, aiding and abetting, fraudulent conveyance, and unjust enrichment claims fare no better, as each of those claims is supported under the law and is more than adequately pled. Further, Plaintiffs' claims are not even close to being untimely under the applicable limitations period. Finally, there is ample factual predicate to exercise personal jurisdiction over Wells Fargo Securities International Limited, particularly given its close ties with Wells Fargo Securities LLC, both generally and in connection with the deals at issue. For these and other reasons detailed below, Defendants' motion should be denied.

## SUMMARY OF ALLEGATIONS

### A. Wachovia's CDO Machine

Until its precipitous collapse in the fall of 2008 and subsequent acquisition by Wells Fargo, Wachovia was a leading player in the subprime capital markets. It was one of the nation's largest originators of consumer loans and a major participant in structuring and underwriting residential mortgage-backed securities ("RMBS") and RMBS-backed CDOs. Between 2006 and its demise, Wachovia ranked third nationally in CDO issuances by volume, issuing nearly $46 billion of CDOs. (*See* Compl., ¶¶ 40, 42-43.)

As a result of its position, Wachovia had a unique perspective and access to inside information, such as loan-level data and analysis unavailable to Plaintiffs or their investment advisor, concerning the assets underlying the CDOs it was creating. By August 2006 at the latest, Wachovia knew, based on this inside information, that subprime loans were increasingly being issued without regard to lenders' underwriting guidelines and were infected by fraud. (*See id.*, ¶¶ 41, 44.) Despite this, Wachovia continued to churn out lucrative RMBS and CDOs backed by ever-shoddier mortgages, including the three fraudulent deals that it sold to Plaintiffs in 2006 and early 2007. (*See id.*, ¶¶ 57-59, 63.)

### B. Defendants' Fraudulent Sale of CDOs to Plaintiffs

#### 1. Octans and Sagittarius

In August 2006, Wachovia approached Plaintiffs' investment advisor in an effort to sell Octans to Plaintiffs. Wachovia knew that Plaintiffs were interested in investing in highly-rated senior tranches of managed CDOs, and thus, in marketing CDOs to Plaintiffs, placed great emphasis on the use of independent, highly-qualified collateral managers to select the deals' collateral portfolios. In the marketing materials they prepared and provided to Plaintiffs through their investment advisor, Wachovia and Harding specifically represented that Harding – and

Harding alone – would select the collateral for Octans. They also touted the rigorous process that Harding would purportedly use to ensure that the portfolio would contain only "high quality assets with stable returns and superior capital preservation profiles" in order to "maximize returns and minimize losses." (*See id.*, ¶¶ 84-90.) In reliance on these and other representations, LFJ 5 ultimately purchased $94 million in Octans notes from Wachovia. (*See id.*, ¶¶ 116-19.)

In November 2006, Wachovia approached Plaintiffs' investment advisor with an opportunity to invest in Sagittarius, representing that it would be managed by SAI, a wholly-owned subsidiary of Wachovia. As with Octans, the marketing materials Wachovia and SAI prepared and provided to Plaintiffs through their investment advisor represented that SAI – and SAI alone – would select the collateral for Sagittarius. They touted SAI's expertise, and represented that SAI would employ a "rigorous upfront credit and structural analysis" and would even "re-underwrite [the] portfolio" (*i.e.*, SAI would re-analyze each of the portfolio assets) in order to "maximize returns and minimize losses" for the deal's noteholders. (*See id.*, ¶¶ 123-31.) In reliance on these and other representations, LFJ 15 and LFJ 28 purchased $10 million in Sagittarius notes from Wachovia. (*See id.*, ¶¶ 151-154.)

Defendants' representations were materially false and misleading. Unbeknownst to Plaintiffs, the deals were constructed by and for Magnetar, a hedge fund that has now become infamous as the hidden hand behind more than two dozen "Constellation" CDOs that it sponsored for the very purpose of profiting from their collapse. In these deals, Magnetar colluded with arranging banks (like Wachovia) and managers (like Harding and SAI) to sponsor the deals (*i.e.*, purchase the equity tranches) at a discount, in exchange for influence over collateral selection and deal structure. This hidden influence was a key aspect of the scheme, because Magnetar clandestinely (with Defendants' knowledge and assistance) took massive short

positions against the deals *via* credit-default swaps ("CDS"),[1] and needed to ensure that its short bets would pay off. At Magnetar's insistence, the deals included structural features designed to finance the costs of Magnetar's short bets using cash flows generated by its equity position, affording Magnetar a virtually free bet against the same deals it designed. (*See id.*, ¶¶ 51-56, 71-76, 78-81.) Because its short investments far exceeded its actual, heavily-discounted long investments, Magnetar was situated to be a substantial net winner when these deals failed.

Arranging banks and managers such as Defendants jumped at the opportunity to participate in Magnetar's scheme: the equity tranches of CDOs were typically the hardest to place, particularly in 2006 as more collateral managers became reluctant to themselves invest in the equity tranche, and without a sponsor a CDO could not proceed. (*See* Compl., ¶¶ 51, 57, 59-60, 63.) In order to find noteholders to take the long side of Magnetar's short bets, Defendants concealed the material fact that a party seeking to profit from the failure of the deals (Magnetar) had actually been allowed to choose the collateral behind the cover of the deals' ostensible "independent" managers. Had Plaintiffs known this truth they would never have invested in the deals.[2]

---

[1] A CDS is akin to an insurance policy on the credit of a referenced security. (*See* Compl., ¶ 30 n.2.)

[2] Defendants' motion repeatedly attempts to misdirect the Court, arguing that Plaintiffs do not allege that assets included in the Octans and Sagittarius CDOs did not meet the technical eligibility criteria set out in the deals' offering documents. (*See, e.g.*, Defendants' Mem. of Law in Support of Mot. to Dismiss ("Mem."), pp. 2, 14, 17, 20, 23, 34, 38.) But the gravamen of Plaintiffs' fraud allegations have nothing to do with the eligibility of the specific collateral chosen for Octans and Sagittarius, but rather are focused on Defendants' misrepresentations and failure to disclose the involvement of Magnetar, a short-seller with interests contrary to the deals' success, in the design of the CDOs and the selection of their collateral. Whether specific assets complied with the deals' eligibility criteria – which was merely the broad range of assets from which an independent collateral manager was supposed to select the best – is irrelevant.

2. The Longshore CDO

In March 2007, Wachovia pitched Longshore, a deal that was to be managed by Wachovia's subsidiary, SAI, to Plaintiffs' investment advisor. In marketing materials that they authored and provided to Plaintiffs *via* their investment advisor, Wachovia and SAI represented that SAI would use a "rigorous screening process" and conduct "extensive on-site due diligence" of the issuers of potential collateral for Longshore. Wachovia and SAI also represented that Longshore's collateral would be acquired on "an arm's length basis" and that any assets acquired from SAI or its affiliates (which would include its parent, Wachovia) would be "on terms as favorable" to Longshore as if they had been acquired from unaffiliated counterparties. (*See* Compl., ¶¶ 157-58.) In reliance on these and other representations, LFJ 3, LFJ 5, and LFJ 30 ultimately purchased over $59 million in Longshore notes from Wachovia. (*See id.*, ¶¶ 168-172.)

These representations were false and misleading. As revealed in an investigation by the Securities and Exchange Commission ("SEC"), a substantial portion of Longshore's portfolio had actually been acquired earlier by Wachovia for another CDO that never closed. Wachovia had continued to hold that collateral on its books, but feared that it was deteriorating and knew that its fair market value had declined substantially between the time it had been purchased for the aborted CDO and the time of Longshore. So Wachovia and SAI dumped it into Longshore at the earlier, higher price – rather than the current, lower market price at which it could and should have been obtained on an arms-length basis. By this below-board maneuver, Wachovia and SAI managed to shift the decline in value and corresponding risk of these deteriorating assets onto unsuspecting investors, including Plaintiffs. (*See id.*, ¶¶ 159-67, 176.) Had Plaintiffs known that the deal was being used as Wachovia's dumping ground, they would never have invested in it.

## ARGUMENT

## I. The Standard Applicable to Defendants' Motion

On a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). The court's analysis is "confined to the allegations contained within the four corners of the complaint," and "any written instrument attached to [the complaint] or any statements or documents incorporated in it by reference." *Viti v. Guardian Life Ins. Co. of Am.*, 817 F. Supp. 2d 214, 223 (S.D.N.Y. 2011). A complaint need only "contain sufficient factual matter" to support a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II. The Complaint Asserts Well-Pled Claims for Common Law Fraud

To state a fraud claim, a plaintiff must allege "that the defendant made a material misrepresentation of fact; that the misrepresentation was made intentionally in order to defraud or mislead the plaintiff; that the plaintiff reasonably relied on the misrepresentation; and that the plaintiff suffered damage as a result of its reliance on the defendant's misrepresentations." *P.T. Bank Cent. Asia v. ABN Amro Bank N.V.*, 301 A.D.2d 373, 376 (1st Dep't 2003); *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 520 (S.D.N.Y. 2010). Material misrepresentations must be pled with particularity under Rule 9(b), but the remaining elements are subject only to the notice pleading standard of Rule 8(a), under which a "short and plain statement of the claim showing that the pleader is entitled to relief" will suffice. Fed. R. Civ. P. 8(a); *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"); *In re NYSE Specialists Secs. Litig.*, 405 F. Supp. 2d 281, 315 (S.D.N.Y. 2005) ("Rule 8(a)(2) … controls the specifics of the required pleading of loss causation, as there is no 'special further requirement in respect to the pleading of proximate causation or economic loss.'") (quoting *Dura*

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).[3]

Defendants do not dispute that the information they are alleged to have misrepresented and concealed "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," and was therefore material. *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). For example, in the case of the Octans and Sagittarius, nowhere did Defendants disclose that the deals had in reality been arranged for the benefit of, and in collusion with, a short-investor, Magnetar, whose interests were in direct conflict with Plaintiffs' interests and the deals' success. (*See* Compl., ¶¶ 3, 103-06, 113-14, 133, 149.) Defendants do not and cannot deny that any reasonable investor would have considered Magnetar's undisclosed role in these CDOs to be material.[4] Likewise, in the case of the Longshore CDO, Wachovia, SAI, and Longshore Ltd.

[3] Defendants contend that much of the Complaint is pled on "information and belief," which they argue is insufficient to state a claim for fraud. Apart from the fact that very few allegations are made on information and belief, the law in this Circuit is clear that "[d]espite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). The case cited by Defendants, *Int'l Telecom, Inc. v. Generadora Electrica del Oriente*, 00-CIV-8695 (WHP), 2002 WL 465291 (S.D.N.Y. Mar. 27, 2002), is inapposite. There, the dismissal of the fraud claims was not based on plaintiff's use of allegations made on "information and belief," but rather on a complete absence of factual allegations supporting the inference that the challenged representations were fraudulent. *See id.* at *7.

[4] In support of their motion, Defendants refer to other complaints filed by various other Loreley companies seeking redress in connection with other fraud-tainted CDOs. (*See* Mem., p. 27 (citing, *e.g.*, *Loreley Financing (Jersey) No. 7 Ltd. v. Credit Agricole*, No. 650673/2010, slip op. (Sup. Ct. June 13, 2011)).) While Defendants cite Justice Schweitzer's decision in the *Credit Agricole* case, which dismissed – without prejudice – claims against the collateral managers only (but not the arranging bank) of two Constellation CDOs because they were not sufficiently particular (*see id.*), they ignore that after the plaintiffs moved for leave to file an amended complaint that would have addressed Justice Schweitzer's concerns regarding particularity, the case was resolved. (*See Aff. of Stephen Plotnick in Support of Motion for Leave to Amend*, Ex. 1 (July 21, 2011) (proposed Second Amended Complaint).) Regardless, Defendants apparently cite to this and other cases in an effort to depict the Loreleys as "serial plaintiffs," while ignoring the now well-known fact – revealed in the scores of lawsuits and through government

falsely represented that the CDO's collateral would be selected by SAI using a rigorous screening process and purchased on arm's length terms, but in reality used it as a secret dumping ground for deteriorating collateral being held on Wachovia's books at rates that were well above the market price.[5] (*See id.*, ¶¶ 157-64.) On its face, this information is material, since any reasonable investor "would have considered [it] significant in making investment decisions." *Dodona I LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 637 (S.D.N.Y. 2012) (quoting *Litwin v. Blackstone Grp. L.P.*, 634 F.3d 706, 716-17 (2d Cir. 2011)).[6]

---

investigations commenced in the wake of the financial crisis – that many banks engaged in the rampant abuses, fraudulent practices, and unethical conduct that led to the financial crisis. Indeed, according to reports, there were over two dozen Constellation CDOs alone, totaling approximately $37 billion, that were arranged by nine major banks. Plaintiffs could also point to the numerous lawsuits brought against Wachovia, but the fact of those other lawsuits simply has no bearing on Plaintiffs' Complaint or Defendants' motion.

[5] This disclosure belies Defendants' argument that Plaintiffs fail to allege "any dealings with" or "any representations from" Longshore Ltd. (Mem., p. 30.) Moreover, with regard to the other fraud elements, the fact that Longshore Ltd., like the other issuers, was a mere instrument of Defendants' fraud and part of the same enterprise for the purposes of the group pleading doctrine, is clear from the Offering Circulars themselves, which noted that the issuers had no operating history or employees of their own. (*See* Declaration of David M. Max *(*"Max Decl."), Ex. A, p. 117 (Octans Offering Circular ("Octans OC")); Ex. B, p. 139 (Sagittarius Offering Circular ("Sagittarius OC")); Ex. C, p. 23 (Longshore Offering Circular ("Long. OC")).) Defendants even directed that any investor inquiries be made to them, not the issuers. (*See* Tambe Decl. Ex. 5, p. 4 (Octans Term Sheet); Max Decl. Ex. D (Sagittarius Term Sheet, p. 5, Longshore Term Sheet, p. 4).)

[6] Unable to deny the materiality of these misrepresentations and omissions, Defendants argue that because Wells Fargo did not admit to any wrongdoing in its consent judgment with the SEC, it can "provide no factual basis to further [Plaintiffs'] claim." (Mem., p. 29.) But the cases cited by Defendants do not support their contention that the Court may dismiss a claim simply because some of the facts pled are also reflected in such a decree. All three of Defendants' case citations relate to motions to strike under Rule 12(f), where the focus is on the ultimate admissibility of evidence, rather than a Rule 12(b)(6) motion to dismiss. *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 891-94 (2d Cir. 1976) (motion to strike under Rule 12(f)); *In re Merrill Lynch & Co.*, 218 F.R.D. 76 (S.D.N.Y. 2003) (same); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050, 2010 WL 3790810 (S.D.N.Y. 2010) (same). The question on a Rule 12(b)(6) motion is simply whether the facts support a reasonable inference that Defendants are liable, and the source of those facts is irrelevant. Plaintiffs could just as easily have pled the same facts without reference to the decree.

### A. <u>The Complaint is More Than Adequately Detailed</u>

First, Defendants' contention that Plaintiffs fail to allege with particularity "any instance" of Magnetar working with the Defendants (*see* Mem., pp. 25-26) is plainly wrong. For example, the Complaint cites:

- A September 18, 2006, e-mail from Xilun Chen of Wachovia to James Prusko of Magnetar asking if Magnetar "plan[s] on shorting any names" into Octans, and offering to plan future collateral purchases for Octans around Magnetar's response.
- A July 3, 2006, e-mail from Wing Chau of Harding to Prusko, indicating that Wachovia intended to participate in a scheme to conceal Magnetar's role in CDS trades with Octans.

(Compl., ¶¶ 104-105.) The Complaint also alleges that Wachovia and Harding acquiesced in Magnetar's inclusion in Octans tranches of four other adversely-selected Constellation CDOs. (*See id.*, ¶ 69.) With regard to Sagittarius, the Complaint alleges that Wachovia and SAI abdicated to Magnetar control over a list of possible assets, 20% of which were comprised of bonds issued by Countrywide Financial, "one of the most infamous originators and securitizers of subprime mortgages." (*Id.*, ¶ 137.) Defendants also acceded to Magnetar's demand to include ABX index components in Octans and Sagittarius, despite a representation in the offering circular for the latter that they would not be included. (*See id.*, ¶¶ 101, 148.)

Second, Defendants' argument that the Complaint does not specify which Wachovia entity made each representation or omission alleged in the Complaint or engaged with Magnetar (*see* Mem., pp. 26-27), is irrelevant because there is no such legal requirement. Pursuant to the "group pleading doctrine," a plaintiff "may satisfy Rule 9(b) by referring to an offering memorandum" where a defendant's "involvement in the fraud [is] sufficient to render it an insider [or affiliate]." *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 263 (S.D.N.Y. 2011) (internal citations omitted); *see also King County v. IKB Deutsche Industriebank AG*, 09 Civ.

8387, 2012 WL 1592193, at *12 (S.D.N.Y. May 4, 2012) (group pleading doctrine applies "whenever Rule 9(b) applies, which is whenever the alleged conduct of defendants is fraudulent in nature"); *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 177 (S.D.N.Y. 2009) (same). Here, the Complaint alleges that the three Wachovia Defendants were insiders and affiliates in the collective fraudulent enterprise. (*See* Compl., ¶¶ 2, 20-22.)[7]

Defendants' third argument – that the Complaint's Longshore allegations do not plead any "report or other information" as to the value of assets transferred from the aborted CDO into Longshore (*see* Mem., pp. 29-30) – is equally lacking in merit. The Complaint sets forth specific allegations concerning Wachovia's insider's knowledge of the deteriorating value of the assets acquired for the aborted CDO and sets out the basis of Wachovia's peculiar knowledge: its unique presence at virtually every level of the subprime market, from mortgage origination through securitization. (*See* Compl., ¶¶ 40-44, 162.)

Finally, Defendants' attempt to "spin" the numerous e-mails cited in the Complaint requires little discussion. On a motion to dismiss, the Complaint must be read liberally and all favorable inferences must be drawn in favor of Plaintiffs, not Defendants. The e-mails cited in the Complaint strongly support a reasonable inference in favor of Plaintiffs' allegations. These e-mails show, *inter alia*, that:

- Magnetar and Wachovia discussed Magnetar's "cdo short" strategy for Octans and that Wachovia was "willing to do the structure [Magnetar] asked"

---

[7] The authority cited by Defendants (at Mem., pp. 26-27) is easily distinguishable. *Welch v. TD Ameritrade Holding Corp.*, No. 07 Civ. 6904, 2009 WL 2356131 (S.D.N.Y July 27, 2009), is inapposite: unlike that case, the Complaint clearly sets out the specific roles each Wachovia Defendant had in the scheme. (*See* Compl., ¶¶ 20-22.) Further, Defendants' selective quotation from *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987), substantively mischaracterizes that decision, which went on to hold that "no specific connection between fraudulent representations in [an] Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question" (internal quotation marks omitted).

(Compl., ¶ 59);

- Harding readily yielded to Magnetar's demand to control "the whole approval/ trade process" and "sourc[ing] of CDO CDS" for Octans (*id.*, ¶ 99);
- Wachovia acceded to Magnetar's demand to receive a "Magnetar Sourcing Fee" for its role in Octans (*id.*, ¶ 111);
- At Magnetar's demand, Wachovia agreed to make SAI "more user friendly" in deference to Magnetar's (undisclosed) role in Sagittarius (*id.*, ¶ 134);
- Wachovia sought Magnetar's approval for potential assets to be included in Sagittarius's portfolio (*id.*, ¶ 136);
- Wachovia structured Sagittarius pursuant to a template ("our latest most innovative structure") Magnetar had devised and implemented in a recent Constellation CDO (*id.*, ¶ 142);
- At Magnetar's insistence, Wachovia agreed to structure Sagittarius as a "triggerless" deal to ensure that Magnetar could apply revenues from its (undisclosed) equity position in the CDO to finance premiums on its (undisclosed) short position (*id.*, ¶ 143);
- Magnetar submitted – and Wachovia accepted – a set of "deal requirements" for Sagittarius's structure, including the (undisclosed) right to unilaterally remove SAI, the deal's ostensible collateral manager, "with and without cause" (*id.*, ¶¶ 144-45); and
- Wachovia and SAI understood Magnetar's long-short trading strategy for Sagittarius (pursuant to which Magnetar's returns would increase the worse the CDO performed poorly) and that Magnetar in fact viewed the CDO it had created as "not a pretty bond" (*id.*, ¶ 147).

Defendants' attempt to brush aside Magnetar's praise for Harding's "can-do" attitude and the high-level meeting between the firms' founders (Alec Litowitz and Wing Chau, respectively) to discuss Magnetar's trading strategy is particularly implausible given that Harding is now known to have been one of Magnetar's go-to managers, having managed no fewer than six Constellation CDOs. (*See* Compl., ¶ 95.) Equally specious is Defendants' attempt to characterize the e-mail offering Magnetar the opportunity of "shorting in" to Octans as something "any investor … could have done" (Mem., p. 16), which conveniently ignores Plaintiffs' allegations that Magnetar, unlike "any investor," also had control over asset selection. Further, Defendants' contention that the e-mail in which Harding asked whether Magnetar wanted to short tranches of

Carina (another Constellation CDO) into Octans and conspire with Magnetar to conceal its short position (*see* Compl., ¶ 107) "ignore[s] the reality of CDO structuring" and "does not relate to Octans" (Mem., p. 16 n.11) is false. Not only does this e-mail coincide in time with Octans, but Octans was the only Magnetar-Harding deal involving Wachovia, and the CDO at issue (Carina) was in fact included in Octans. Finally, Defendants' attempt to spin the e-mail exchange where Wachovia undertook to make SAI "more user friendly" as evidence that SAI did, in fact, act independently, is unconvincing. This e-mail actually reveals that whatever reluctance SAI may have had initially was quickly quelled by Magnetar and Wachovia. (*See* Compl., ¶¶ 134-35.)[8]

In any event, leaving aside the shear implausibility of Defendants' interpretation, these are fact issues that are inappropriate for determination at the pleadings stage.

**B. <u>Defendants Owed a Duty to Disclose</u>**

Defendants' argument that they cannot be held liable for their nondisclosure of material facts because they did not owe Plaintiffs any fiduciary duty is a straw man. (*See* Mem., pp. 12, 18, 22, 32.) Plaintiffs have never alleged that Defendants' duty to speak completely and truthfully is based on a fiduciary relationship. Rather, Defendants' duty to disclose arises from two other well-settled principles of New York law.

First, even in the absence of a fiduciary relationship, where a party to an arms-length contract chooses to speak, "it has a duty to be both accurate and complete." *Dodona*, 847 F. Supp. 2d at 646; *see also Caiola v. Citibank,* 295 F.3d 312, 331 (2d Cir. 2002) ("Once [defendant] chose to discuss its hedging strategy, it had a duty to be both accurate and

[8] Indeed, is has been reported that managers who actually pushed back against Magnetar were removed and not permitted to serve as managers for the deals they sponsored. *See* Jesse Eisinger and Jake Bernstein, *The Magnetar Trade: How One Hedge Fund Helped Keep the Bubble Going*, (ProPublica) April 9, 2010, available at http://www.propublica.org/article/all-the-magnetar-trade-how-one-hedge-fund-helped-keep-the-housing-bubble.

complete."); *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, No. 6500027/11, 2012 WL 1425264, at *34 (Sup. Ct. Apr. 23, 2012) (same). In other words, once Defendants undertook to make affirmative representations to Plaintiffs, they assumed a duty to disclose all material information necessary to ensure that their representations were not misleading or incomplete.[9]

Thus, in the case of Octans and Sagittarius, once Defendants made representations regarding the selection of the deals' collateral by Harding and SAI, they assumed a corresponding duty to disclose Magnetar's role – and its conflicting interest – in the deal. Indeed, as this Court has recognized, an arranging bank is liable for misleading partial disclosures it makes concerning the role and interests of short-side investors in CDOs. *See Richman v. Goldman, Sachs Grp., Inc.*, 10 Civ. 3461, 2012 WL 2362539, at *10-12 (S.D.N.Y. June 21, 2012) (bank's disclosure that it had a long position, without disclosing that it also had short positions, was actionable); *SEC v. Goldman, Sachs & Co.*, 790 F. Supp. 2d 147, 162 (S.D.N.Y. 2011) ("Here, having … affirmatively represented [that] Paulson [a short trader] had a particular investment interest in ABACUS – that it was long – in order to be both accurate and complete, [defendants] had a duty to disclose Paulson had a different investment interest – that it was short."). Likewise, in the case of Longshore, having touted the rigorous selection process that SAI would supposedly apply to collateral selection, and the terms on which the collateral would be acquired, Wachovia and SAI assumed a duty to disclose that a substantial portion of the collateral would be dumped, at inflated prices, from an aborted CDO so that Wachovia could avoid the loss and risks of those deteriorating assets. (*See* Compl., ¶¶ 159-64.)

---

[9] Defendants' attempt to cast blame on Plaintiffs for failing to "inquire[] as to the identity of the eventual short counterparty" (Mem., p. 10; *see also id.*, p. 12) is absurd. Defendants suggest that Plaintiffs should have assumed they were being defrauded, and then inquired whether the short counterparty was involved in the design of the CDO and collateral selection, contrary to Defendants' representations. The law imposes no such requirement.

Second, "[u]nder the 'special facts' doctrine, a duty to disclose arises where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair." *Swersky v. Dreyer & Traub*, 219 A.D.2d 321, 327 (1st Dep't 1996); *see also ACA Fin*, 2012 WL 1425264 at *34 (same). Here, the Complaint alleges that Defendants possessed superior knowledge, unavailable to Plaintiffs, regarding the material role that Magnetar played in constructing Octans and Sagittarius.[10] In the case of Longshore, Wachovia also possessed superior knowledge, unavailable to Plaintiffs, about the source and actual prices of the CDO's collateral. (*See* Compl., ¶¶ 160-64.) Defendants' failure to disclose this material information constituted a fraudulent omission under New York law.

Defendants' argument that the special facts doctrine does not apply because "the material subject of any omissions alleged here – the quality and nature of the collateral assets selected for the CDOs – was accessible to the [Plaintiffs]" (Mem., pp. 32-33) is premised upon a mischaracterization of Plaintiffs' claims and contradicts the allegations of the Complaint. As stated, this case is not about the visible "quality and nature of the collateral assets selected for the CDOs." *Id.* In the case of Octans and Sagittarius, it is about the secret involvement of Magnetar. In the case of Longshore, it is about the source of the collateral (an aborted CDO), and the interim deterioration of the value of that collateral. These facts were concealed by Defendants, unavailable to Plaintiffs, and could not have been discovered. Nevertheless,

[10] In an analogous recent decision involving the concealed role of short investors in a CDO, Justice Kapnick of the New York State Supreme Court, Commercial Division, found that the plaintiff, an entity which had been induced to provide financial guarantee insurance on a CDO, had properly alleged a duty to disclose on the part of Goldman Sachs, the CDO's arranger, concerning the role that a short investor (Paulson) had played in selecting the deal's collateral. *See SEC v. Goldman Sachs*, 790 F. Supp. 2d at 162 (duty to disclose adequately pled based on allegations that while plaintiff "believed that Paulson had an economic incentive to select reference obligations that would perform when, in fact, as Goldman Sachs allegedly knew and concealed from [plaintiff], Paulson had an economic incentive to select reference obligations that would default").

whether or not the facts underlying Defendants' omissions were discoverable is a question of fact not resolvable on the basis of the pleadings. *See Black v. Chittenden*, 69 N.Y.2d 665, 669 (N.Y. 1986) (whether fraud could have been discovered or was peculiarly within defendant's knowledge is a "question[] of fact mandating the denial" of summary disposition).[11]

Finally, Defendants argue that there could be no duty to disclose because the Complaint pleads that "the Defendants only interacted with IKB, not Loreley" and that the Complaint "fails to allege facts with any particularity that the Defendants *even knew* that the Loreleys existed." (*See* Mem., p. 32 fn. 18.) This is incorrect: the Complaint makes detailed allegations regarding Defendants' knowledge of Plaintiffs' investment program, including the relationship between Plaintiffs and their investment advisor, IKB. (*See* Compl., ¶¶ 45-50.) Defendants' citation to *Abbatiello v. Monsanto Co*., 522 F. Supp. 2d 524, 534 (S.D.N.Y. 2007) is misplaced. That case involved disclosures made to a corporation but not to its employees (plaintiffs in the suit) where the defendant never knew or intended that the facts would be disclosed to the employees. Here, the Complaint pleads that Defendants made representations to Plaintiffs' investment advisor with the knowledge and intention that they would be conveyed to Plaintiffs. (*See* Compl., ¶¶ 86-87,

---

[11] This conclusion is in fact strengthened by contrast with the cases Defendants cite. The decision in *MBIA Insurance Corp. v. Merrill Lynch* was based on "the undisputed fact that the information was not exclusively in defendants' possession." 81 A.D.3d 419, 419 (1st Dep't 2011). That is the opposite of the case here, where the relevant information was deliberately withheld from investors. Similarly, in *HSH Nordbank AG v. UBS AG*, the facts underlying the omissions – whether the credit ratings in question were warranted – were "far from being peculiarly within UBS's knowledge" and were "understood in the relevant marketplace at the time" 95 A.D.3d 185, 193, 196 (1st Dep't 2012). In *SRM Global Fund Ltd. Partnership v. Countrywide Finance Corp*., No. 09 Civ. 5064, 2010 WL 2473595, at *8 (S.D.N.Y. June 17, 2010), *aff'd*, 448 Fed. Appx. 116 (2d Cir. 2011), the missing facts complained of by plaintiffs were fully disclosed in defendants' 10-K filings. In *Granite Partners L.P. v. Bear Stearns & Co., Inc.*, 17 F. Supp. 2d 275 (S.D.N.Y. 1998) the court found that plaintiffs' investment advisors "made purchase decisions based on little or no analysis or research." *Id.* at 283. Such is not the case here, as the Complaint pleads that Plaintiffs, through their investment advisor, performed extensive due diligence on the CDOs. (*See* Compl., ¶¶ 33-34, 47-50.)

126, 128, 157.) Moreover, it has long been settled that a false representation need not be made directly or personally in order to support an action for fraud. *See, e.g.*, *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 348 (S.D.N.Y. 2010); *Tindle v. Birkett*, 171 N.Y. 520 (1902); *Desser v. Schatz*, 182 A.D.2d 478, 479-480 (1st Dep't 1992). Rather, a false representation made to one person, with the intention or expectation that a third person may act thereon, is actionable by such third person. *See Ostano Commerzanstalt v. Telewide Sys. Inc.*, 792 F.2d 763, 766 (2d Cir. 1986); *Buxton Mfg. Co. v. Valiant Moving & Storage, Inc.*, 239 A.D.2d 452, 453-454 (2d Dep't 1997); *Wechsler v. Hoffman-LaRoche*, 198 Misc. 540, 541 (Sup. Ct. 1950). In fact, courts have expressly recognized a cause of action in favor of a party whose investment advisor has been defrauded. *See In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386 (S.D.N.Y. 2010).

**C. The Generic Disclosures in the Transaction Documents Do Not Sanitize Defendants' Fraud**

Defendants' reliance on the various disclosures set forth in certain of the documents associated with Octans, Sagittarius, and Longshore (*see* Mem., pp. 10-13, 18-19, 22, 30-32) is another exercise in misdirection, as they cannot shield Defendants from their failure to disclose specific, known, material facts. Indeed, "[g]eneral risk disclosures in the face of specific known risks which border on certainties" are ineffective to shield a party from liability for fraud. *In re Prudential Secs. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). In other words, "[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Id.*; *see also Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) (same); *Dandong v. Pinnacle Performance, Ltd.*, 10 Civ. 8086, 2011 WL 5170293, at *13 (S.D.N.Y. Oct. 31, 2011) ("general risk disclosures in the face of specific known risks which border on certainties

are not sufficient to defeat a securities fraud claim"); *Panther Partners, Inc. v. Ikanos Communs., Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008) ("risk disclosures must accurately characterize the scope and specificity of the risk, as understood at the time the statements are made"). That is precisely the situation presented here.

For example, Defendants point to passages in the Octans and Sagittarius offering circulars which stated that the collateral manager "could solicit a third party to take the ultimate 'short' positions on synthetic assets," that the equity tranches "would be sold 'through individually negotiated transactions' and at discounts to par," and that "proceeds raised from placing the Notes would be use [sic] to pay various 'structuring fees' and other fees." (*See* Mem., pp. 8-9, 11-13, 18-19, 30-31.) None of these disclosures, presented as isolated possibilities, could have alerted a reasonable investor that the hypothetical "third party" who "could" take the short position against the CDOs' collateral was not only a known certainty but had in fact *sponsored* the CDOs, *selected their collateral*, and included structural features to allow that investor to finance its short bets for free. (*See* Compl., ¶¶ 52-53, 98-103, 132-40.)

In the case of Longshore, Defendants highlight statements from the offering circular which "warned" that Defendants "may" engage in "proprietary activities" that could create "conflicts of interest" with investors, and which purportedly disclosed that the price Longshore paid for its collateral would not be the price at closing but rather the price at the time it was purchased for the CDO's warehouse.[12] (*See* Mem., p. 31; *see also id.*, p. 22 (same).) Again, however, these disclosures would not put a reasonable investor on notice that a substantial portion of the assets that SAI had supposedly selected for Longshore at "arms-length" using a

[12] In any event, this disclosure relates only to the transfer from the Longshore warehouse into the Longshore CDO, and *not* to the transfer from the aborted CDO's warehouse to the Longshore warehouse.

"rigorous screening process" had in fact been purchased from Wachovia for a *different* CDO before they were dumped at inflated prices into Longshore.

This Court has recently rejected disclosure defenses just like those invoked by Defendants, holding that they are ineffective where, as here, they are not sufficiently specific or connected to the fraud at issue. For example, in *Dandong*, Judge Sand rejected the same argument advanced here by Defendants:

> The cautionary language, general as it is, does not embrace the alleged fraud. Boilerplate language indicating that Morgan Stanley "may be adverse to the interest of the Noteholders" and "[p]otential and actual conflicts may arise" is insufficient to put investors on notice of what Plaintiffs allege was the inevitable risk that Morgan Stanley would invest their principal in an instrument that was engineered to fail….
>
> [Further,] the language indicating the possibility of decline [in Plaintiffs' notes] cannot be used to shield Morgan Stanley from Plaintiffs' allegations that MS capital had custom-built [the CDOs] to intensify the normal risk of principal loss.

2011 WL 5170293, at *13. In *Dodona*, Judge Marrero reached a similar conclusion:

> [T]he Complaint indicates that Goldman had determined in late 2006 that the risks associated with subprime-related assets were substantial enough to warrant a major shift in strategy. Yet, in addressing the risks, the Offering Circulars provide only boilerplate statements regarding the "SPECULATIVE" and risky nature of investing in securities, the possibility of market downturns, and the risks generally associated with mortgage-backed assets. Given Dodona's allegations that Defendants were aware of singularly prohibitive risks associated with the Hudson CDOs in particular, it follows that such boilerplate disclosures do not accurately represent Defendants' assessment of the risks.

847 F. Supp. 2d at 647; *see also In re Morgan Stanley Pass-Through Certs. Litig.*, 810 F. Supp. 2d 650, 672 (S.D.N.Y. 2011) (rejecting use of "boilerplate disclaimers and disclosures in the relevant offering documents [that] do not disclose the risk of a systematic disregard for underwriting standards").

### D. <u>Plaintiffs' Allegations Strongly Support a Reasonable Inference of Scienter</u>

Defendants erroneously contend that the Complaint fails to plead scienter because it

alleges that Defendants' misconduct was motivated by nothing more than a "generic profit motive." (Mem., pp. 33-37.) In truth, the Complaint alleges far more, setting forth facts supporting a strong inference both that Defendants knowingly made material misrepresentations and omitted material facts in order to induce Plaintiffs to invest, and that Defendants had both a powerful motive and the opportunity to defraud the Plaintiffs.

Outside the context of claims under federal securities laws (which are not asserted in this case), the scienter element of a fraud claim is subject only to the notice pleading standard of Rule 8(a). Indeed, as courts have recognized, because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," plaintiffs in fraud actions need only allege "a minimal factual basis for their conclusory allegations of scienter." *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987); *see also Houbigant, Inc. v. Deloitte & Touche LLP*, 303 A.D.2d 92, 98 (1st Dep't 2003) ("The element of scienter, that is, the requirement that the defendant knew of the falsity of the representation being made to the plaintiff, is, of course, the element most likely to be within the sole knowledge of the defendant and least amenable to direct proof.")[13] Thus, a plaintiff need only allege "facts to show that defendants had both motive and opportunity to commit fraud, or … by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000).

---

[13] The requirement to allege scienter applies only to Plaintiffs' fraud claim seeking damages. But Plaintiffs' Complaint also seeks rescission, and under New York law a claim for rescission based upon misrepresentation does not need to allege or prove scienter. *See Albany Motor Inn & Rest., Inc. v. Watkins*, 85 A.D.2d 797, 798 (3d Dep't 1981) ("An action for rescission of a contract based on fraud, unlike a cause of action for damages on the same ground, does not require that scienter either be pleaded or proved. Even an innocent misrepresentation is a sufficient ground for rescission"); *Brodsky v. Nerud*, 68 A.D.2d 876, 877 (2d Dep't 1979) (same); *Seneca Wire & Mfg. Co. v. A. B. Leach & Co*., 247 N.Y. 1, 7-8 (1928) (same).

### 1. The Complaint Pleads Facts Supporting a Reasonable Inference That Defendants Knowingly Misrepresented and Concealed Material Facts

A complaint satisfies the "strong circumstantial evidence" of fraudulent intent when the facts pled make it "difficult to imagine how such events could have occurred if the defendants who controlled them had not actually intended to defraud." *Ouaknine v. MacFarlane*, 897 F.2d 75, 81 (2d Cir. 1990). That standard is satisfied here.

The Complaint alleges that Defendants acted knowingly by representing in their marketing materials that Harding and SAI were independently selecting collateral for Octans and Sagittarius when in fact they knew that Magnetar was in control. Likewise, Defendants engaged in "conscious misbehavior" by representing that the Longshore portfolio would be constructed by SAI using a "rigorous screening process" and acquired on an "arm's length basis." While these allegations are sufficient, the Complaint goes a step further and identifies documentary evidence which bolsters them. Among other things, the Complaint cites numerous e-mails showing that Defendants knew of, understood, participated in, and helped to conceal Magnetar's long-short trading scheme in connection with the Octans and Sagittarius CDOs. (*See* Compl., ¶¶ 59, 61, 96, 99, 101, 104-07, 134, 136, 147.)

Similarly, for Longshore, the Complaint pleads facts showing "strong circumstantial evidence" of conscious misbehavior or recklessness. It is "difficult to imagine" how Defendants' failure to disclose that the collateral was derived from a failed CDO at inflated prices could have been the product of mere negligence.[14]

---

[14] Defendants argue that, since the SEC's claims against Wells Fargo over Longshore only alleged negligence, Plaintiffs cannot rely on the consent judgment to allege scienter. However, the fact that Wells Fargo was only *charged* with negligence does not mean that the facts do not support an inference that they *acted* with scienter. Moreover, Plaintiffs allegations of scienter do not rely exclusively on the consent judgment, but are also based on Wachovia's and SAI's motive and opportunity for engaging in the Longshore fraud. In any event, the case cited by Defendants in support of their argument is inapposite, since the decision from the Ninth Circuit

### 2. Alternatively The Complaint Also Pleads <u>that Defendants Had Motive and Opportunity</u>

As this Court has explained, "opportunity" entails "the means and likely prospect of achieving concrete benefits by the means alleged," while "motive" entails "concrete benefits that could be realized by one or more of the false statements or wrongful disclosures." *Dandong*, 2011 WL 5170293, at *11.

For the Octans and Sagittarius deals, Magnetar wielded enormous clout; as of 2006 and 2007, the Constellation CDOs it was sponsoring accounted for between 35% and 60% of the entire mezzanine market during that period. (*See* Compl., ¶ 63.) Without Magnetar's agreement to purchase the equity tranches these deals would not have proceeded. (*See id.*, ¶¶ 51 n.5, 57, 59-60, 63.) In other words, if Defendants wanted to be in the subprime CDO game, they had to play by Magnetar's rules. (*See id.*, ¶¶ 57, 59-60, 63.)[15] Thus Wachovia stood to realize a very concrete benefit, not just in the form of millions of dollars in fees, but in the perpetuation of its "lucrative business of arranging CDOs" at a time when the market for those instruments was beginning to slow. (Compl., ¶ 57; *see also* ¶¶ 32, 51 n.5, 63, 210-11.) Additionally, Wachovia's business of originating and securitizing loans, and making huge profits from these activities (*see id.*, ¶¶ 42-43), depended in large part on maintaining its CDO business; a slowing CDO business

---

concerned allegations under the heightened pleading standard of the PSLRA, not common law fraud. *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008).

[15] Defendants argue that the scienter theory with respect to the managers is "irrational" since no collateral manager would risk its "professional reputation" by collaborating with Magnetar. (*See* Mem., p. 37 fn. 22) (citing *Stephenson v. Citgo Grp. Ltd.*, 700 F. Supp. 2d 599, 621 (S.D.N.Y. 2010)). In *Stephenson*, the court found that a major global accounting firm would not risk its very existence for some extra fees from a single client. By contrast, Harding and SAI were collateral managers – their entire business counted on managing structured products such as Octans, Sagittarius and Longshore (particularly in the case of Harding, given the number of deals it is now known to have managed for Magnetar). Thus, far from being irrational, the managers had every reason to participate in Wachovia's fraud. (*See* Compl., ¶ 72.)

meant being stuck with the risks attached to the loans it was securitizing at a rate of over $50 billion a year (*see id.*, ¶ 43). Similarly, Harding and SAI had an incentive to "earn lucrative management fees" from serving as collateral managers.[16] (*Id.*, ¶ 72.) Harding, in fact, was particularly incentivized to yield to Magnetar given the deal volume it received in exchange; it is now known that Harding was one of Magnetar's favorite managers, having collaborated with Magnetar on at least six separate Constellation CDOs. (*See id.*, ¶¶ 94-98.) And with respect to Longshore, Wachovia profited not just by the deal itself, but by divesting itself of risky assets (which it may otherwise have been stuck with) at above-market prices. (*See id.*, ¶¶ 159-67.)

The Complaint also supports more than a reasonable inference that Defendants had the opportunity and means to commit fraud. As alleged, Wachovia was the fourth largest bank holding company in the United States and a leading player in the CDO and RMBS market. (*See id.*, ¶¶ 40-44.) It was familiar with Plaintiffs' investment program and had an existing relationship with Plaintiffs' investment advisor. (*See id.*, ¶¶ 45-50.) And by virtue of its role as the arranger of the CDOs at issue, Wachovia had the means and opportunity to secretly collude with Magnetar, structure the deal to Magnetar's specifications, assist its shorting strategy, and select a malleable collateral manager to serve as a "beard" to conceal the scheme. Harding and SAI also had the opportunity and means to commit fraud – the former as one of Magnetar's go-to

---

[16] This understanding of Harding's business interest is supported by Michael Lewis's book *The Big Short*, in which Wing Chau allegedly explained to a short trader, Steven Eisman, how happy he was to work with short-side investors: "the more excited that you get that you're right, the more trades you do, and the more trades you do, the more product for me." Chau went on to say that Harding "sold everything out" *i.e.*, retained no interest in the CDOs it managed, so that it was unaffected by their success or failure, and "didn't spend a lot of time worrying what was in CDOs." (*See* Max Decl., Ex. E, pp. 15-16 (Complaint in *Chau v. Lewis*, No. 11-CV-1333 (S.D.N.Y).) Harding and Chau sued Eisman and Lewis for defamation. Defendants have moved for summary judgment on the grounds, *inter alia*, that Chau did in fact make those (or substantially similar) statements to Eisman. (See Max Decl., Ex. F (Lewis's memorandum in favor of summary judgment); G (Eisman's memorandum in favor of summary judgment).)

managers and the latter as Wachovia's in-house collateral manager division. (*See id.*, ¶¶ 94-95, 125, 159.) In several recent cases, this Court has found similar allegations of motive and opportunity sufficient to plead scienter. *See, e.g.*, *Dandong*, 2011 WL 5170293, at *12 ("The engineered frailty of the CDOs and Morgan Stanley's positions on both sides of the deal adequately alleges motive."); *King County v. IKB Deutsche Industriebank AG*, 751 F. Supp. 2d 652, 663 (S.D.N.Y. 2010) (defendant motivated by $15 million in arranger's fees for structuring deal and had opportunity to commit fraud through, *inter alia*, distribution of marketing documents to plaintiff).

Defendants' argument that the Complaint's allegations are "contradictory" because Magnetar took both "short and long positions with respect to each CDO" (Mem., p. 36) overlooks the actual scheme alleged – that is, Magnetar took the long positions (*i.e.*, the equity tranches) for the very purpose of creating the vehicle (*i.e.*, the CDOs) for it to finance, essentially for free, larger short positions that would generate far greater profits (*see* Compl., ¶¶ 55, 65, 80-81). In that regard, Defendants' unsupported *ipse dixit* assertion that Magnetar's long position in Sagittarius was supposedly "twice the size" of its short position is misplaced. (Mem., p. 36.) Even if this purported fact were true, it is far from a determinative defense on its face. Given that Magnetar bought its equity stake at steeply discounted prices (as Defendants themselves concede), a straight comparison of the nominal value of the short and long bets made by Magnetar is misleading. (*See* Compl., ¶ 52.) Moreover, Sagittarius was not a one-off deal for Magnetar; it was part and parcel of the larger Constellation CDO scheme which, according to public reports, included over two-dozen CDOs that cross-sold to each other, magnifying their collapse (and Magnetar's profits). The thrust of Plaintiffs' claims with respect to Octans and Sagittarius is that Defendants knowingly misrepresented and concealed the highly material fact

that assets were being selected not by independent collateral managers for the benefit of long investors, but instead by an investor running a trading strategy that was directly at odds with Plaintiffs' interests. (*See id.*, ¶¶ 92, 132-33.) Defendants effectively concede the veracity of these allegations in making the fact-based argument – inappropriate for determination on a motion to dismiss – that Magnetar's strategy was publicly known (which, as alleged, it was not). (*See* Mem., pp.13, 18.)

Defendants also argue that "Defendants disclosed the central issues about which Plaintiffs complain: the collateral assets would be acquired by Longshore 2007-3 at closing at the same price as the original acquisition." (Mem., p. 35.) But Plaintiffs do not challenge the price at which assets were sold into Longshore *per se*. Rather, Plaintiffs allege that Defendants fraudulently misrepresented that SAI would undertake a rigorous process to acquire assets for Longshore in best interests of long-investors, in arm's length transactions on fair terms. In reality, SAI and Wachovia used Longshore to dump assets they knew were deteriorating, at prices substantially higher than Longshore would have paid in *bona fide* arm's length trades. (*See* Compl., ¶ 163.) This was never disclosed in any of the offering documents.[17]

In short, the Complaint alleges that Defendants were driven to commit fraud by much more than "a generic profit motive."[18]

---

[17] For that reason, the cases cited by Defendants are inapposite, since they involved disclosure of the actual facts allegedly concealed. *See Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001) (the "public was aware" of facts allegedly concealed by defendant); *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327 (S.D.N.Y. 2007) (scienter not shown where defendant disclosed some of the allegedly concealed contracts, and no basis for concluding that non-disclosure of others was intentional).

[18] The authority Defendants cite in support of their "generic profit motive" argument are thus inapposite. For example, in *Landesbank Baden-Wurttemberg (LBW) v. Goldman, Sachs & Co.*, the court found that "[t]he complaint in this case does not ascribe to [defendants] any particular motive for committing fraud beyond a general profit motive common to all corporations." No. 11-4443, 2012 WL 1352590, at *2 (2d Cir. April 19, 2012). Likewise, in *Alki Partners, L.P.v.*

**E. The Complaint Pleads Reasonable Reliance**

The element of reasonable reliance is "fact-intensive and not suited for resolution on a motion to dismiss." *Nathel v. Siegal*, 592 F. Supp. 2d 452, 466 (S.D.N.Y. 2008).[19] Unless it appears on the face of the Complaint that Plaintiffs' "reliance on the alleged misrepresentations was … so utterly unreasonable, foolish or knowingly blind as to compel the conclusion that whatever injury it suffered was its own responsibility," dismissal is inappropriate. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc*., 500 F.3d 171, 182 (2d Cir. 2007); *King County*, 751 F. Supp. 2d at 660 n.56 (same).[20]

**1. The Complaint Pleads Actual Reliance**

Defendants' argument that the Complaint does not allege actual reliance (*see* Mem., p. 40) ignores that the documents containing Defendants' misrepresentations and omissions were provided to Plaintiffs' investment advisor with the knowledge and intention that they would be conveyed to Plaintiffs, and that Plaintiffs relied on these misrepresentations and omissions in deciding to invest in the CDOs at issue (*see* Compl., ¶¶ 86-87, 100, 116-19, 126, 128, 132-33,

*Windhorst*, No. 11-cv-1071, 2012 WL 933979, at *2 (2d Cir. Mar. 21, 2012), the Second Circuit merely found that an assertion of a profit motive, without more, was insufficient.

[19] *See also Dandong*, 2011 WL 5170293 at *13 (same); MTV Networks v. Curry, 867 F. Supp. 202, 207 (S.D.N.Y. 1994) ("reasonableness of reliance raise issues of fact that must be resolved at trial."); *Papworth v. Steel Hector & Davis*, 5:06-CV-1237, 2007 WL 2903944, at *8 (N.D.N.Y. Sept. 30, 2007) ("whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss.").

[20] Defendants state that Plaintiffs' reliance on SEC investigations "does not militate against the Loreleys' burden to plead reasonable reliance with particularity." (Mem., p. 42 n.26.) Nowhere do Plaintiffs plead that they are relieved from pleading reliance. Defendants' citation to *Serino v. Lipper*, 47 A.D.3d 70 (1st Dep't 2007), is inapposite since, in that case, the plaintiff had argued that he was not required to show reliance at all. *See id* at 78

146, 150-54, 157, 159, 164, 168-71, 185, 189-90, 203, 226).[21] Reliance is sufficiently pled where the allegations "support the inference that, but for the Defendants' fraudulent misrepresentations," plaintiff would not have entered into the transaction. *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 333 (S.D.N.Y. 2009).

The fact that Defendants' misrepresentations and omissions were "filtered" through Plaintiffs' investment advisor (*see* Mem., p. 40) is irrelevant. The Complaint alleges that Defendants were aware of Plaintiffs' investment program, and knew and intended that the offering materials would be conveyed to Plaintiffs. (*See* Compl., ¶¶ 86-7, 126, 128, 157.) Again, New York law is clear that a party can reasonably rely on representations conveyed indirectly *via* its investment advisor. *See Secs. Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 77 (2d Cir. 2000) ("[S]o long as the plaintiff receives the substance of a defendant's misstatements, he or she may establish reliance on that information even if the defendant did not communicate with the plaintiff directly."); *Jay Dees Inc. v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954, 2008 WL 4501652 at *5 (S.D.N.Y. Sept. 30, 2008) ("Reliance need not result from direct communication from defendant to plaintiff. There is no reason why a misrepresentation to the plaintiff's agent does not suffice.").[22]

---

[21] By contrast, in the cases cited by Defendants, there were no such specific allegations of actual reliance. *See Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011) (general, unspecific statement of reliance insufficient); *Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett*, No. 05 Civ. 8988(GEL), 2007 WL 1732427, at *9-10 (S.D.N.Y. June 14, 2007) (court found it unclear whether plaintiffs' general averral of reliance referred to actionable statements or statements made after the fraud was disclosed and were therefore not actionable).

[22] The cases cited by Defendants are distinguishable, since the representations at issue were made to third parties unrelated to plaintiffs (rather than, as here, to Plaintiffs' investment advisor). *See Filler v. Hanvit Bank*, 156 F. Appx. 413, 416 (2d Cir.2005) (representations made to *defendants'* auditors, not to plaintiffs or plaintiffs' agents) (emphasis added); *Secs. Investor Protection Corp.*, 95 N.Y.2d at 711 (representations made to a regulatory body, not to plaintiffs or their agents). Moreover, the plaintiff's theory of reliance in *Secs. Investor Protection Corp.* was that it determined not to take any action on the basis of the silence of the party to whom the

**2. Plaintiffs' Reliance Was Reasonable**

New York law is clear that "[a] disclaimer is generally enforceable only if it tracks the substance of the alleged misrepresentation." *Caiola*, 295 F.3d at 330 (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc*., 748 F.2d 729, 735 (2d Cir. 1984)). Thus, "the disclaimer must show a clear indication that the disclaiming party has knowingly disclaimed reliance on the specific representations that form the basis of the fraud claim." *Hotel Capital LLC v. Wells Fargo Bank,* 35 Misc. 3d 1218A, 2012 WL 1506120, at *8 (Sup. Ct. 2012). Moreover, under the special facts doctrine, a defendant may not invoke even specific disclaimer clauses in order to preclude evidence of misrepresentations if the facts allegedly misrepresented are peculiarly within their knowledge. S*ee Steinhardt Grp., Inc. v. Citicorp*, 272 A.D.2d 255, 257 (1st Dep't 2000); *King County*, 751 F. Supp. 2d at 661; *see also China Dev. Indus. Bank v Morgan Stanley & Co. Inc.*, 86 A.D.3d 435, 436 (1st Dep't 2011).

Here, Defendants do not (and indeed cannot) identify a single disclaimer of reliance pertaining to misrepresentations and omissions upon which Plaintiffs' fraud claims are based. To the contrary, the boilerplate disclaimers upon which Defendants rely – for example, that Plaintiffs had access to collateral lists and "such financial and other information concerning the Issuers and Notes as [they have] deemed necessary" (Mem., p. 8) – do not track Defendants' misrepresentations and omissions concerning Magnetar's role in Octans and Sagittarius.[23]

Plaintiffs' supposed "sophistication" does not change the result, even if it were an issue

---

alleged misrepresentations were made – *i.e.*, a "no news is good news" theory. *Secs. Investor Protection Corp.*, 95 N.Y.2d at 709-11. The Complaint here plainly does not allege any such theory, *i.e.*, that Plaintiffs refrained from acting based on the silence of their investment advisor.

[23] Defendants' reliance on the disclosure of collateral lists is inapt for another reason: Octans and Sagittarius were not fully "ramped" (*i.e.*, stocked with collateral) by closing date, and were to be stocked in a ramping period lasting until 90 days after closing (long after Plaintiffs purchased their notes). (*See* Max Decl., Exs. A, pp. 35, 117-18 (Octans OC); B, p. 4 (Sagittarius OC).)

that could be determined on a motion to dismiss (and it is not).[24] Indeed, courts have routinely applied the peculiar knowledge rule to transactions involving sophisticated parties. For example, in *M & T Bank Corp. v. Gemstone CDO VII, Ltd.*, 23 Misc.3d 1105(A), 2009 WL 921381 at *1, 9-10 (Sup. Ct. April 7, 2009), *aff'd*, 68 A.D.3d 1747, 1749 (4th Dep't 2009), the court upheld fraudulent concealment claims brought by "one of the nation's twenty (20) largest banks" against a CDO arranger like Wachovia that used "misleading and inflated" credit ratings to sell a CDO investment. Similarly, in *MBIA v. Royal Bank of Canada*, 28 Misc. 3d 1225(A), 2010 WL 3294302, at *1 (Sup. Ct. Aug. 19, 2010), the court relied on the peculiar knowledge rule in upholding the claims of a "highly sophisticated insurer" that insured "billions of dollars worth of risks" on structured securities like those at issue here. *See also P.T. Bank*, 301 A.D.2d at 378 ("special facts" doctrine applicable where loan agent withheld facts from commercial lender); *Swersky*, 219 A.D.2d at 327 ( "special facts" doctrine applicable to sophisticated parties).

Moreover, New York courts have consistently rejected the "extraordinary proposition" that "a general sweeping disclaimer can serve to disclaim any and all extrinsic fraud between sophisticated parties." *JPMorgan Chase Bank ex rel. Mahonia Ltd. v. Liberty Mut. Ins.*, 189 F. Supp. 2d 24, 27 (S.D.N.Y. 2002). While a sophisticated plaintiff must "make use of the means of verification that were available to it," *HSH Nordbank*, 95 A.D.3d at 195, this platitude is relevant only when the means of verification are in fact available. Indeed, the decision in *HSH* was predicated on the fact that the plaintiff did "not allege that UBS misrepresented any material existing fact as to which HSH could not have learned the truth had it conducted (or hired a

[24] The sophistication of an investor is an issue of fact that is inappropriate for determination on a motion to dismiss. *See M & T Bank*, 2009 WL 921381, at *12 ("Defendants' argument invites the Court to weigh the evidentiary material they submitted to determine the level of sophistication possessed by Plaintiff with respect to CDOs against the special knowledge allegedly possessed by HBK and DBSI. On a motion to dismiss, the Court cannot evaluate the credibility of these competing allegations[.]")

consultant to conduct on its behalf) an independent appraisal of the risks of the [challenged] transaction." *Id.* at 207.[25] In other words, there was no allegation of peculiar knowledge.

Here, by contrast, there is no amount of due diligence that Plaintiffs or their investment advisor could have done that would have uncovered Defendants' secret agreement with Magnetar or their plan to divest assets onto unsuspecting investors in Longshore, both of which were intentionally concealed. (*See* Compl., ¶¶ 108, 133, 159.) *See DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999) (claim for fraud cannot be dismissed for failure to allege due diligence "where the facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty").[26]

Defendants also argue that the merger clauses in the CDOs' offering circulars shield them from liability for misrepresentations and omissions in the term sheets and marketing presentations they used to induce Plaintiffs' investments. (*See* Mem., p. 7.) They are mistaken. Under New York law, general merger clauses such as these are "ineffectual to exclude evidence of fraudulent representations," since allowing parties to disclaim their fraudulent misrepresentations would provide a defendant with the "power to perpetrate a fraud with immunity, depriving the victim of all redress, if he simply has the foresight to include a merger

[25] Similarly, in the other case relied upon by Defendants, *MBIA Ins. Corp. v. Merrill Lynch*, 81 A.D.3d at 419, the court found it "undisputed [] that the [allegedly misrepresented] information was not exclusively in defendants' possession."

[26] *See also Dandong*, 2011 WL 5170293 at *14 ("[E]ven a sophisticated investor armed with a bevy of accountants, financial advisors, and lawyers could not have known that Morgan Stanley would select inherently risky underlying assets and short them."); *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets LLC*, No. 602529/08, 7622010 WL 2431613, at *7 (Sup. Ct. May 10, 2010) ("It is not apparent at this early stage of the litigation that the true nature of the situation would have been revealed even upon inspection. Even if the truth could have ultimately been discerned, there is no way of knowing what efforts this would have entailed.").

clause in the agreement." *Sabo v. Delman*, 3 N.Y.2d 155, 161 (1957).[27]

Neither does Defendants' argument that Magnetar's scheme was supposedly "public knowledge" assist them. This fact-based argument – that contradicts the pleadings and cannot be decided on a motion to dismiss – is based on two articles in an obscure publication that were not attached to or incorporated by reference in the Complaint (and thus cannot even be considered). *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991) (on a motion to dismiss, court may only consider the complaint, as well as documents attached to it or incorporated by reference in it). The cursory articles at most report speculation, do not even mention Octans or Sagittarius or link Magnetar to Wachovia, and there is nothing in them that could have informed Plaintiffs that these deals were fraudulent. Moreover, there is no suggestion that Plaintiffs or their investment advisor were even aware of this publication.[28]

In sum, Plaintiffs could not have discovered Defendants' fraud, no matter how

---

[27] *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp., LLC*, 19 A.D.3d 273, 275 (1st Dep't 2005) ("a general merger clause such as that contained in the parties' agreement does not operate to bar parol evidence of fraud in the inducement; only where the parties expressly disclaim reliance on the particular misrepresentations is extrinsic evidence barred") (internal citations omitted). This is particularly the case where, as here, the fraud was concealed. New York law deems reliance to be reasonable in the case of a concealed fraudulent plan even where the parties have *specifically* contracted out of reliance (which is not the case here, as explained above). *See Tahini Invs. Ltd. v. Bobrowski* 470 N.Y.S.2d 431, 433 (2d Dep't 1984) ("even where the parties have executed a specific disclaimer of reliance on a seller's representations, a purchaser may not be precluded from claiming reliance on any oral misrepresentations if the facts allegedly misrepresented are peculiarly within the seller's knowledge"). By contrast, the case relied on by Defendants, *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537, 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003), did not involve allegations of such a concealed, fraudulent plan.

[28] Defendants' reliance (at Mem., p. 5 n.2) on *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406 (2d Cir. 2008) for the proposition that news reports can be considered on a motion to dismiss "to confirm that information has been publicly disseminated" is misplaced. In that case, the Second Circuit reversed the district court finding that its decision to dismiss had improperly relied on general "storm warnings" of fraudulent activity that were not "company specific" to defendants. *Id.* at 432. Similarly, here, the articles relied on by Defendants were not specific to Wachovia, Harding or SAI – let alone Octans or Sagittarius. (*See* Tambe Decl., Ex. 15.)

sophisticated they were or how much due diligence they performed, because Defendants had peculiar knowledge of, and concealed, the facts concerning their scheme. (*See* Compl., ¶¶ 73, 108, 133, 159.) These allegations, which must be credited as true, are more than sufficient to plead that Plaintiffs reasonably relied on Defendants' fraudulent statements and omissions. *See, e.g.*, *P.T. Bank Cent. Asia*, 301 A.D.2d at 378 ("While the evidence might ultimately demonstrate that … [defendant] did not misrepresent what it knew about the value of the collateral or that plaintiff was not justified in relying on [its alleged] misrepresentations – it is inappropriate to determine those issues as a matter of law based solely on the allegations in plaintiff's complaint….").[29]

**F. Plaintiffs' Losses Were Caused by Defendants' Fraud**

In pleading common law fraud,[30] a plaintiff need only allege "that its loss was caused when a risk that was concealed by the defendants materialized in a foreseeable chain of events." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 05 Civ. 1898 (SAS), 2005 WL 2148919, at *12 (S.D.N.Y. Sept. 6, 2005). The allegations in the Complaint easily satisfy

[29] Since the fraud was well-concealed, Defendants' citation to *CIFG Assurance N. Am., Inc. v. Goldman, Sachs & Co.*, No. 652286/2011, 2012 WL 1562718 (Sup. Ct. May 1, 2012), is unavailing. In that case, the court's decision was based on a finding that plaintiff "would have discovered the misrepresentations had it conducted a review of sample loans." *Id.* at *9. By contrast, here, no review Plaintiffs could have done would have revealed the fraud.

[30] As with scienter, insofar as Plaintiffs are seeking rescission, they need not allege damages. *Krinsky v. Title Guarantee & Trust Co.*, 298 N.Y.S. 31, 37 (App. Term 1937) ("It is well settled that in an action based upon rescission for misrepresentations a plaintiff is not bound to show that pecuniary loss resulted from the misrepresentations. It is sufficient that plaintiff received something different from what she contracted for and that she might not have accepted the same had the facts not been misrepresented to her."); *Urquhart v. Philbor Motors, Inc.*, 9 A.D.3d 458, 458 (2d Dep't 2004) ("In an action for rescission of a contract of sale on the ground of fraud, it is not incumbent upon the plaintiff to establish actual pecuniary loss.")

this standard.[31]

For Octans and Sagittarius, the Complaint alleges that Magnetar adversely selected the deals' reference assets in order to profit from their failure *via* CDS contracts. (*See* Compl., ¶¶ 53-55.) In order to induce unsuspecting investors to invest, Wachovia concealed Magnetar's involvement and falsely represented that independent collateral managers (Harding and SAI) would choose the collateral to "maximize returns and minimize losses" for the benefit of long investors. (*See id.*, ¶¶ 86-90, 123-30.) When the Octans and Sagittarius reference portfolios failed as Magnetar had designed them, the concealed risk materialized and Plaintiffs' investment was used to pay off Magnetar's short bet.

In the case of Longshore, the Complaint asserts that Wachovia used the deal as a vehicle for avoiding losses and the heightened risk from hundreds of millions of dollars of deteriorated assets that were stuck on Wachovia's books after another CDO it was arranging failed to close. (*See id.*, ¶¶ 159-67.) Wachovia and SAI knew that these assets were rapidly increasing in risk and decreasing in value, and they caused Longshore to acquire this toxic collateral at inflated prices that did not reflect its fair market value. (*See id.*, ¶¶ 164, 166.) In order to induce unsuspecting investors to purchase notes in a deal stocked with collateral that Wachovia itself refused to keep on its own books, Wachovia and SAI concealed this patently material information. Less than ten months later, Longshore collapsed beneath the weight of the garbage

[31] As the Court noted in the pre-motion conference, loss causation is a question typically "reserved for summary judgment. It's not typically the driver on a motion to dismiss." (Dkt. No. 47, Pre-Motion Conference, Tr. p. 9:6-8.) Yet, again, Defendants deploy a fact-intensive argument in an effort to show that their fraud did not cause Plaintiffs' losses. For example, Defendants cite to IKB's 2006/2007 annual report, which attributed its losses to the "sub-prime crisis in the USA." (Mem., p. 39.) Aside from the fact that such documents are irrelevant on a motion to dismiss, those statements of IKB do not apply to Plaintiffs and are by no means inconsistent with Plaintiffs recent discovery of facts showing that their losses were caused by Defendants' fraud.

assets that Wachovia and SAI had knowingly dumped into it, resulting in the loss of Plaintiffs' investment.

Citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), Defendants argue that the Complaint's loss causation allegations are deficient because they do not exclude intervening events, such as the global financial crisis, as possible causes of their losses. (*See* Mem., pp. 38-39.) However, as one court in this District recently noted, *Lentell* does not "impose[] on plaintiffs the heavy burden of pleading facts sufficient to *exclude* other non-fraud explanations" for their loss. *King County v. IKB*, 708 F. Supp. 2d 334, 342 (S.D.N.Y. 2010). Other recent decisions have also rejected Defendants argument that the global financial crisis insulates fraudsters from responsibility for their misrepresentations. *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 296 (1st Dep't 2011), ("It cannot be said, on this pre-answer motion to dismiss, that MBIA's losses were caused, as a matter of law, by the 2007 housing and credit crisis."); *ACA Fin.*, 2012 WL 1425264 at *38 (same); *Dodona*, 847 F. Supp. 2d at 649 ("Although Defendants argue that Dodona's losses coincided with the general market downturn and therefore cannot be linked with the alleged fraud, the law does not require plaintiffs to plead facts sufficient to exclude other non-fraud explanations.") (internal quotations omitted); *White v. Kolinsky*, No. 10 Civ. 2252, 2011 WL 1899307, at *8 (D.N.J. May 18, 2011) ("While the real estate crisis and broader economic climate may be relevant to [the] ultimate causation inquiry, Defendants have not met their burden … of demonstrating that it was the sole, or even primary, factor in causing Plaintiffs' losses.").[32]

[32] The other cases cited by Defendants in support of their argument that Plaintiffs must exclude other causes of loss are inapposite. *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (complaint failed to plead loss causation where it failed to distinguish between effect of separate misleading disclosures made by company and its outside auditor); *Waters v. GE Co.*, No. 08 Civ. 8484, 2010 WL 3910303, at *10 (S.D.N.Y. Sept. 29, 2010), *aff'd*, 447 F.

Moreover, Defendants' argument is "premised on a convenient confusion of cause and effect. The conduct that plaintiffs allege, if true, would make [defendant] an active participant in the collapse of their own business, and of the financial markets in general, rather than merely a passive victim." *In re Ambac Fin. Grp., Inc.*, 693 F. Supp. 2d 241, 270 (S.D.N.Y. 2010). Indeed, Defendants include the nation's third largest issuer of asset-backed CDOs (Wachovia) during the relevant period, its wholly-owned in-house collateral manager subsidiary (SAI), and Magnetar's go-to collateral manager of choice (Harding), and they cannot evade liability by invoking as a defense a financial crisis they played a substantial role in creating. But more importantly, the simple fact is that Plaintiffs would not have invested in Octans, Sagittarius, or Longshore if not for Defendants' fraud.

With regard to Longshore, Defendants also argue that the $4.6 million mispricing cited by the SEC does not translate to a loss for Plaintiffs, who "were fully protected … by their $9.75 million-plus subordination cushions" and compensated by the $5 million paid by Wells Fargo to Longshore investors. (Mem., pp.20-22.) Apart from the fact that Defendants' argument disregards the fact that Plaintiffs are also seeking rescission,[33] nowhere does the Complaint allege that the $4.6 million mispricing was the full extent of Plaintiffs' damages. Rather, Plaintiffs cite this as an example (one that happens to have been substantiated by the SEC's investigation) of Wachovia's fraudulent behavior with regard to Longshore, and how such behavior caused Plaintiffs' losses. That is all Plaintiffs must do to satisfy the pleading

Appx. 229 (2d Cir. 2011) (loss causation not pled where complaint alleged facts showing plaintiffs had suffered no loss); *In re Sec. Capital Assurance Ltd. Secs. Litig.*, No. 07 Civ 11086, 2011 WL 4444206, at *6 (S.D.N.Y. Sept. 23, 2011) (complaint admitted that downgrades were caused by "known exposures, which had been disclosed by [defendant]").

[33] Rescissory damages, the monetary equivalent of rescission, may also be awarded where rescission is appropriate but not practical. *See Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, 935 N.Y.S.2d 858, 869-870 (Sup. Ct. 2012).

requirements of Rule 8(a).

## III. Plaintiffs' Fraud Claims Are Timely

A "party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action and the burden of proving foreign law to enable the district court to apply it in a particular case." *Bigio v. Coca-Cola Co.*, 97 Civ. 2858, 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010), *aff'd*, 675 F.3d 163 (2d Cir. 2012). Far from meeting their burden, Defendants fail to even submit an affidavit from an expert in Jersey law to support their position. *See Application of Chase Manhattan Bank*, 191 F. Supp. 206, 209 (S.D.N.Y. 1961) ("Generally [sworn] affidavits are the minimal formal requirements … [because they serve as] safeguards of truth and accuracy."). Instead, they merely attach a copy of a statute and a court decision, neither of which apply to the present case.[34]

Defendants also mischaracterize Jersey law (assuming *arguendo* that it even applies). As detailed in the Declaration of Robert Oliver Basil Gardner (the "Gardner Decl."), a Jersey Advocate, the fraud claims asserted in the Complaint would, under Jersey law, most likely be subject to a ten-year prescription period. (*See* Gardner Decl., ¶¶ 4, 14.) But even if a three-year period applied, Plaintiffs' causes of action would not have accrued under Jersey law until after they suffered damages, which could not possibly have occurred until Plaintiffs suffered losses. (*See id.*, ¶¶ 15-16.) At the earliest, this did not occur until May 6, 2008 (for Octans) and October 23, 2007 (for Sagittarius), well within the three years of the date of the tolling agreement for

[34] The Law Reform (Miscellaneous Provisions) (Jersey) Law 1960 applies by its terms only to "tort materiel" and "tort personnel," which does not include fraud of the type alleged here (between parties in a contractual relationship) (*see* Gardner Decl., ¶ 4), and does not apply to *dol* or *erreur*, the Jersey causes of action most similar to that alleged here (*see id.*, ¶¶ 9-11). The Jersey case cited by Defendants, *Boyd v. Pickersgill & Le Cornu*, [1999] JLR 284, involved the application of a three year limitation period to a negligence claim, not fraud. In fact, *Boyd* noted that contract claims – to which the action of *dol* is most similar – are subject to a ten year prescription period. (*See* Gardner Decl., ¶¶ 11, 17.)

those transactions (October 15, 2010). (*See* Comp., ¶¶ 120, 155.)[35] And regardless of when these claims accrued, the prescription period is tolled under Jersey law where, as here, a plaintiff "is ignorant of the facts giving rise to the cause of action and such ignorance is objectively reasonable." (*See id.*, ¶ 17.) In this case, Plaintiffs could not have pursued their cause of action earlier because the relevant facts, which had been fraudulently concealed by Defendants, did not come to light until 2010 at the earliest, in the case of Octans and Sagittarius,[36] and April 5, 2011 (the date of the SEC consent judgment) in the case of Longshore.

In any event, this fact-intensive issue cannot be resolved on a pre-answer motion to dismiss. *See, e.g.*, *In re Direxion Shares ETF Trust*, 09 Civ. 8011 (KBF), 2012 WL 717967, at *5 (S.D.N.Y. Mar. 6, 2012) (rejecting argument that "ignores the Court's inability to resolve fact-intensive issues relating to the statute of limitations on a motion to dismiss").

## IV. <u>The Remedy of Rescission is Available and Appropriate</u>

As an afterthought, Defendants devote four lines to arguing that Plaintiffs are not entitled to rescission because Plaintiffs' "claims can easily be satisfied through monetary damages." Defendants' argument amounts to nothing more than a premature defense on the merits – inappropriate for a motion to dismiss – that contradicts Plaintiffs' allegations that they cannot be

[35] For Longshore, the earliest date of injury was February 4, 2008. (*See* Compl., ¶ 173.) While the applicable tolling agreement was entered into on April 28, 2011, this was promptly after plaintiffs learned of the SEC consent judgment and thus the relevant facts previously concealed by defendants.

[36] *See* Eisinger and Bernstein, *supra* fn.8. Defendants' argument that "contemporaneous press reports concerning Magnetar" and "IKB's own admissions" establish that it was "far from practically impossible for the Loreleys to understand the key facts by no later than summer of 2007" (Mem., p. 45) is a premature fact-based argument that has no place on a motion to dismiss and improperly relies on extrinsic evidence. Moreover, this argument is untenable: neither the article in Derivatives Week, much less IKB's annual report, could have given Plaintiffs *any* indication that Octans and Sagittarius were subject to a deliberately concealed fraudulent scheme involving Magnetar (let alone the Longshore fraud, which was uncovered even later).

made whole by monetary damages. (*See* Compl., ¶ 204.) Indeed, whether damages are an adequate remedy is a factual issue unsuited for disposition at the pleadings stage. *See Buller v. Giorno*, 28 A.D.3d 258, 258 (1st Dep't 2006) ("arguments to the effect that plaintiff's claims for equitable relief are barred by … the adequacy of monetary damages present factual issues and accordingly are not amenable to summary disposition").

## V. <u>The Complaint Asserts Viable Claims For Conspiracy and Aiding and Abetting</u>

In order "to establish a claim for conspiracy to defraud, a plaintiff must first demonstrate the underlying fraud, although the plaintiff need not prove that each defendant committed every element of the underlying fraud.… In addition, the plaintiff must show (1) a corrupt agreement; (2) an overt act in furtherance of that agreement; and (3) membership in the conspiracy by each defendant." *Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 319 (S.D.N.Y. 2009). With respect to aiding and abetting, the elements are: "(1) the existence of a fraud; (2) defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).

As detailed above, the Complaint asserts a claim for the underlying fraud. Further, with respect to Plaintiffs' conspiracy claim, the Complaint plainly alleges that Defendants entered into corrupt agreements to defraud Plaintiffs, that these agreements included overt acts (such as the preparation of misleading offering documents), and that each Defendant was a member of the conspiracy. Likewise, for Plaintiffs' aiding and abetting claim, the Complaint pleads detailed facts supporting more than a reasonable inference that for each of the three transactions, Defendants knew of each other's fraud and gave material assistance to one another. (*See* Compl., ¶¶ 91-115, 132-50, 159-64, 218-24.)

## VI. <u>Plaintiffs' Fraudulent Conveyance Claims Are Supported By the Law and Facts</u>

Defendants incorrectly assert that Plaintiffs cannot bring a fraudulent conveyance claim

"because they are limited recourse creditors of the CDOs" and thus have recourse only to the CDOs' collateral in accordance with the CDOs' payment priority schemes. The fraudulent conveyances at issue in the Complaint resulted in a diminution of the value of the CDOs' collateral portfolio – to which Plaintiffs *do* have recourse. By overpaying for collateral, and purchasing collateral that was adversely selected to fail, Defendants created a CDO with collateral that was wholly insufficient from the start to satisfy Plaintiffs' notes. A transaction which causes such a "diminution in the value of the [] property, to which plaintiff is entitled to look in the event of default" can be set aside, notwithstanding a non-recourse provision. *Travelers Ins. Co. v. 633 Third Assocs.*, 973 F.2d 82, 86 (2d Cir. 1992).[37]

Defendants also contend erroneously that the Complaint does not sufficiently allege the elements of a fraudulent conveyance claim, including that the transactions left the CDOs insolvent or with unreasonably small capital. (*See* Mem., p. 23.) As defined by the New York Debtor and Creditor Law ("DCL"), "insolvency" occurs "when the present fair salable value of [the transferor's] assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." DCL § 271. "Unreasonably small capital" is defined as where "the transferor [is] technically solvent but doomed to fail." *See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995). These allegations of constructive fraudulent conveyance (which do not require

[37] The cases cited by Defendants (at Mem., p. 46) are inapposite. Unlike *In re Enron*, No. 04 Civ. 1367 (NRB), 2005 WL 356985 (S.D.N.Y. Feb, 15, 2005) and *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 133 (2d Dep't 1986), Plaintiffs are not attempting to expand "[their] interest in the property," but instead have alleged diminution in the value of assets to which they *do* have recourse. *NTL Capital LLC v. Right Track Recording LLC*, 73 A.D.3d 410, 412 (1st Dep't 2010) was based on a finding that another debtor would have had claim to the transferor's assets even absent the transfer, and therefore plaintiff could not recover for a fraudulent conveyance. That is not the case here, since Plaintiffs were deprived by the conveyances of the value backing the notes to which they had recourse.

culpable intent) are subject to the "notice pleading" standard of Rule 8. *See Gateway I Group v. Park Ave. Physicians, P.C.*, 62 A.D.3d 141, 149 (2d Dep't 2009) ("the plaintiff was not required to plead violations of [DCL] §§ 273, 273-a, 274 and 275 with such heightened particularity"). The Complaint easily meets this standard.

For each of the fraudulent transactions at issue, the Complaint pleads that Wachovia, assisted by Harding and SAI, caused the issuers to purchase cash assets for above-market prices, and issue CDS contract for below-market premiums. (*See* Compl., ¶¶ 5, 74-76, 140, 164, 175-177.) As acknowledged in the offering circulars, the issuers did not "have any material assets other than the Collateral Debt Securities and other assets comprising the Collateral" (Max Decl, Exs. A (Octans OC, p. 4); *see also* Max Decl. Ex. B (Sagittarius OC, p. 1); Tambe Decl., Ex. 10 (Longshore OC, p. 1)); *by definition* the purchase of collateral for more than its true worth left the issuers insolvent, since the value of the collateral would be insufficient to meet the impending CDS credit payments *and* payments owed to noteholders. Further, the CDOs were left with "unreasonably small capital" since the combined effect of weak collateral, bought for excessive prices, and impending CDS payments, meant that the CDOs were "doomed to fail" by the transfers.

Plaintiffs are not required to specify the exact assets transferred. *See In re Bernard L. Madoff Inv. Sec. LLC*, 445 B.R. 206, 235 (Bankr. S.D.N.Y. 2011) (fraudulent conveyance claim need only provide a "short and plain statement of facts, and a dollar-for-dollar accounting is not required … at the pleading stage") (internal quotation marks omitted). Nonetheless, as an illustrative example, the Complaint does plead that certain assets were transferred to Sagittarius at 28% below the then-market value. (*See* Compl., ¶ 178.) Knowing this, Defendants' self-servingly characterize this allegation as a "feeble citation," but it must be credited on a motion to

dismiss. *See Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008).[38]

Defendants further argue that the intentional fraudulent conveyance claim (under Section 276 of the Debtor and Creditor Law) fails for lacking "particularized facts that the Defendants directed transfers of the collateral assets as a means to defraud Plaintiffs as creditors." (Mem., p. 47.) But the Complaint contains detailed allegations of how Defendants knowingly caused the issuers to pay above-market rates for cash collateral and sell credit protection on synthetic collateral at below-market premiums as part of a fraudulent scheme. (*See* Compl., ¶¶ 5, 74-76, 140, 164, 175-77.) Since the above-market purchase of cash assets and below-market sale of CDS protection were carried out in furtherance of Defendants' fraudulent schemes, the scienter allegations for the fraud claims also support a reasonable inference that Defendants directed the transfers for the purpose of enriching Wachovia and Magnetar by depriving the CDOs' creditors (including Plaintiffs) of the value of the collateral supporting their notes. *See Marine Midland Bank v. Zurich Ins. Co.*, 263 A.D.2d 382, 328-83 (1st Dep't 1999) ("fraudulent intent is fairly inferred [where] plaintiff alleged the overall fraudulent scheme in detail").[39]

---

[38] The cases cited by Defendants to support their argument that the fraudulent conveyance claims are insufficiently specific are unavailing. In *NTL Capital*, 73 A.D.3d at 412, the fraudulent conveyance claims contained "no specific factual allegations" and were contradicted by the documentary evidence. By contrast, here, the Complaint sufficiently pleads the fraudulent conveyance claim. *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 365-65 (S.D.N.Y. 2011) was not even a fraudulent conveyance case, and there, the ABX indices were cited for a completely different purpose (knowledge of material risk) rather than as an index of current market prices, as in the Complaint. Contrary to *Lippe v. Bairnco*, 249 F. Supp. 2d 357, 379-80 (S.D.N.Y. 2003), *aff'd*, 99 F. Appx. 274 (2d Cir. 2004), the Complaint here pleads that the CDOs became insolvent at the time of transfer (*see* Compl., ¶¶ 177-79, 233-35, 239-41 245-47), *not* simply with the benefit of hindsight.

[39] Finally, Defendants argue that the fraudulent conveyance claim must be dismissed because the co-issuers (Octans II CDO LLC, Sagittarius I CDO LLC and Longshore CDO Funding 2007-3 LLC) are not currently parties to the action. (*See* Mem., p. 46 n. 29.) This is a curious argument, since – as Defendants well know – the voluntary dismissal of the co-issuers was without prejudice and pursuant to a stipulation that expressly provided that Plaintiffs reserved the right to re-assert claims against them (the latter agreeing to toll any limitations arguments for a further

## VII. Plaintiffs' Unjust Enrichment Claims Are Proper

To plead a claim for unjust enrichment, a plaintiff must allege that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) that it is against equity and good conscience to permit defendant to retain what is sought to be recovered." *Lake Minnewaska Mountain Houses, Inc. v. Rekis*, 259 A.D.2d 797, 798 (3d Dep't 1999) (internal citations omitted). Here, Plaintiffs allege that Defendants received millions of dollars in fees for fraudulently arranging the CDOs at issue, and that Wachovia was also enriched by the $163 million it received from Plaintiffs pursuant to Defendants' fraudulent misrepresentations. (*See* Compl., ¶¶ 32, 59, 83, 257.) Those payments were tainted by fraud, and equity and good conscience dictates that Wachovia return Plaintiffs' funds.

Defendants argue that Plaintiffs' claim for unjust enrichment is "barred" because the subject matter of the claim is covered by an enforceable contract. (*See* Mem., p. 48.) This argument ignores the well-established rule that a contract "induced by deceitful methods or crafty device is nothing more than a scrap of paper." *Sabo*, 3 N.Y.2d at 162. In such circumstances, a claim for restitution of the defendants' unjust enrichment may properly lie. *See Chrysler Capital Corp. v. Century Power Corp*., 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991); *see also Taylor & Jennings v. Bellino Bros. Constr. Co*., 106 A.D.2d 779, 780 (3d Dep't 1984) ("Since the trial court correctly voided the subcontract as induced by fraud … recovery under the

---

three years). (*See* Dkt. No. 32.) Additionally, as made clear by the offering circulars for each of the three transactions at issue, the *issuers* – not the co-issuers – are the transferors (*see* Max Decl., Ex. A, pp. 4, 5 (Octans OC); Ex. B pp. 1, 17 (Sagittarius OC); Tambe Decl., Ex. 10, pp. 1, 4 (Longshore OC)) and therefore the co-issuers are not necessary parties to any fraudulent conveyance action. By contrast, in the cases cited by Defendants, the parties missing from the Complaint were in fact the true transferors. *See Universal Computer Consulting, Inc. v. Pitcairn Enters., Inc*., No. 03-2398, 2005 WL 2077269, at *15 (E.D. Pa. Aug. 26, 2005) (transferee had been dismissed with prejudice); *Geren v. Quantum Chem. Corp*., 832 F. Supp. 728, 737 (S.D.N.Y. 1993) ("plaintiff has named neither the transferees … nor the transferor [] as defendants").

equitable doctrine of quantum meruit [*i.e.*, quasi-contract] was proper"). Additionally, even if there were a valid contract, an unjust enrichment claim would not be barred against defendants Wells Fargo Bank, N.A., Wells Fargo Securities LLC, Harding or SAI, since those entities were not parties to the contracts pursuant to which Plaintiffs purchased their notes. *See Fid. Nat'l Title Ins. Co. v. JP Morgan Chase Bank*, 3:12-cv-540, 2012 WL 1682036, at *2 (N.D.N.Y. May 14, 2012) (defendant's "claim that the contract … precludes an unjust enrichment claim is misplaced" since it was not a party to the contract in question).

Defendants' argument that they were not unjustly enriched at the Plaintiffs' expense because Defendants' fees were paid by the CDOs (*see* Mem., p. 48) is contradicted by the very documents cited by Defendants, which establish that their fees were paid from the proceeds of the sale of notes to investors, prior to being given to the issuers. (*See, e.g.*, Tambe Decl., Ex. 3, p. 2) ("The net proceeds which the Issuer expects to receive from the issuance and sale of the Securities … reflects the payment from gross proceeds of organizational and structuring fees and expenses").) The fact that the funds were funneled through a (shell) third party does not mean that the Plaintiffs were not in fact paying Defendants. *See Friedman v. Ocean Dreams, LLC*, 15 Misc.3d 1146A, 2007 WL 1687165, at *5 (Sup. Ct. June 11, 2007), *aff'd*, 56 A.D.3d 719 (2d Dep't. 2008) ("direct payment" not required for unjust enrichment claim). Moreover, Defendants' argument ignores Plaintiffs' allegations that, aside from the fees, Wachovia was enriched by the $163 million paid to it by Plaintiffs for the notes. (*See* Compl., ¶¶ 83, 258.)

## VIII. The Court Has Personal Jurisdiction Over Defendant WSIL/WFSIL

On a pre-discovery motion under Rule 12(b)(2), a plaintiff "need only make a prima facie showing of personal jurisdiction" which may be accomplished by plaintiff's "own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *S. New Eng. Tel. Co. v. Global NAPs*, 624 F.3d 123, 138 (2d

Cir. 2010) (internal quotation marks omitted). A court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Id.* (internal quotation marks omitted).

Defendants argue that the Court lacks personal jurisdiction over Wells Fargo Securities International Limited ("WFSIL")[40] because it "does not routinely and systematically transact business in New York" and because it was not a party to the agreements providing for submission to jurisdiction in New York. (Mem., p. 49.) However, a foreign entity with no physical presence within the state is nonetheless subject to jurisdiction in New York when a related domestic entity is acting as its agent or when it is a "mere department" of a domestic entity. *See Dorfman v. Marriott Int'l Hotels, Inc.*, 99 Civ. 10496, 2002 WL 14363 at *11 (S.D.N.Y. Jan. 3, 2002) (finding jurisdiction over foreign related entity under agency and mere department theories). Here, on its face, WFSIL's relationship with WFS supports specific and general jurisdiction.[41]

**A. <u>Specific Jurisdiction</u>**

WFSIL's agency relationship with WFS with respect to the CDOs at issue gives rise to specific jurisdiction. Specific jurisdiction is established under CPLR 302(a)(1) when a foreign corporation "in person or *through an agent* … transacts business" within New York. CPLR 302(a)(1) (emphasis added). Here, two of the offering circulars explicitly disclose that WSIL

[40] WFSIL is the successor to Wachovia Securities International Limited ("WSIL"). For clarity, references herein to WFSIL and Wells Fargo Securities LLC ("WFS") pertain both to the current and predecessor entities.

[41] At a minimum, Plaintiffs are entitled to pursue discovery necessary to establish jurisdiction over WFSIL. *See Gundlach v. IBM Corp.*, No. 11–CV–846, 2012 WL 1520919, at *11 (S.D.N.Y. May 1, 2012); *Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628, 639 (S.D.N.Y. 2000).

was acting as WCM's agent in selling the notes.[42] (*See* Tambe Decl., Exs. 6 (Sagittarius OC, p. i), 9 (Longshore OC, p. i).) For all these CDOs, WFSIL transacted business in New York through WFS – by structuring and marketing the deals at issue – and it is directly from those transactions that Plaintiffs' claims arise. (See Compl., ¶¶ 21, 26.)

**B. General Jurisdiction**

Additionally, WFSIL is subject to general jurisdiction in New York. To establish general jurisdiction under CPLR 301, a foreign corporation must be "doing business" within the state. An agency relationship exists for such purposes where the domestic entity "does all the business which [the foreign entity] could do were it here by its own officials." *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 537 (N.Y. 1967); *see also Armstrong*, 91 F. Supp. 2d at 638 (fact that UK defendants "did not maintain a formal presence in New York" did not "shield[] them from suit in the United States" where it acted as agent for domestic corporation). In *Palmieri v. Estefan*, 793 F. Supp. 1182, 1192 (S.D.N.Y. 1992), this Court found that a commonly-owned foreign affiliate selling music recorded in New York was an agent for the purposes of conferring jurisdiction. Based on this agency relationship, the Court rejected defendants' argument that they did "no business in New York, because their only business is to produce, manufacture, promote and sell records within their own territories." *Id.* Similarly here, WFSIL was charged with selling notes overseas in CDOs and other transactions generated in New York. (*See* Compl., ¶ 21.) WFSIL is regularly involved in selling investments devised by Wells Fargo in New York to overseas investors. (*See* Max Decl., Ex. L. (prospectus supplements of New York-listed offerings sold overseas by WFSIL as agent).)

---

[42] For purposes of jurisdictional agency, it is not necessary that one entity "control" the other. Rather, the focus is on the interrelatedness of the enterprise. *See Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 120 (2d Cir. 1967) (finding agency despite absence of "directness of control" among principal and agent).

Common ownership also "gives rise to a valid inference as to the broad scope of the agency." *Frummer*, 19 N.Y.2d at 538. This inference is explicitly confirmed by the Defendants in the marketing documents for Octans, Sagittarius, and Longshore, each of which contains a statement indicating that WSIL and Wachovia Capital Markets ("WCM") (predecessor-in-interest of WFS) were part of the same business operating under the same trade name. (*See* Max Decl., Ex. D.)[43]

WFSIL is further subject to jurisdiction as a "mere department" of WFS. New York Courts consider four factors in making this determination: (1) common ownership; (2) financial dependency; (3) the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and (4) the degree of control over the marketing and operational policies of the subsidiary exercised by the parent. *See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120-22 (2d Cir. 1984).[44] Notably, "[a] subsidiary may function as a mere department of its parent even where the companies observe corporate formalities." *Dorfman*, 2002 WL 14363, at *9. The key *Beech* factor is common ownership. *See King County v. IKB Deutsche Industriebank AG*, 712 F. Supp. 2d 104, 110 (S.D.N.Y. 2010) ("the first factor – common

[43] Wells Fargo makes a similar disclosure covering WFSIL, WSIL's successor: "Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC …Wells Fargo Securities International Limited (authorized by the U.K. FSA)…." (Max Decl., Ex. H.)

[44] This theory of jurisdiction applies both to situations of a domestic subsidiary and foreign parent corporation, as well as the reverse. *See Turbon Int'l, Inc. v. Hewlett-Packard Co.*, 769 F. Supp. 2d 259, 261 (S.D.N.Y. 2011) ("While it is true that the typical case involves a [local] subsidiary and a [foreign] parent, nothing in *Beech Aircraft* or *Jazini* precludes the use of the "mere department" and agency theories in the reverse situation … The Court is not persuaded that asserting jurisdiction over a foreign subsidiary under the "mere department" or agency theories would be contrary to law, nor lead to the parade of horribles of which HP-Thailand warns, as long as both the requirements of § 301 and constitutional due process are met.").

ownership – is essential for an assertion of jurisdiction, the other three are important, but not essential").[45] This factor is clearly satisfied, since both WFSIL and WFS are wholly owned subsidiaries of Wells Fargo & Co. (*See* Max Decl., Exs. J; L, p. S-48.) With respect to the fourth *Beech* factor,[46] WFS exercises a strong degree of control over WFSIL's marketing and operational policies. WFSIL operates under the "trade name" WFS[47] and is listed as an "international location" of WFS.[48] *See Dorfman*, 2002 WL 14363, at *8 ("The fact that the parent characterizes its subsidiary as part of the parent's business tends to show that the parent treats the subsidiary as a department."); *Titu-Serban Ionescu v. E. F. Hutton & Co.*, 434 F. Supp. 80, 83 (S.D.N.Y. 1977), *aff'd*, 636 F.2d 1202 (2d Cir. 1980) (such a description "is a factor to be considered."). WFSIL and WFS engage in common business together with respect to marketing financial products. *See Dorfman*, 2002 WL 14363 at * 8 ("Courts have frequently drawn an inference of substantial control from the fact that a subsidiary is engaged in a common business endeavor with its parent corporation."). Further, Wells Fargo & Co. cultivates the appearance of a single, unified enterprise among its subsidiaries, including WFS and WFSIL.[49] *See DCA Food Indus., Inc.*, 470 F. Supp. 574, 585 (S.D.N.Y. 1979) ("numerous references by White to

---

[45] *See also Erick Van Egeraat Assoc. Architects B.V. v. NBBJ LLC*, 08 Civ. 7873 (JSR), 2009 WL 1209020, at *2 (S.D.N.Y. Apr. 29, 2009) (finding mere department jurisdiction when foreign and domestic defendants were both subsidiaries of the same parent corporation).

[46] While facts concerning the second and third *Beech* factors are inaccessible to Plaintiffs prior to discovery, Plaintiffs are able to establish jurisdiction in their absence. *See Allojet PLC v. Vantage Assoc.*, No. 04 Civ. 05223(SAS), 2005 WL 612848, at *10 (S.D.N.Y. Mar. 15, 2005) (denying motion to dismiss made prior to discovery when plaintiff only established the first *Beech* factor and made a "sufficient start" at establishing the third and fourth factors).

[47] *See* Max Decl., Ex. H.

[48] *See id.*, Ex. I.

[49] *See id.*, Ex. K.

Hawthorn Wisconsin as a 'division' of the corporate 'we' add to the picture created by the total fiscal integration of the parent and subsidiaries and the executive overlap among them.").[50]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied. In the alternative, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Forman v. Davis*, 371 U.S. 178, 182 (1962).

Dated: New York, New York
September 17, 2012

Respectfully submitted,

/s/ Marc E. Kasowitz__________

Marc E. Kasowitz
Sheron Korpus
David M. Max
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

James M. Ringer
Alexander D. Pencu
MEISTER SEELIG & FEIN LLP
140 East 45th Street, 19th Floor
New York, NY 10017
(212) 655-3500

*Attorneys for Plaintiffs*

[50] *See also Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 864 (2d Cir. 1996) (subsidiary was mere department of parent where parent's annual report and promotional materials portrayed subsidiary "as part of a unified global banking network").