UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

No. 12 Civ. 3723 (RJS)

---

LORELEY FINANCING (JERSEY) NO. 3 LIMITED, *et al.*,

Plaintiffs,

VERSUS

WELLS FARGO SECURITIES, LLC, *et al.*,

Defendants.

---

MEMORANDUM AND ORDER

March 28, 2013

---

RICHARD J. SULLIVAN, District Judge:

Plaintiffs[1] bring this action against Defendants[2] for claims arising out of a series of investments in three collateralized debt obligations ("CDOs"). In particular, Plaintiffs allege (1) common law fraud; (2) conspiracy to defraud; (3) aiding and abetting fraud; (4) fraudulent conveyance; and (5) unjust enrichment by all Defendants. Plaintiffs also seek (6) rescission as against WFB. Defendants[3] now move to dismiss the Complaint on the grounds that (1) Plaintiffs lack personal jurisdiction over WFSIL; (2) Plaintiffs' fraud claims are time-barred; and (3) Plaintiffs fail to allege facts that plausibly support the elements of their claims. For the reasons set forth below, the Court dismisses Plaintiffs' claims in their entirety.

---

[1] Loreley Financing (Jersey) No. 3 Limited ("LFJ 3"); Loreley Financing (Jersey) No. 5 Limited ("LFJ 5"); Loreley Financing (Jersey) No. 15 Limited ("LFJ 15"); Loreley Financing (Jersey) No. 28 Limited ("LFJ 28"); and Loreley Financing (Jersey) No. 30 Limited ("LFJ 30") (collectively, "Plaintiffs").

[2] Wells Fargo Securities, LLC ("WFS"); Wells Fargo Securities International, Limited ("WFSIL"); Wells Fargo Bank, N.A. ("WFB"); Harding Advisory, LLC ("Harding"); Structured Asset Investors, LLC ("SAI"); Octans II CDO, Ltd. ("Octans"); Sagittarius CDO I, Ltd. ("Sagittarius"); and Longshore CDO Funding 2007-3, Ltd. ("Longshore") (collectively, "Defendants").

[3] Although Defendants Octans and Sagittarius are not named in the moving papers, the Motion nevertheless has the potential to dispose of the claims against them. The Court therefore refers to the Motion simply as "Defendants'" Motion.

## I. BACKGROUND

### A. Facts[4]

This case arises out of the collapse of the U.S. housing market and the resulting shock wave that resounded through the financial services industry, which had staked its fortunes on the promise of ever appreciating real estate assets. In particular, Plaintiffs' claims involve allegations of fraud and unjust enrichment in relation to their investments in CDOs – investment vehicles that bundle a variety of revenue-generating assets and then sell pieces of the expected revenue to investors in the form of debt and equity securities. (Compl. ¶¶ 30–31; Mem. at 5–6.)

Generally, a sponsoring bank will create and structure a CDO. (Compl. ¶ 30.) In preparation for the CDO's launch, the bank will purchase investment assets, such as mortgage-backed securities ("MBS")[5] or credit default swap ("CDS") contracts,[6] and it will hold or "warehouse" those assets until the CDO is ready to launch. (Compl. ¶ 32.) Simultaneously, the bank will sell portions of the anticipated CDO to investors on the premise that the CDO will eventually use the investors' dollars to purchase the assets held by the bank, and then the CDO will funnel the income from those assets back to the investors. (Compl. ¶¶ 30–32; Mem. at 5–6.) In a managed CDO, a collateral manager selects the assets that will ultimately go into the CDO. (Compl. ¶¶ 35–36; Mem. at 6.)

When a sponsoring bank creates and structures a CDO, it generally divides the securities-for-sale into several classes – or "tranches" – from which investors may select their desired risk profile. (Compl. ¶ 30.) Generally, a senior tranche will consist of notes that receive preferred access to the income that is generated from the assets that the CDO purchases, while notes from junior tranches receive lower priority; after all note holders have been paid, the equity tranche receives what is left. (Compl. ¶¶ 31, 51 n.5; Mem. at 6.) Because the equity tranche bears the most risk of loss in the event that a CDO does not succeed, it is often the most difficult piece to sell. (Compl. ¶¶ 31, 51 n.5.)

Plaintiffs are five special purpose financial companies incorporated under the laws of the Bailiwick of Jersey. (Compl. ¶¶ 9–13.) At various times, various Plaintiffs invested in the three Defendant CDOs – Octans, Sagittarius, and Longshore. (*Id.*) These Defendant CDOs are Cayman

---

[4] Except where otherwise noted, the following facts are derived from the Complaint ("Compl."). In resolving the instant motion, the Court has also considered Defendants' Memorandum of Law in Support of Defendants' Motion ("Mem."), Plaintiff's Memorandum of Law in Opposition to Defendants' Motion ("Opp."), and Defendants' Reply Memorandum of Law in Support of Defendants' Motion ("Reply"), as well as the various exhibits and declarations attached thereto.

[5] A single MBS can be conceptualized as a bundle of individual mortgages – residential ("RMBS") or commercial ("CMBS") – in which each individual mortgage is expected to produce a steady stream of payments from the mortgagor. For instance, 100 mortgages might be bundled together and then cut up into 25 slices. Each slice is one MBS, which is composed of small pieces of each of the 100 different mortgages. An MBS investor would therefore get a small piece of the revenue stream from each of those 100 mortgages. A CDO that invests in multiple MBS is therefore a bundle of bundles.

[6] CDS contracts are essentially insurance contracts in which the policy holder pays premiums to an investor/insurer who pays out the policy upon the occurrence of a "credit event" such as a default or loss. These contracts permit investors to hedge against other losses. For instance, *A* – who has a $100,000 investment in MBS – might arrange a CDS contract in which he pays $100 to *B* every month unless the value of *A*'s MBS investment falls below $50,000, in which case *B* pays *A* $30,000.

Islands limited liability companies, which were created and marketed by Wachovia Capital Markets, Wachovia Securities International Ltd., and Wachovia Bank, N.A. – all of which are predecessors in interest to the Wells Fargo Defendants. (*See id.* ¶¶ 14–22.) Specifically, Wachovia Capital Markets was the initial purchaser of the notes issued by the CDO Defendants and was succeeded by Defendant WFS. (*See id.* ¶ 20.) Wachovia Securities International Ltd. served as the agent of Wachovia Capital Markets for international sales and was succeeded by WFSIL. (*See id.* ¶ 21.) Wachovia Bank, N.A. was the initial CDS counterparty for the CDOs and was succeeded by WFB. (*See id.* ¶ 22.)

In creating these CDOs, Wachovia[7] employed collateral managers to select and manage the assets that would comprise the CDOs. (*Id.* ¶ 34.) Harding, a limited liability company ("LLC") incorporated in Delaware, served as collateral manager for Octans (*id.* ¶ 23); and SAI, another Delaware LLC that was a wholly-owned subsidiary of Wachovia, served as collateral manager for both Sagittarius and Longshore (*id.* ¶ 24).

According to the Complaint, Wachovia did not market the CDOs directly to Plaintiffs but instead marketed them to Plaintiffs' investment advisor, IKB Duetsche Industriesbank AG, and its former affiliate, IKB Credit Asset Management GmbH (collectively, "IKB"). (*See id.* ¶¶ 34–37, 73.) IKB is not a party in this action.

Another non-party, Magnetar Capital LLC ("Magnetar") invested in Octans and Sagittarius by purchasing the equity tranche of those CDOs. According to the Complaint, Magnetar's equity positions – which effectively amounted to bets that the CDOs would succeed – were simultaneously offset or "hedged" by short positions – specifically, CDS contracts that would pay off if the CDOs failed. (*Id.* ¶¶ 2–3, 52–54, 67, 72, 108). Thus, according to the Complaint, in the event of either success *or* failure of the CDOs, Magnetar was positioned to benefit. (*Id.* ¶ 147 (alleging that several Defendants knew that "Magnetar would profit not only if the CDO performed but also if it failed . . .").)

Overall, Plaintiffs allege that, because the Defendant CDOs purchased assets from the sponsoring bank through non-arm's-length deals, at above-market prices, the CDOs did not receive fair consideration for their payments and were rendered insolvent. (*See id.* at ¶¶ 232–237 (Octans); 140, 238–243 (Sagittarius); 244–249 (Longshore).) The specific allegations as to each CDO follow below.

1. The Octans CDO

The activities at issue in this case began in the summer of 2006. According to the Complaint, in July of that year, Magnetar agreed to purchase the equity portion of Octans. (*See id.* ¶ 109.) In August and September 2006, Wachovia provided IKB with term sheets, a marketing book, and the offering circular for Octans,[8] representing that Harding would select and monitor the

---

[7] Throughout the Complaint, Plaintiffs refer generally to "Wachovia," without specifying any particular Wachovia entity.

[8] The offering circulars for the CDO Defendants functioned as the contracts for the parties involved and contained language limiting the terms of the agreement to the terms therein. (*See* Decl. of Jayant Tambe, dated July 31, 2012, Doc. No. 46 ("Tambe Decl."), Ex. 6 at 5 (Octans); Ex. 8 at iii (Sagittarius); Ex. 10 at v, xii (Longshore).) Accordingly, in determining this motion, the Court relies only on allegations about representations in the offering circulars.

3

collateral for the CDO. (*Id.* ¶¶ 84–90.) On October 12, 2006, Plaintiff LFJ 5 invested in the CDO, which became operational the same day. (*See id.* ¶¶ 95, 116–120.)

Although Harding was designated to serve as the collateral manager for Octans, Plaintiffs allege that Magnetar interfered with Harding's selection of collateral. (*Id.* ¶¶ 88–89, 91, 96–101.) For example, on August 8, 2006, as the assets for Octans were being purchased and the notes were being sold to investors, Plaintiffs allege that a Magnetar official e-mailed Wachovia and Harding saying:

> I[']d like to be copied on the whole approval/trade process and definitely would like to get an updated log each day that there is any trading.
>
> We should also discuss CDO exposure as I will source the CDO CDS.

(*Id.* ¶ 99.) Plaintiffs also allege an exchange of three e-mails between Magnetar and Harding on September 12, 2006:

> [Magnetar:] I know this is short notice but very important. The big guy himself, Alec Litowitz, will be in our NYC office tomorrow. He would like to meet with you at 5PM to discuss your thoughts on the no trigger structure, how you would think about hedging, risks to strategy. If you can come over then, would be greatly appreciated.
>
> [Harding:] Will make myself available.
>
> [Harding:] [S]tick w/Harding, we get the job done right!

(*Id.* ¶¶ 96–97.)

In addition to exchanging e-mails with Wachovia and Harding, Magnetar requested a structure that would not divert collateral-asset cash flow away from subordinated notes (*id.* ¶110), and it proposed a "sourcing fee" that it would receive for proposing assets that were ultimately incorporated into the deal (*id.* ¶ 111). Ultimately, the cash flow structure and sourcing fees were disclosed in the Octans offering circular. (Mem. at 17; Opp. at 17.)

2. The Sagittarius CDO

Plaintiffs do not make clear whether or when Magnetar invested in the Sagittarius CDO, but they imply that Magnetar was an equity investor. (*See* Compl. ¶ 146.) Plaintiffs allege that, beginning in November 2006, Wachovia approached IKB about investing in Sagittarius, for which SAI would serve as collateral manager. (*See id.* ¶ 123.) From December 2006 through February 2007, Wachovia provided IKB with several iterations of the term sheet for Sagittarius, as well as a marketing book and offering circular, all of which represented that SAI would select and monitor the collateral for the CDO. (*See id.* ¶¶ 126–130, 150.) The offering circular also represented that all collateral assets would be purchased in arm's length transactions for fair market value. (*See id.* ¶ 131.) In March 2007, Plaintiffs LFJ 15 and LFJ 28 purchased Sagittarius notes from Wachovia. (*See id.* ¶ 154.)

Although Sagittarius was a managed CDO, with SAI designated to select and manage the collateral (*see* Compl. ¶¶ 127–128), Plaintiffs allege that Magnetar interfered with asset selection (*id.* ¶ 132), and they point to a series of e-mails as evidence of that interference (*see id.* ¶¶ 134–138). For example, on September 19, 2006, a Magnetar official e-mailed Wachovia, saying that Magnetar "didn't mean to kill

[SAI] off," it "just wanted them to be more user friendly." (*Id.* ¶ 134.) Wachovia replied within an hour: "[W]e're working on that angle as we speak – let[']s talk tomorrow." (*Id.*)

As it had with Octans, Magnetar requested a structure that would not divert cash flow from subordinated investors (*id.* ¶ 143), and it also sought a provision that would permit removal of the collateral manager with or without cause (*id.* ¶ 145). Also, as with Octans, these structural features were disclosed in the offering circular. (Mem. at 20; Opp. at 17.)

### 3. The Longshore CDO

In February 2007, Wachovia was contemplating the formation of two CDOs: Longshore and another that was ultimately cancelled. (*See id.* ¶ 160.) On an unspecified date after the cancellation of the second CDO, Wachovia transferred forty assets from the account, or "warehouse," of assets for the cancelled CDO into the warehouse established for Longshore. (*Id.* ¶ 164.) Moreover, according to the Complaint, Wachovia ultimately charged Longshore the same price for the assets as Wachovia had paid on the open market some months earlier, even though the market value of the assets had dropped considerably since the original purchase by Wachovia. (*Id.* ¶ 164.)

In essence, Plaintiffs allege that this transaction constituted a "dumping" of toxic assets by Wachovia and belied Longshore's Offering Circular, which represented that:

> The Collateral Manager shall cause any acquisition or sale of Collateral by the Issuer to be conducted on an arm's length basis . . . and, if effected with the Collateral Manager or one of its Affiliates . . . , on terms as favorable to the Issuer as would be the case if such Person were not so affiliated.

(*Id.* ¶ 158; Tambe Decl. Ex. 10 at 149.) Nevertheless, relying on this representation, Plaintiffs LFJ 3, LFJ 5, and LFJ 30 purchased Longshore Notes from Wachovia in April 2007. (*See* Compl. ¶¶ 168–171.)

\*   \*   \*

The Complaint alleges that each of the three CDOs in which Plaintiffs invested "eventually [defaulted] . . . and became virtually worthless." (*Id.* ¶ 181.) Specifically, on May 26, 2008, Octans defaulted, and by July 2009, both Moody's and Standard and Poor ("S&P") had withdrawn their ratings for the CDO altogether. (*See id.* ¶¶ 120–121.) Sagittarius defaulted on October 23, 2007, and Moody's and S&P withdrew their ratings in July 2009. (*See id.* ¶¶ 155–156.) Finally, Longshore defaulted on February 4, 2008, and S&P downgraded the tranches in which Plaintiffs had invested to junk status on March 25, 2008. (*See id.* ¶¶ 173–174.) On April 5, 2011, the Securities and Exchange Commission (the "SEC") issued an order commencing cease-and-desist proceedings against WFS with regard to, *inter alia*, above-market prices that Wachovia – WFS's predecessor – charged Longshore for some of the assets in that CDO. (Tambe Decl. Ex 12 (the "SEC Order").) In addition to alleging securities infractions by WFS, the Order announced that WFS agreed to settle the matter without stipulating to any facts or admitting any wrongdoing. (*Id.* Ex. 12 at 1.) Nevertheless, although the Defendant CDOs failed, Wachovia and the Defendant collateral managers walked away with fees from the transactions pursuant to the contract for the sale of the CDO notes. (*See* Compl. ¶ 257.)

5

B. Procedural History

Plaintiffs commenced this action by filing suit in New York State Supreme Court, New York County, on April 9, 2012. (Doc. No. 1.) Defendants removed the case on May 10, 2012 pursuant to the Edge Act, 12 U.S.C. § 632, which extends federal jurisdiction to certain actions that implicate international banking. (*Id.*) On July 31, 2012, Defendants filed the instant Motion (Doc. No. 43). The Motion was fully briefed on October 8, 2013 (Doc. No. 57), and the Court heard oral argument on January 18, 2013.

II. DISCUSSION

At the outset, the Court will consider whether Plaintiffs have adequately established the Court's personal jurisdiction over WFSIL. The Court will then assess whether Plaintiffs have pleaded facts sufficient to plausibly make out their claims – first with regard to the statute of limitations and then in connection with their substantive causes of action.

A. Rule 12(b)(2): Personal Jurisdiction

Defendant WFSIL argues that Plaintiffs have failed to establish the Court's jurisdiction over WFSIL, a limited liability company that exists under the laws of England and Wales and has its principal place of business in London. (Compl. ¶ 21.)

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Gr. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)). "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006). "Such a showing entails making 'legally sufficient allegations of jurisdiction,' including 'any averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant.'" *Penguin Gr.*, 609 F.3d at 35 (quoting *Magnetic Audiotape*, 334 F.3d at 206). "However, '[c]onclusory allegations are not enough to establish personal jurisdiction' and the allegations must be well-pled." *Sikhs for Justice v. Nath*, No. 10-cv-2940, 2012 WL 4328329, at *22 (S.D.N.Y. Sept. 21, 2012) (quoting *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003)).

"The amenability of a foreign corporation to suit in a federal court in a diversity action . . . is determined in accordance with the law of the state where the court sits . . . ." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 183 (2d Cir. 1998) (internal quotations and brackets omitted). "A court may exercise personal jurisdiction under New York Civil Procedure section 301 over a foreign corporation that is engaged in 'continuous, permanent, and substantial activity in New York.'" *Saudi v. Marine Atl., Ltd.*, 306 F. App'x 653, 654–55 (2d Cir. 2009) (quoting *Landoil Resources Corp. v. Alexander & Alexander Servs. Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1991) (internal quotation marks omitted)). Absent such general grounds for jurisdiction, long-arm jurisdiction pursuant to "N.Y. C.P.L.R. 302(a) provides, in pertinent part, that a court 'may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state,' so long as the plaintiff's 'cause of action aris[es] from' that 'transact[ion].'" *Licci ex rel. Licci v. Lebanese Canad'n Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012) (quoting N.Y. C.P.L.R. 302(a)).

6

Plaintiffs allege that the non-CDO Defendants "engage in, or during the relevant time period engaged in, a continuous and systematic course of business in New York and have offices in New York City. Moreover, all Defendants transacted business within New York giving rise to Plaintiffs' causes of action and orchestrated the fraudulent scheme at issue in and from New York." (Compl. ¶ 26.) Clearly, conclusory allegations such as these, which merely recite the legal standard, are inadequate to establish general jurisdiction over WFSIL pursuant to Section 301.

Plaintiffs alternatively rely on long-arm jurisdiction, arguing that the express agency relationship between Wachovia Securities International ("WSI") and Wachovia Capital Markets ("WCM") – the predecessors to WFSIL and WFS, respectively – establishes jurisdiction over WFSIL. (Opp. at 46–48.) Plaintiffs allege that WSI "was the agent of [WCM] for the sale of the Sagittarius and Longshore Notes." (Compl. ¶ 21; *see* Tambe Decl. Exs. 6, 10.) Although C.P.L.R. 302(a) permits a Court to exercise jurisdiction over a foreign corporation whose agent transacts business in the state of New York, "that statutory provision does not provide for the 'reverse.' It does not permit the acts of a principal to be imputed to a foreign agent to confer jurisdiction over the agent." *Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1262 (S.D.N.Y. 1995) (listing cases); *see also Societe d'Assurance de l'Est SPRL v. Citigroup Inc.*, 10-cv-4754 (JGK), 2011 WL 4056306, at *7 (S.D.N.Y. Sept. 13, 2011) (rejecting jurisdiction over Citigroup Congo when it carried out the financial decisions of its parents abroad). Here, Plaintiffs attempt to reverse the structure of Section 302(a) by making the acts of the principal in New York (WCM) the basis for jurisdiction over the agent (WSI), which conducted business only abroad. (*See generally* Decl. of Toby Peregrine-Jones, dated July 31, 2012, Doc. No. 45, ¶¶ 4–8. (summarizing WFSIL's utter lack of ties to New York State).) Since WSI was the express agent of WCM, WCM's amenability to jurisdiction will not transfer to WSI pursuant to Section 302(a).[9]

As a final alternative, Plaintiffs argue that WFSIL is subject to jurisdiction pursuant to Section 301 because it is a "mere department" of WFS. (Opp. at 48–49.)

> In determining whether [a] subsidiary is a 'mere department' of the parent . . . the court must consider four factors . . . : first, 'common ownership' – which is essential[]; second, 'financial dependency of the subsidiary on the parent corporation;' third, 'the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities;' and fourth, 'the degree of control over the marketing and operational policies of the subsidiary exercised by the parent.'

*Jazini*, 148 F.3d at 184–85 (quoting *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120–22 (2d

---

[9] Plaintiffs also argue that common ownership "gives rise to a valid inference as to the broad scope of the agency" relationship between commonly owned parties. (Opp. at 48.) However, Plaintiffs mischaracterize the holding of the case on which they rely: *Frummer v. Hilton Hotels Int'l., Inc.*, 19 N.Y.2d 533, 538 (1967). After the language that Plaintiffs quote, the opinion goes on to explain that the inference of agency only arises "in the absence of an express agency agreement." *Id.* Where, as here, an express agency agreement sets forth the roles of principal and agent, the long-arm statute will not permit the principal's amenability to jurisdiction to carry to the agents.

Cir. 1984)). Plaintiffs do not even begin to allege facts that would satisfy this legal standard, so this argument fails as well. *See id.* at 185 (finding no personal jurisdiction over a mere department where plaintiffs' allegations "lack[ed] the factual specificity necessary to confer jurisdiction" and relied instead on "conclusory allegations").

Having failed to plead facts that would establish the Court's jurisdiction over WFSIL, Plaintiffs' claims against that party are dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2).

B. Rule 12(b)(6): Failure to State a Claim

In order to survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must "provide the grounds upon which his claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Plaintiffs must also allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 570. If a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.*

1. Statute of Limitations for Fraud-Based Claims

Defendants move to dismiss all fraud claims based on the statute of limitations. (Mem. at 44–45.) "A motion to dismiss on statute of limitations grounds is properly viewed as a Rule 12(b)(6) motion to dismiss for failure to state a claim . . . ." *Jowers v. Lakeside Family & Children's Servs.*, 435 F. Supp. 2d 280, 283 (S.D.N.Y. 2006); *see Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989). Under N.Y.C.P.L.R. § 202, when a nonresident brings an action in New York based upon an injury that occurred outside of the state, the action must satisfy both New York's statute of limitations and the limitations period of the jurisdiction in which the cause of action accrued. New York grants a party six years in which to bring fraud-based claims, *see* N.Y.C.P.L.R. § 213(8), which the parties do not dispute Plaintiff satisfies. Therefore, Plaintiffs' claims could be time-barred only if they accrued in a jurisdiction with a shorter limitation than New York's six-year period.

"If the claimed injury is an economic one, the cause of action typically accrues where the plaintiff resides and sustains the economic impact of the loss." *Portfolio Recovery Assoc., LLC v. King*, 901 N.Y.S.2d 575, 577 (N.Y. 2010) (internal quotation marks omitted). The parties do not dispute that Plaintiffs are Jersey entities so their economic losses occurred in Jersey, and their claims accrued there. Jersey's statute of limitations therefore applies. The parties also agree that Jersey law provides no specific limitation for common law fraud, so Jersey courts would determine the limitations period by working to identify a limitation by analogy. (*See* Decl. of Robert Oliver Basil Gardner, dated Sept. 17, 2012, Doc. No. 49 ("Gardner Decl."), ¶¶ 6–7; Decl. of Michael Paul Cushing, dated

8

October 8, 2012, Doc. No. 58 ("Cushing Decl."), ¶ 9.) It is the proper analogy that the parties struggle to agree on.

Plaintiffs assert that their fraud-based claims are analogous to the causes of action for *dol*, *erreur*, and fraudulent misrepresentation – all of which are contract-related causes of action in Jersey with ten-year limitations periods. (*See* Gardner Decl. ¶¶ 4, 8–10.) Defendants contend that the fraud-based claims should sound in tort, because Plaintiffs' fraud claims are leveled against all parties, not just WFB, the lone Defendant in contractual privity (through its predecessor) with Plaintiffs. (*See* Cushing Decl. ¶¶ 12–13.) Tort actions in Jersey operate on a three-year statute of limitations. (*Id.*) Moreover, Defendants point to *Pell Frischmann v. Bow Valley*, (2008) JLR 311, in which the Jersey Court of Appeal addressed a cause of action similar to common law fraud and treated it as the tort of "deceit." (*Id.* ¶ 15.) According to the court in *Pell Frischmann*, a plaintiff may bring an action for deceit where "a defendant makes a false representation, knowing it to be untrue, or being reckless as to whether it is true, and intends that the claimant should act in reliance on it, [thereby causing the plaintiff to] suffer[] loss . . . ." (*Id.* ¶ 15.) This formulation – which is nearly identical to the elements for common law fraud in New York set forth below in Section II.B.2 – weighs strongly in favor of Defendants' argument for a three-year limitation based in tort.

Even assuming a three-year limitation, however, "in the statute of limitations context . . . dismissal is appropriate only if a complaint clearly shows the claim is out of time." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999). At this stage, too many questions of fact remain for the Court to determine whether the statute of limitations bars Plaintiffs' fraud claims. In particular, the parties agree that tolling standards under Jersey case law suspend the statute of limitations when it is objectively and subjectively reasonable for a would-be plaintiff to be unaware of his cause of action. (Gardner Decl. ¶ 13; Cushing Decl. ¶ 22.) Here, Plaintiffs adequately allege that they did not know, and could not reasonably have discovered, the facts underlying their fraud claims. (Compl. ¶ 182.) Not until July 2009 did Moody's and S&P withdraw their ratings from Octans and Sagittarius (*id.* ¶¶ 121, 156), and the SEC did not settle the Longshore matter with Wells Fargo until April 5, 2011 (Tambe Decl. Ex. 12). At least at this stage of the proceedings, Plaintiffs have alleged facts that would support an inference that they had neither actual nor constructive knowledge of the facts underlying their claims until July 2009, which would make their action timely under Jersey's three-year statute of limitations for tort. Accordingly, Defendants' motion based on the statute of limitations is denied.

2. Common Law Fraud

The Court now proceeds to consider the adequacy of each cause of action under the familiar Rule 12(b)(6) pleading standard. The parties focus the bulk of their briefs on the cause of action for common law fraud. In New York, a claim for common law fraud requires a plaintiff to plead (1) a material misrepresentation of fact, (2) knowledge of its falsity, (3) intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages. *See Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 F. App'x 679, 681 (2d Cir. 2012) (citing *Eurycliea Partners, LP v. Seward & Kissel, LLP*, 883 N.Y.S. 147, 150 (N.Y. 2009)). Additionally, fraud claims are subject to the particularity pleading requirements of Rule 9(b), under which a plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify

the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004). Moreover, in pleading scienter, a plaintiff needs to allege facts that give rise to a "strong inference" of fraudulent intent either by (1) showing that Defendants had the motive and opportunity to commit fraud or (2) providing strong circumstantial evidence of their conscious misbehavior or recklessness. *See id.* Finally, in pleading damages, a plaintiff must allege loss causation – that is, that its reliance on the misrepresentation or omission proximately caused the loss. *See Solow v. Citigroup, Inc.*, No. 12-2499-cv, 2013 WL 149902, at *2 (2d Cir. Jan. 15, 2013).

Plaintiffs allege common law fraud arising from representations and omissions that induced them to invest in each of the three CDOs at issue. In relation to Octans and Sagittarius, however, they fail to plead facts that raise a plausible inference of a material misrepresentation or omission, much less a strong inference of scienter, under the Rule 9(b) standard. For Longshore, they fail to allege scienter.

### a. Octans CDO

Plaintiffs' fraud theory for Octans holds that Defendants named Harding as the collateral manager for the CDO, but Harding knowingly abdicated its role to the CDO's equity investor, Magnetar, in order to curry favor with that investor. (Compl. ¶¶ 2–4, 113.) Because Magnetar held a short position even larger than its equity position, however, it selected assets that would cause Octans to fail. (*Id.*) When Octans did in fact fail, Plaintiffs lost their investment while Magnetar profited. (*Id.* ¶¶ 113, 120–122.)

Plaintiffs allege that the offering circular for Octans represented that Harding would select and monitor the collateral for the CDO. (*Id.* ¶ 90.) To demonstrate that this representation was materially false, Plaintiffs point to a series of e-mail exchanges among Magnetar, Harding, and an undifferentiated "Wachovia" entity in which Magnetar purportedly exercised influence over Harding in its selection of collateral. They also argue that Defendants failed to disclose material information that Plaintiffs had a right to know. These allegations fail to make out a material misrepresentation or omission.

### i. Failure to Differentiate Among Defendants

Before reaching the substance of Plaintiffs' claims, the Court notes that Plaintiffs do not identify which of the Wells Fargo Defendants is responsible – through its Wachovia predecessor – for the representations in the Octans Term Sheets or Marketing Book, nor do they identify which Wachovia entity betrayed those representations by colluding with Magnetar. Instead, throughout the Complaint, Plaintiffs refer generally to "Wachovia." (*See, e.g.*, Compl. ¶¶ 84–87 (aggressive marketing by "Wachovia"), 90–91 (representations by "Wachovia"), 99 (e-mail exchange with "Wachovia"), 104–106 ("Wachovia" helping Magnetar execute its scheme), 108 ("Wachovia" concealing information), 111 ("Wachovia" negotiating deal features with Magnetar).) This is not enough. Under Rule 9(b), plaintiffs are required to specify which Defendants are responsible for which alleged fraud. *See DiVittorio v. Equidyne Extractive Indus. Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987); *Welch v. TD Ameritrade Holding Corp.*, 07-cv-6904 (RJS), 2009 WL 2356131, at *6 (S.D.N.Y. July 27, 2009) ("Plaintiff improperly groups all Defendants

10

together through the use of headings that label his allegations as misrepresentations by the 'TD Ameritrade Defendants.'")

Plaintiffs respond that the "group pleading doctrine" permits them to refer generally to Wachovia or the Wells Fargo Defendants. (Opp. 12–13.) That doctrine applies, however, only when a plaintiff "allege[s] interaction between the corporate entities relating to the subject matter of the alleged fraudulent misstatement or omission that is more than conclusory." *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 264 (S.D.N.Y. 2011); *see also DiVittorio* 822 F.2d at 1248 (dismissing claims based upon conclusory allegations that defendants were affiliated entities). Plaintiffs make only one vague allegation of interrelatedness among the Wachovia entities: that "Wachovia Securities International Limited was the agent of Wachovia Capital Markets, LLC for the sale of the Sagittarius and Longshore Notes." (Compl. ¶ 21.) Otherwise, Plaintiffs substantiate their group pleading argument by describing each of the Wells Fargo Defendants individually and without cross-reference (*id.* ¶¶ 20–22), and by alleging generally that Octans was "arranged by Wachovia Capital Markets, LLC, Wachovia Securities International Limited, and Wachovia Bank, N.A. (collectively 'Wachovia'; the predecessors-in-interest of, respectively, WFS, WFSI[L], and WFB) . . . " (*id.* ¶ 2). These allegations set forth no specific interactions between the Wells Fargo entities "relating to the subject matter of the alleged fraudulent misstatement or omission," *Optimal U.S. Litig.*, 837 F. Supp. 2d at 264; therefore, Plaintiffs fail to create a basis on which the Court may apply the group pleading doctrine. Accordingly, Plaintiffs fail to state a claim against any of the Wells Fargo Defendants for fraud in relation to the Octans CDO.

ii. Failure to Plead Fraudulent Misrepresentations

Turning to the non-Wells Fargo Defendants, Plaintiffs *do* specify Harding's role in the purported fraud. Even with Harding adequately identified in the pleadings – and even if the Wells Fargo Defendants had been properly disaggregated – the allegations do not raise a plausible inference that the statements about Harding's role as collateral manager were material misrepresentations. Plaintiffs identify two alleged e-mails as the strongest proof of Magnetar's improper influence over the selection of collateral for Octans. (Tr. of Oral Arg. on January 18, 2013 ("Tr.") at 42:22–23; 43:11–13.) According to the Complaint, on August 8, 2006, as the assets for Octans were being purchased and the CDO's notes were being sold to investors, a Magnetar official e-mailed Wachovia and Harding saying:

> I[']d like to be copied on the whole approval/trade process and definitely would like to get an updated log each day that there is any trading.
>
> We should also discuss CDO exposure as I will source the CDO CDS.

(Compl. ¶ 99.) Harding replied: "Sounds good." (*Id.*)

Plaintiffs argue that this exchange should have been disclosed because it reveals that, even though Magnetar was "sourc[ing] the CDO CDS" – i.e., seeking a short position against any other CDOs that Octans was investing in (Tr. 41:6–14) – Magnetar was also "together with the so-called independent collateral manager deciding which assets should go in the CDO for the long side" (Tr. 40:14–24). Plaintiffs simply read too much from this e-mail

11

exchange. In fact, the e-mail says nothing about Magnetar selecting collateral for the CDO. To the contrary, the e-mail implies that Harding was in the process of selecting collateral and that Magnetar simply wished to be kept apprised of which assets were going into the CDO. At most, the exchange can plausibly be read to reveal that Magnetar was looking to hedge the CDO's long bets by staking out short positions. Aside from there being nothing improper about Magnetar's hedging its exposure to the equity tranche, there is simply nothing in the exchange to suggest that Magnetar was selecting Octans's collateral or influencing Harding's selection process in contravention of the CDO's offering circular.

The other e-mail exchange that Plaintiffs say most strongly demonstrates Magnetar's improper influence also fails to support an inference of undue influence by Magnetar:

> [Magnetar:] I know this is short notice but very important. The big guy himself, Alec Litowitz, will be in our NYC office tomorrow. He would like to meet with you at 5PM to discuss your thoughts on the no trigger structure, how you would think about hedging, risks to strategy. If you can come over then, would be greatly appreciated.
>
> [Harding:] Will make myself available.
>
> [Harding:] [S]tick w/Harding, we get the job done right!

(Compl. ¶¶ 96–97.) Plaintiffs assert that this conversation reveals:

> [h]igh-level meetings between Magnetar and Harding, between the founder of Magnetar and the founder of Harding[;] and all of these statements by Harding [–] we will get the job done, we have a can-do attitude [–] these are the discussions between the collateral manager and the party that has the overwhelming short interest in the deal, the party that benefits if the deal fails.

(Tr. at 43:15–23.)

Plaintiffs again read too much into an e-mail exchange. Viewed in the light most favorable to Plaintiffs' theory, this e-mail shows Magnetar asking Harding for a meeting to talk about the CDO's structure and its hedge position. The e-mail plausibly implies that Magnetar was an active and involved equity investor and that Harding was happy to accommodate the request for a meeting, but it does not provide any reason to believe that Magnetar was influencing Harding's collateral selection, no matter how much Plaintiffs insist otherwise. Indeed, the tone of Magnetar's e-mail suggests that Harding was in control and that Magnetar merely wanted to be kept abreast of developments. If Magnetar was already involved in selecting assets, this exchange would have been unnecessary. In short, Plaintiffs' allegations do not support a plausible inference that Harding – or any Defendant, for that matter – fraudulently misrepresented Octans to Plaintiffs.

iii. Failure to Plead Fraudulent Omissions

Plaintiffs also allege that Magnetar requested certain deal features for the CDO, including a sourcing fee for any assets that Magnetar proposed and a payout structure that ensured the assets' cash flows would not be diverted from junior interests in Octans, such as Magnetar's equity interest. (Compl. ¶¶ 110–111.) The parties do not dispute, however, that these deal features were disclosed in the Octans offering

circular. (Mem. at 17; Opp. at 17.) Moreover, these allegations, if true, do not show that Harding failed to independently control the selection of assets. Rather, they demonstrate simply that Magnetar, like any equity investor, was interested in the structure of the deal in which it was taking a risky position. But again, none of the deal's structure was hidden from investors.

Plaintiffs nevertheless argue that, because "Defendants possessed superior knowledge, unavailable to Plaintiffs, regarding the material role that Magnetar played in Constructing Octans . . . [, the] failure to disclose this material information constituted a fraudulent omission under New York law." (Opp. at 17.) In making this argument, Plaintiffs rely on a formulation of the "special facts" doctrine from *Swersky v. Dreyer & Traub*, a New York Appellate Division case that adopted "a duty to disclose . . . where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair."[10] 643 N.Y.S.2d 33, 37 (N.Y. App. Div. 1996) (internal quotation marks omitted). However, *Swersky* is clearly distinguishable from this case. There, plaintiffs entered into an investment agreement by which they would pay for several hundred thousand shares of stock with the understanding that their stock would be immediately registered and saleable; unbeknownst to plaintiffs, however, defendants omitted factual information that bore directly on whether the stock could in fact be registered and sold. *Id.* at 323–25. Thus, in *Swersky*, the terms of the agreement changed based on undisclosed information. By contrast, Plaintiffs here made an investment in Octans while relying on terms that were expressly and exhaustively disclosed. Presumably, Plaintiffs invested because they thought the disclosed terms were fair; certainly those disclosed terms do not suddenly become "inherently unfair," triggering application of the "special facts" doctrine, simply because Magnetar proposed some of them. Absent an allegation that undisclosed information changed the terms of the agreement, Plaintiffs have failed to allege "superior knowledge" of fraud on the part of Defendants; the "special facts" doctrine is thus wholly inapplicable.

iv. Failure to Raise a Strong Inference of Scienter

For the same reasons that Plaintiffs' allegations fail to raise a plausible inference of a misrepresentation or omission, the pleadings fail to raise a strong inference of scienter. Because the alleged e-mail exchanges with Magnetar do not show that Defendants misrepresented Harding's independence, they hardly can show that Defendants *knowingly* misrepresented Harding's role. Similarly, to the extent that Defendants had no obligation to elaborate on the process that produced the CDO's terms, Plaintiffs do not identify any misdeed to which scienter might apply.

\* \* \*

In sum, Plaintiffs do not adequately plead common law fraud by any Defendant in relation to the Octans CDO. To the extent Plaintiffs do not differentiate among Defendants in the pleadings, they fail to satisfy the particularity requirement of Rule

---

[10] Plaintiffs also rely on *SEC v. Goldman Sachs & Co.*, in which the court found that a party's long and short positions should have been disclosed because that party made requests of the collateral manager. 790 F. Supp. 2d 147, 162 (S.D.N.Y. 2011). What Plaintiffs decline to mention is that, allegedly, the party in that case had also played a role in selecting the collateral with the collateral manager. *Id.* at 151. Here, there are no facts that show anyone other than Harding selected collateral for Octans.

13

9(b). And, particularized or not, Plaintiffs' factual allegations do not support a plausible inference of an actionable misrepresentation or omission, let alone a misrepresentation or omission perpetrated with scienter.

### b. Sagittarius CDO

Plaintiffs' fraud theory for Sagittarius is nearly identical to their theory for Octans, and the same pleading defects taint both sets of allegations. Plaintiffs allege that Defendants represented that Sagittarius would "select and manage the Collateral Assets" (Compl. ¶ 129), and that "[t]he performance of the Collateral [would] be highly dependent on the financial and managerial expertise of the Collateral Manager" (*id*.). As they did with Octans, however, Plaintiffs fail to differentiate among the various predecessors of the Wells Fargo Defendants, alleging generically that "Wachovia approached Plaintiffs' investment advisor" (*id.* ¶ 123; *see id.* ¶¶ 125–126); "Wachovia provided Plaintiffs' investment advisor with a marketing presentation" (*id.* ¶ 128; *see id* ¶ 129); and then "Wachovia" exchanged allegedly incriminating e-mails with Magnetar (*see id.* ¶¶ 134, 136–138, 142–145). Of these e-mails, Plaintiffs argue that one exchange between Magnetar and Wachovia best illustrates Magnetar's impermissible influence over the collateral manager, SAI. (Tr. 42:24–43:4.) On September 19, 2006, a Magnetar official e-mailed "Wachovia," saying that Magnetar "didn't mean to kill [SAI] off," it "just wanted them to be more user friendly." (Compl. ¶ 134.) Wachovia replied within an hour: "[W]e're working on that angle as we speak – let[']s talk tomorrow." (*Id.*) Plaintiffs argue that this interaction demonstrates

that Magnetar was saying something to SAI, the collateral manager, and trying to put some kind of pressure on them. . . . But then the reply from Wachovia is, we will talk to them . . . [s]o we know that there was some kind of communication there, some kind of pressure put by Wachovia on its subsidiary SAI to get them to play ball.

(Tr. 43:3–10.)

As with the Harding exchanges discussed above, however, this exchange demonstrates very little. If anything can be plausibly inferred from the exchange, it would be that SAI was acting in a way that – far from appeasing or catering to Magnetar – displeased Magnetar, prompting discussion by Wachovia and Magnetar the next day. Of course, with or without a hedging strategy, as an equity investor, Magnetar would not be acting inappropriately by seeking a user-friendly collateral manager. Nor do the parties point to any provisions of the offering circular that prohibit Harding from communicating with investors such as Magnetar, or Plaintiffs for that matter. Plaintiffs' speculation and innuendo with respect to this exchange simply cannot support a claim for fraud.

Finally, as they did with Octans, Plaintiffs allege that Magnetar influenced the structure of the Sagittarius deal by requesting terms that ensured cash flow would not be diverted from subordinated investors and that permitted SAI's removal with or without cause. (Compl. ¶¶ 143, 145.) They further argue that Defendants' failure to disclose these requests constituted a material omission. (Opp. at 17.) As with Octans, though, Sagittarius' terms were fully disclosed (Mem. at 20; Opp. at 17), and the fact that Magnetar may have requested some

14

of those terms does not, on its own, render the terms inherently unfair or misleading.

Ultimately, Plaintiffs' generalized allegations fail to identify Defendants with the requisite specificity, and the pleadings in relation to Sagittarius do not carry Plaintiffs' claims for fraudulent misrepresentations or omissions over the 12(b)(6) hurdle. Having failed to make out misrepresentations of omissions, Plaintiffs necessarily fail to allege facts that would raise a strong inference of scienter.

### c. Longshore CDO

The overall theory of fraud for the Longshore CDO differs from that for Octans and Sagittarius. Longshore's offering circular represented:

> The Collateral Manager shall cause any acquisition or sale of Collateral by the Issuer to be conducted on an arm's length basis . . . and, if effected with the Collateral Manager or one of its Affiliates, . . . on terms as favorable to the Issuer as would be the case if such Person were not so affiliated.

(Compl. ¶ 158.) Plaintiffs allege that, contrary to this representation, "Longshore was really a vehicle for Wachovia to get rid of RMBS assets that it knew . . . were set to face a quick and steep loss of value." (*Id.* ¶ 159.) Specifically, they allege that when Wachovia cancelled a different contemplated CDO in February 2007, it brokered a sale with its wholly owned subsidiary SAI so that Longshore would acquire the assets originally destined for the cancelled CDO. (*Id.* ¶¶ 160–163.) They further allege that SAI then overpaid for those assets, the market value of which had fallen between their initial purchase and the disposition to Longshore, a fact that Defendants failed to disclose. (*Id.* ¶¶ 160–164.)

However different Plaintiffs' theory of the purported Longshore fraud may be from their theory for Octans and Sagittarius, it nevertheless suffers from the same lack of particularity that plagues the pleadings for those CDOs. Once again, Plaintiffs lump all the Wachovia entities under the broad, generic moniker "Wachovia." (*See id.* ¶¶ 157 ("Wachovia provided Plaintiffs' investment advisor [with] a marketing book."), 159 ("Wachovia [sought] to get rid of RMBS assets . . . ."), 163 ("Wachovia transferred the assets."), 167 ("Wachovia had knowingly misrepresented its collateral selection process for Longshore.").) For the reasons stated above in Section II.B.2.a, allegations that refer to an undifferentiated Wachovia entity fail to make out a claim against any of the Wells Fargo Defendants. Because Plaintiffs fail to identify which Wells Fargo – or Wachovia – entity was responsible for the specific actions and representations underpinning their fraud claim, Plaintiffs fail to state a claim against any Wells Fargo Defendant for fraud in relation to Longshore.

Moreover, even if the Court accepted Plaintiffs' generalized claims against Wachovia as a basis of liability for WFB and WFS, Plaintiffs still fail to make out a claim for fraud. As an initial matter, the heart of Plaintiffs' allegations with regard to Longshore relies on the SEC Order in which the SEC asserted that collateral manager SAI had purchased assets at above-market price for Longshore. (*Id.* ¶¶ 165–167.) However, SEC settlements and consent judgments are generally not admissible as evidence and thus are not a proper basis for a complaint. *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 891–94 (2d Cir.

15

1976). Moreover, Wells Fargo did not admit any liability or wrongdoing as part of the settlement. (Tambe Decl. Ex. 12 at 1.) And in any event, the SEC Order does not allege that Defendants' representations were *knowingly* false. (*Id.* at 7 (alleging that "Wachovia Capital Markets acted negligently" with regard to the pricing of the contested assets); Mem. at 35 n.21; Opp. at 23 n.14.)

Setting aside those portions of the Complaint that rely on the SEC Order, Plaintiffs fail to levy other allegations that support a strong inference of scienter. To the contrary, the assets that SAI ultimately acquired for Longshore were originally purchased by Wachovia on the open market in anticipation of the cancelled CDO "months" before Longshore acquired them and at precisely the same time that Wachovia was purchasing other assets for Longshore. (Compl. ¶¶ 160, 163.) Notably, Plaintiffs neither provide real dates or concrete timeframes to this months-long period during which the assets languished, nor do they allege any facts that would suggest Defendants were aware that the assets had fallen in value. Instead, they once again resort to innuendo and surmise, but offer nothing in the way of hard facts to support an inference of fraudulent intent.[11]

Plaintiffs also attempt to make out scienter by arguing that Defendants had a motive and opportunity to defraud Plaintiffs in that Defendants sought to exact fees from the Longshore CDO. (Opp. at 25.) However, while Plaintiffs clearly allege that Defendants sought fees from new financial instruments (Compl. ¶ 4), they fail to recognize that "a desire to earn transactional fees . . . is [in]sufficient to establish scienter." *Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7, 10 (2d Cir. 2012) (internal citations omitted) (finding scienter was not established when corporate defendant was simply "motivated to earn fees from the transactions [it structured])"; *Friedman v. Ariz. World Nurseries Ltd. P'ship*, 730 F. Supp. 521 532 (S.D.N.Y. 1990) (concluding it "would defy common sense" to find that the "scienter analysis would be satisfied merely by alleging the receipt of normal compensation for professional services rendered, because to do so would effectively abolish the requirement, as against professional defendants in a securities fraud action, of pleading facts which support a strong inference of scienter"), *aff'd*, 927 F.2d 594 (2d Cir. 1991). Moreover, even if scienter could be based on a party's desire to accrue fees and cultivate business, Plaintiffs do not explain how Defendants would help their bottom line by facilitating a massive scheme to scuttle their own financial instruments. Failures such as those would presumably lead to fewer future opportunities for the Wachovia entities or SAI to earn fees.

In short, without alleging when Wachovia held the purported toxic assets or for how long or at what value, and by relying on general corporate profit motives as proof of scienter, Plaintiffs provide no basis from which to plausibly infer that Wachovia knew it was dumping assets onto Longshore's books.

\* \* \*

---

[11] For example, Plaintiffs generally allege that, "[a]t the time, based on its insider's knowledge of the mortgage market, Wachovia was aware of significant problems in the RMBS sector, including impending changes to the rating methodologies used by ratings agencies, and consequent downgrades, that would cause major decreases in the value of RMBS assets." (Compl. ¶ 162.) Plaintiffs do not specify, however, which "significant problems" or "ratings methodologies" would bear on the value of Longshore's assets, let alone which of those assets would be affected or why.

16

For the reasons set forth above, Plaintiffs have failed to adequately plead the elements of common law fraud as against any Defendant. Accordingly, their first cause of action is dismissed.

3.  Aiding and Abetting Fraud, Conspiracy to Defraud, and Rescission Based on Fraud

"To establish liability for aiding and abetting fraud, [*inter alia*, a plaintiff] must show . . . the existence of a fraud." *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (internal quotation marks omitted). Likewise, "[t]o plead a valid cause of action for conspiracy under New York law, a plaintiff must allege [a] primary tort." *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991) (citing *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir. 1981)). Similarly, "[r]escission is only a remedy, not a cause of action." *Zola v. Gordon*, 685 F. Supp. 354, 374 (S.D.N.Y. 1988); *see also Procapui-Productores de Camaroes de Icapui Ltda v. Leyani*, 07-cv-6627 (BSJ), 2010 WL 2720584, at *4 (S.D.N.Y. June 22, 2010) (dismissing a rescission cause of action after dismissing the underlying claims). Because Plaintiffs fail to state an underlying claim for fraud, their derivative claims necessarily fail as well.

4.  Fraudulent Conveyance

In addition to their common law fraud claims, Plaintiffs allege that the Octans, Sagittarius, and Longshore perpetrated fraudulent conveyances by paying above-market prices for toxic assets, which rendered them insolvent. *See* N.Y.D.C.L. §§ 270–281; (Compl. ¶¶ 232–254). Plaintiffs reason that, because they are creditors of the CDO Defendants, they may seek to set aside the transactions and thus recoup their losses by clawing back the purchase price of the collateral for the CDOs. (*Id.* ¶ 255.)

Although Plaintiffs are creditors of the Defendant CDOs, Plaintiffs' fraudulent conveyance claim must fail because, under the terms of the CDOs' offering circulars, Plaintiffs are limited-recourse creditors who only have a right to the collateral assets and the revenue generated by those assets. (*See* Tambe Decl. Ex. 6 at ii (Octans); Ex. 8 at 20, 164 (Sagittarius); Ex. 10 at 16 (Longshore).) Given their limited recourse, they have no right to the funds that the CDOs used to purchase the collateral assets. Consequently, even if the CDOs used those funds to purchase overpriced assets and were thus rendered insolvent, Plaintiffs are powerless to invoke the law of fraudulent conveyance. *See Miller v. Forge Mench P'ship Ltd.*, 00-cv-4314 (MBM), 2005 WL 267551, at *4 (S.D.N.Y. Feb. 2, 2005) (holding that a creditor may only unwind the conveyance of assets to which the creditor had recourse in the first place) (citing *Marine Midland Bank v. Murkoff*, 508 N.Y.S.2d 17, 24–25 (N.Y. App. Div. 1986)). Without alleging any right to the property that is the object of their fraudulent conveyance claim, Plaintiffs fail to make out a cause of action.

5.  Unjust Enrichment

Plaintiffs' final cause of action sounds in quasi-contract. To prevail on a claim for unjust enrichment in New York, a "plaintiff must show that (1) the other party was enriched, (2) at [plaintiff]'s expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 919 N.Y.S.2d 465, 471 (N.Y. 2011) (internal quotation marks and brackets omitted).

17

Plaintiffs allege that their investments in the CDOs were used to pay a portion of Wachovia's fees, which flowed to the Wells Fargo Defendants. (Compl. ¶ 257.) Plaintiffs also argue that they contributed to the fees paid to Harding and SAI for their collateral management services.[12] (*Id.*) Fundamentally, Plaintiffs' claim for unjust enrichment fails because Plaintiffs did not pay these fees; the *CDOs* paid the fees that Plaintiffs allege were unjustly acquired by the other Defendants. *See Banco Espirito Santo de Envestimento, S.A. v. Citibank, N.A.*, 03-cv-1537 (MBM), 2003 WL 23018888, at *18 (S.D.N.Y. Dec. 22, 2003) (dismissing plaintiff's unjust enrichment claim where fees were not paid by plaintiff but rather by two structured finance funds); *Clark v. Daby*, 751 N.Y.S.2d, 622, 623 (N.Y. App. Div. 2002) ("[I]t is the plaintiff's burden to demonstrate that services were performed *for the defendant* resulting in the latter's unjust enrichment, and the mere fact that the plaintiff's activities bestowed a benefit on the defendant is insufficient to establish a cause of action for unjust enrichment." (internal citations and quotation marks omitted)).

Moreover, in addition to the fact that Plaintiffs did not directly enrich Defendants with fees, it is also worth noting that the fees paid by the CDOs to the other Defendants were governed by the contractual terms of the CDOs' offering circulars. (*See* Tambe Decl. Ex. 6 at 31, 52, 63, 75, 172, 189 (Octans fees); Ex. 8 at 40, 50, 148 (Sagittarius fees); Ex. 10 at 57, 149 (Longshore fees).) Where contract governs, unjust enrichment will not lie. *See U.S. East Coast Telecomms., Inc. v. U.S. West Commc'ns. Servs., Inc.*, 38 F.3d 1289, 1296 (2d Cir. 1994). Accordingly, Plaintiffs fail to state a claim for unjust enrichment.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted as to all claims and all Defendants. Accordingly, IT IS HEREBY ORDERED THAT the Complaint is dismissed with prejudice.[13] The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 43 and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 28, 2013
New York, New York

---

[12] Although the cause of action for unjust enrichment is captioned as an action against all Defendants, the allegations of enrichment relate only to Harding, SAI, and the Wells Fargo Defendants.

[13] At the pre-motion conference on July 17, 2012, Plaintiffs declined the Court's invitation to amend the Complaint. Specifically, the Court engaged in the following colloquy with Plaintiffs' counsel at the pre-motion conference:

> THE COURT: [L]et me ask you out of the gate, do you want to amend your complaint?
>
> [PLAINTIFFS' COUNSEL]: No, I don't believe that there is any need to amend our complaint, your Honor. . . .
>
> THE COURT: I should be clear. [O]ne of the reasons I have a premotion conference policy . . . is that it allows defendants to front their arguments and often then it presents an opportunity for the plaintiffs to amend their complaint. And if they don't take advantage of that opportunity, then I don't necessarily give them another opportunity later . . . . And so I think you should have fair warning. [Y]ou don't think you need to amend[?]
>
> [PLAINTIFFS' COUNSEL]: I do not.

(Tr. of Pre-Motion Conf. on July 17, 2012 at 12:16–19, 13:5–15.)

\* \* \*

Plaintiffs are represented by Alexander D. Pencu, Austin D. Kim, and James M. Ringer of Meister, Seelig & Fein, LLP, 708 Third Avenue, 24th Floor, New York, NY 10017; and Marc E. Kasowitz, David M. Max, and Sheron Korpus of Kasowitz, Benson, Torres & Friedman, LLP, 1633 Broadway, New York, NY 10019.

The Wells Fargo Defendants and Defendants SAI, Octans, and Longshore are represented by Jayant W. Tambe, Alexander P. McBride, and Howard Frederick Sidman of Jones Day, 222 East 41st Street, New York, NY 10017; and David C. Bohan and William M. Regan of Katten Muchin Rosenman, LLP, 575 Madison Ave, New York, NY 10022.

Defendant Harding Advisory LLC is represented by Steven F. Molo and Benoit Quarmby of MoloLamken, LLP, 350 Park Avenue, New York, NY 10022; and Joseph J. Frank, Kelly Marie Falls, and Matthew L. Craner of Orrick, Herrington & Sutcliffe, LLP, New York, NY 10019.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-28-13