UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

LORELEY FINANCING (JERSEY) NO. 3
LIMITED; LORELEY FINANCING
(JERSEY) NO. 5 LIMITED; LORELEY
FINANCING (JERSEY) NO. 15 LIMITED;
LORELEY FINANCING (JERSEY) NO. 28
LIMITED; and LORELEY FINANCING
(JERSEY) NO. 30 LIMITED,

            *Plaintiffs,*

   -*against*-

WELLS FARGO SECURITIES, LLC;
WELLS FARGO BANK, N.A.; HARDING
ADVISORY LLC; and STRUCTURED
ASSET INVESTORS, LLC,

            *Defendants.*

------------------------------------------------------------X

12 Civ. 3723 (PAC)

**OPINION & ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/17/19

HONORABLE PAUL A. CROTTY, United States District Judge:

More than a decade ago, Plaintiffs invested in three collateral debt obligations ("CDOs")—Octans II ("Octans"), Sagittarius, and Longshore—which were comprised primarily of residential mortgage-backed securities. As we all know now, those investments turned upside down in 2007 and 2008. The CDOs defaulted and Plaintiffs lost their entire investment. Plaintiffs allege that Defendants, who created the three CDOs, failed to disclose conflicts of interest and that the CDOs were set up to fail. Specifically, Plaintiffs allege that an important hedge fund client of Defendants', Magnetar, exerted improper influence over and selected inferior collateral for Octans and Sagittarius to advance Magnetar's strategy to bet against or "short" the CDOs. Plaintiffs also allege that Defendants dumped toxic assets from their own warehouse into Longshore in an effort to offload their risk onto unknowing investors who believed they were investing in a vehicle intended to produce returns to long investors.

Plaintiffs filed suit in New York State Supreme Court on November 1, 2011, alleging fraud, rescission, conspiracy, aiding and abetting, fraudulent conveyance and unjust enrichment. (Dkt. 1 ¶¶ 3, 13.) Defendants removed the action to federal court on May 10, 2012 pursuant to the Edge Act, 12 U.S.C. § 632. (*Id.* ¶ 1.) This Court dismissed Plaintiffs' claims in their entirety in 2013. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, No. 12 Civ. 3723, 2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) ("*Loreley I*"). Plaintiffs appealed the determination, (Dkt. 71), and the Second Circuit reversed in part and vacated in part, 797 F.3d 160 (2d Cir. 2015) ("*Loreley II*"), remanding the action back to this Court on August 17, 2015, (Dkt. 74).

Plaintiffs filed their First Amended Complaint ("FAC") on September 11, 2015, (Dkt. 84), and Defendants moved to dismiss on December 2, 2015, (Dkt. 106). Wells Fargo and Harding filed a third party complaint against IKB Deutsche Industriebank AG on February 16, 2016. (Dkt. 123.) The CDO Defendants—Octans II CDO Ltd., Octans II CDO LLC, Sagittarius CDO I Ltd., Sagittarius CDO I LLC, Longshore CDO Funding 2007-3, Ltd., and Longshore CDO Funding 2007-3, LLC—were voluntarily dismissed without prejudice on May 12, 2016. (Dkt. 140.) On September 26, 2016, the Court granted in part and denied in part Defendants' motion to dismiss. (Dkt. 180.) The third party complaint was voluntarily dismissed with prejudice on October 23, 2018. (Dkt. 365.)[1] The remaining Defendants then moved for summary judgment and to exclude Plaintiffs' experts on December 14, 2018. Oral argument was held on May 29, 2019.

The Court DENIES Defendants' motion to exclude Plaintiffs' experts, with one limited exception, and GRANTS Defendants' motion for summary judgment.

---

[1]     This case was reassigned from the Hon. Richard J. Sullivan to the Hon. Paul A. Crotty on October 24, 2018.

## FACTUAL BACKGROUND

### I.     The Parties

Plaintiffs[2] are five special purpose entities organized under the laws of the Bailiwick of Jersey and formed to invest in CDOs.  (FAC ¶¶ 9-13, 28; Tambe Ex. 38 ¶ 2.)

IKB Deutsche Industriebank AG and IKB Credit Asset Management GmbH (collectively "IKB") created Plaintiffs and served as their investment advisor.  (FAC ¶ 32.)  IKB is a German banking company that was Plaintiffs' investment advisor for Octans, Sagittarius, and Longshore, which were part of a larger investment program called the "Rhineland Program."  (Tambe Ex. 39 ¶ 10, Ex. 138 at LOR-WF-IKB 00060800, Ex. 167 at 16.)

Defendants are banks and collateral managers.  The banks are (1) Wells Fargo Securities, LLC (successor by merger to Wachovia Capital Markets, LLC ("WCM")) and (2) Wells Fargo Bank, N.A. (successor by merger to Wachovia Bank, N.A.) (collectively, "Wachovia").  (FAC ¶¶ 20-21; Tambe Ex. 36 ¶¶ 20-21.)  The collateral managers are Harding Advisory LLC ("Harding") and Structured Asset Investors LLC ("SAI").  (FAC ¶¶ 22-23; Tambe Ex. 36 ¶¶ 22-23.)  SAI is a Delaware limited liability company that was a wholly-owned subsidiary of WCM. (Tambe Ex. 36 ¶ 23.)  Harding, now a Florida limited liability company, was established by Wing Chau as an investment advisory firm.  (Tambe Ex. 1 at LORWFS0006989, Ex. 21 at 33:21-23; Ex. 20 at 21:10-13; Ex. 37 ¶ 22.)

Set forth below are the roles played, positions taken, and relevant actions of the parties. (*See infra* at 3-17).

### II.     IKB's Investment Recommendations

---

[2]     Loreley Financing (Jersey) No. 3 Ltd., Loreley Financing (Jersey) No. 5 Ltd., Loreley Financing (Jersey) No. 15 Ltd., Loreley Financing (Jersey) No. 28 Ltd., and Loreley Financing (Jersey) No. 30 Ltd.

IKB assessed potential investments for the Rhineland Program to ensure they met eligibility criteria (*e.g.* assets were required to be rated at least BBB-/Baa3), before evaluating the deal's structure, asset manager, and portfolio and writing up an analysis of the deal for Plaintiffs. (Tambe Ex. 25 at 66:10-67:4, Ex. 112 at LOR-WFS0003511.) Plaintiffs did not review offering memoranda before or after approving an investment decision, (*id.* Ex. 23 at 78:20-79:8), and did not independently confirm whether or not investments conformed to IKB's investment criteria, but rather relied on recommendations received from IKB, (*id.* 79:23-80:11.)

IKB was "an independent contractor and not a general agent of" Plaintiffs. (*Id.* Ex. 109 at LOR-WFS0003425.) IKB did "not have authority to act for or represent" Plaintiffs. (*Id.* Ex. 112 at LOR-WFS0003490.)

## III. Octans

### A. Assets

Octans was a $1.575 billion collateralized debt obligation backed primarily by a portfolio of residential mortgage-backed securities ("RMBS"), which closed on October 12, 2006. (*See id.* Ex. 1.) Harding was the collateral manager for Octans. (*Id.* Ex. 2 at WF_LOR_000898907, Ex. 3 at WF_LOR_000895544.) SAI was the warehouse manager, and was responsible for approving assets selected by Harding. (*Id.* Ex. 14 at 126:7-17.)

Harding's Wing Chau, the collateral manager for Octans, testified that "all the securities that went into Octans II warehouse or CDO [were] fully vetted by my analysts and myself, and met all the investment criteria." (*Id.* Ex. 21 at 238:16-20.)

### B. Magnetar's Involvement with Octans

Octans was initiated by Magnetar, and Magnetar imposed conditions on the deal. (*See* Korpus Ex. 96.) In Octans' early stages, Magnetar's James Prusko sent an email to Harding's Wing Chau and Wachovia's Brian Farrell, stating:

Here's what will work for us. As Wing knows, we have our deal and it is what it is. As far as the structure, there can be no diversions of cash flow from the equity during the first five years whatsoever. The loss test is not acceptable. . . .

Also, the CDO exposure will be primarily from mezz ABS deals and Magnetar will buy the protection from the deal.

(*Id.*) At Magnetar's request, Octans did not contain an interest coverage test ("IC Test") and delayed application of the overcollateralization test ("OC Test"). (*Id.* Ex. 147 at WF_LOR_000870587, Ex. 148.)

Magnetar expressed a preference to Harding, who passed on to Wachovia, that some of the Octans collateral portfolio be chosen from bonds listed on particular ABX indices.[3] (*Id.* Ex. 98.) Ultimately, 25 percent of the Octans portfolio was comprised of names drawn from the ABX indices. (*Id.* Ex. 36 ("JN Rep.") ¶ 92.) A Wachovia employee discussing collateral for Octans commented that "we had to pick the lesser of evils when we were looking at the index" and "we knew we had to pick the less worse." (Tambe Ex. 117.)

After Octans closed and Plaintiffs had purchased their notes, four other Constellation CDOs—Auriga, Carina, Pyxis, and Vela—were added to the Octans portfolio. (*Id.* Ex. 144, Ex. 118 at HALLC00038831-38; Korpus Ex. 66, Ex. 68, Ex. 86 at WF_LOR_000406439, Ex. 166 at WF_LOR_000841246, Ex. 97.)

Magnetar took short positions against Octans CDO notes; its short position was more than double its long position. (*See id.* Ex. 176.) In a 2006 email from Magnetar's Prusko to Wachovia's Farrell and Harding's Chau and Tony Huang, Prusko said "we should also discuss CDO exposure as I will source the CDO CDS." (Tambe Ex. 144.)

### C. Defendants' Representations

---

[3]    The ABX indices each referenced a small subset of the universe of available RMBS. (Korpus Decl. Ex. 36 ¶¶ 31, 92.)

Wachovia provided IKB with term sheets and a marketing book for Octans. (Korpus Exs. 1-2.) The term sheet and marketing book stated that Harding's investment objectives included "[i]nvest[ing] in high quality assets with stable returns and superior capital preservation profiles" and "[m]aximiz[ing] returns and minimiz[ing] losses through rigorous upfront credit and structural analysis, as well as ongoing monitoring of asset quality and performance." (*Id.* Ex. 1 at LOR-WF-IKB 00002117, Ex. 2 at LOR-WF-IKB 00023431.)

Wachovia provided IKB with drafts of and a final offering circular for Octans. (*Id.* Exs. 3, 118, 201; Tambe Ex. 73 at LOR-WF-IKB 00000223.) The offering circular identified Harding as the collateral manager, and stated:

> The performance of the portfolio of Collateral Debt Securities depends heavily on the skills of the Collateral Manager in analyzing and selecting the Collateral Debt Securities. As a result, the Issuer will be highly dependent on the financial and managerial experience of the Collateral Manager. . . .

(*Id.*) The offering circular provided that an investment in Octans is "intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved," (Tambe Ex. 1 at LORWFS0006843), the purchaser is making an independent judgment and "is not relying on the advice or recommendations of any of the Initial Purchaser, the Issuer, the Co-Issuer, the Collateral Manager or any of their respective affiliates (or any representative of any of the foregoing)," (*id.* at LOR-WFS0007017), and the purchaser may not rely on any prospector investor presentations, (*id.* at LOR-WFS0006881.)

None of the term sheet, marketing book or offering circular mentioned Magnetar or its role in Octans. The offering circular did not disclose that the Octans portfolio would consist largely of ABX index assets, or that Octans' collateral would include notes from four other Magnetar transactions.

## D. IKB's Recommendation

IKB drafted a risk analysis of Octans, (*id.* Ex. 45), which it did not provide to Plaintiffs, (*id.* Ex. 23 at 96:20-97:8.) The risk analysis stated that "OC test and IC tests do not exist," but "[i]n return the rating agencies demanded a thicker equity tranche and therefore a higher subordination for the rated notes." (*Id.* Ex. 45 at LOR-WF-IKB 00234613.)

In an investment proposal, IKB recommended an investment in Octans based on four factors, one of which was "[t]he quality of the manager." (*Id.* Ex. 41 at LOR-WFS0000024.) IKB's Investment Advisory Board approved the proposal. (*Id.* at LOR-WFS0000025.)

On or about October 13, 2006, Plaintiff LFJ 3 bought $94 million in Octans notes: $41 million in Class A-2 notes, $30 million in Class B notes, and $23 million in Class C-1 notes. (*Id.*; Hollywood Decl. ¶ 15.) Octans suffered an event of default on May 8, 2008, and subsequently the notes became worthless. (Korpus Ex. 208.)

## IV. Sagittarius

### A. Assets

Sagittarius was a $1.030 billion collateralized debt obligation backed primarily by a portfolio of RMBS, which closed on March 15, 2007. (Tambe Ex. 4 at LOR-WFS0002224, 54-60.) SAI was the collateral manager for Sagittarius and was responsible for asset selection and management. (*Id.* at LOR-WFS0002362, Ex. 6 at WF_LOR_000480072.)

SAI's James Burke, the collateral manager for Sagittarius, testified that SAI vetted every asset that went into the Sagittarius portfolio. (Tambe Ex. 14 at 390:17-391:14.) He also stated that SAI only selected assets that they "were comfortable with" for Sagittarius. (*Id.* at 391:4-18.)

### B. Defendants' Representations

Wachovia provided IKB a term sheet and marketing book for Sagittarius. (Korpus Ex. 5.) The term sheet indicated that Sagittarius would be managed by SAI and stated: "A key market advantage for SAI is its ability to leverage off of the resources and infrastructure of

Wachovia, while maintaining strict separation from the trading and sales side of the broker/dealer." (*Id.* Ex. 5 at LOR-WF-IKB 00023199.) It also described that "SAI's investment approach is to maximize returns and minimize losses through rigorous upfront credit and structural analysis as well as ongoing monitoring of asset quality and performance." (*Id.*) The marketing book contained similar representations. (*Id.* at LOR-WF-IKB 00023135.)

Wachovia also provided drafts of and a final offering circular for Sagittarius to IKB, which identified SAI as the collateral manager, responsible for selecting Sagittarius' collateral portfolio, and stated that "[t]he performance of the Collateral will be highly dependent on the financial and managerial expertise of the Collateral Manager." (Korpus Exs. 90, 120, 175, Ex. 6 at LOR-WF-IKB 00513380, Ex. 120 at WF_LOR_000222231.)

The offering circular provided that an investment in Sagittarius is "intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved," (Tambe Ex. 4 at LOR-WFS0002241), and the purchaser is making an independent judgment and "is not relying on the advice or recommendations of any of the Initial Purchaser, the Issuer, the Co-Issuer, the Collateral Manager or any of their respective affiliates." (*id.* at LOR-WFS0002384-2385).

None of the term sheet, marketing book or offering circular mentioned Magnetar or its role in Sagittarius.

## C. Magnetar's Involvement with Sagittarius

Sagittarius was initiated by Magnetar, and Magnetar imposed conditions on the deal. (Korpus Ex. 114 at WF_LOR_000205808, Ex. 77 at WF_LOR_000917411.) At Magnetar's request, Sagittarius did not contain an IC test and delayed application of the OC Test. (*Id.* Ex. 133 at WF_LOR_000673884, Ex. 127 at WF_LOR_000870587, Ex. 5, Ex. 120.) Wachovia traders were aware that Sagittarius involved the "creation" of debt tranches "for Magnetar to

short" and of "Magnetar's desire to hedge their equity position by taking a short position." (*Id.* Ex. 77 at WF_LOR_000917411.)

Magnetar encouraged SAI to source credit risk for Sagittarius from the ABX index. (Tambe Ex. 120 at WF_LOR_000801086, Ex. 122; Korpus Ex. 76.) The ABX indices made up almost a quarter of the entire Sagittarius portfolio. (JN Rep. at 57.)

In a February 2007 email, Wachovia's Michael Thompson told SAI's James Burke: "We never explicitly disclosed Magnetar is purchasing the equity in Sag[ittarius]." (Korpus Ex. 131.)

### D. IKB's Recommendation

In an investment proposal, IKB recommended that Plaintiffs invest in Sagittarius, stating:

> From a credit perspective, SAI can be characterized as an above average Manager according to the criteria crucial to us. They do have a conservative view on the RMBS products as they feel uncomfortable with affordability products and above average risk characteristics in the pools they do consider for investments. A fact which clearly could be observed in the portfolio selection. . . . They are also aware of the structural risks incorporated in RMBS structures. Their CDO Management component seems to be prudent and they should be aware of the main things to focus on dependent of the different CDO type (HG vs. Mezz). However, as this transactions lacks most of the classic CDO features which were considered as being challenging within a CDO beside the collateral performance, this is not such an important fact for this transaction. . . .

(Tambe Ex. 42 at LOR-WFS0002662-2663.) IKB's investment committee approved the proposal. (*Id.* at LORWFS0002658.)

On or about March 15, 2007, LFJ 15 bought $5 million of Sagittarius Class A notes, and LFJ 28 bought $5 million of Sagittarius Class B notes. (Hollywood Decl. ¶ 17.) Sagittarius suffered an event of default on November 6, 2007, and subsequently the notes became worthless. (Korpus Ex. 208.)

## V. Longshore

### A. Assets

Longshore was a $1.30 billion collateralized debt obligation backed primarily by a portfolio of RMBS, which closed on or about April 26, 2007. (Tambe Ex. 7 at LOR-WFS0006085-86.) SAI was the collateral manager for Longshore, and was responsible for selecting and managing the assets for Longshore. (*Id.* at LOR-WFS0006253, Ex. 8.)

## B.  Defendants' Representations

Wachovia provided IKB with a term sheet for Longshore, which stated that SAI would be the collateral manager for the transaction, (Korpus Ex. 7 at LOR-WF-IKB 00142658), and a marketing book stating:

> SAI is a wholly-owned subsidiary of Wachovia Corporation whose investment approach is to maximize returns and minimize losses through rigorous upfront credit and structural analysis as well as ongoing monitoring of asset quality and performance.

(*Id.* Ex. 8 at LOR-WF-IKB 00023211.) The marketing book also touted SAI's access to Wachovia's "vast resources and infrastructure" while "maintaining strict separation from the broker/dealer." (*Id.* at LOR-WF-IKB 00023218.)

Wachovia provided IKB drafts of and a final offering circular for Longshore, stating:

> Because the composition of the Collateral Assets will vary over time, the performance of the Offered Securities will depend heavily on the skills of the Collateral Manager in analyzing, selecting and managing the Collateral Assets. As a result, the Issuer, which has no employees, will be highly dependent on the financial and managerial experience of certain individuals associated with the Collateral Manager.

(Korpus Ex. 9 at LOR-WFS0006134, Ex. 122 at WF_LOR_000624346, Ex. 231 at LORWF-IKB00020198.)

The offering circular also said that collateral would be selected by SAI and would be acquired "on an arm's length basis" and "at fair market prices." (Korpus Ex. 122 at WF_LOR_000624377, Ex. 9 at LOR-WFS0006167, Ex. 231 at LOR-WF-IKB00020231.)

None of the term sheet, marketing book or offering circular mentioned that Wachovia had instructed SAI to transfer assets into Longshore from the warehouses of other CDOs, and that such assets were transferred at non-market prices.

### C. Wachovia's Strategy for Longshore

On February 2007, Wachovia stated: "Due to the market volatility in ABS and feared contagion and/or disappearance of liquidity in CDO market, let's do everything we can to push out all our inventories and pending new issues." (Korpus Ex. 48.) One "deal of focus" in this effort was Longshore. (*Id.*)

In March 2007, Wachovia's Michael Thompson sent an email out to his colleagues with the subject line "Risk Management Discipline," stating "[w]e are very clearly in risk mgmt/loss mitigation/profit preservation mode," and instructed Wachovia's Dash Robinson, to "sell [Longshore] debt and equity. Get the roadshow going – come up with a target list, specific marketing plan. Then do the same for GA3." (*Id.* Ex. 82.) "GA3" was a reference to Grand Avenue III ("Grand Avenue"), another CDO which Wachovia was in the process of ramping. (Korpus Ex. 29 at 81:6-25.) The collateral manager of Grand Avenue was TCW, a manager that was on IKB's "no go" list because of a negative previous experience. (Bauknecht Decl. ¶ 19; Korpus Ex. 11 at 60:13-61:13.)

Thompson stated during his deposition that Wachovia:

> [W]as trying to minimize our risk, which we were thinking of, frankly as mark-to-market volatility by selling collateral, selling warehouses. . . . So we had an idea of taking the TCW warehouse, which was – I don't remember, but 30, 40 percent ramped, and the Longshore warehouse, which was the same or maybe even a little more ramped. And rather than have two half-baked things, you have something that's pretty close to fully baked and ready to go.

(Korpus Ex. 32 at 342:12-343:2.)

In February 2007, when James Burke of SAI heard that Wachovia would be transferring assets from Grand Avenue's warehouse to Longshore's, he sent an email stating:

I am VERY sensitive to where SAI might take down bonds from the TCW warehouse. I do not want anymore [sic] in market to think we were stuffed with bonds at above-market prices. So – if TCW is still doing a deal, SAI should only take whatever bonds it wants at MARKET prices.

(Tambe Ex. 145.) Subsequently, Burke wrote to Dash Robinson of Wachovia that "The marks you provided for the bonds to be transferred over to [Longshore] (from TCW) are not defensible." (Korpus Ex. 153.) Burke also emailed his superior, Darrell Baber, and wrote:

The difference between the banking team's suggested transfer prices and where the bonds are actually marked by the traders in the system is negative $5mm. The difference between the banking team's suggested transfer prices and where . . . the bonds the individual SAI p.m.'s [portfolio managers] feel 'comfortable' with the bonds is negative $7.8mm.

(Tambe Ex. 152.)

On March 13, 2007, Wachovia's chief compliance officer, David Hunt, sent Burke, Baber, and others an email summarizing SAI's "fiduciary responsibility [which] extends to each of its clients" to obtain the "best execution" possible. (Korpus Ex. 52.) Burke responded to the group, airing his concern that "[i]nvestors commit to buy [Longshore] and subsequently learn that SAI took down $300m of collateral from another warehouse from Wachovia post-pricing [] at above market prices." (Id.) To alleviate that concern, Burke suggested that SAI "send the full list of assets (including the $300mm from the TCW warehouse) out to prospective investors (along with transfer prices) before they give a verbal commitment on [Longshore] and before the deal prices." (Id.)

Also on March 13, 2007, James Burke of SAI emailed his wife: "I'm having a very bad day. I'm being asked/told to do something that I believe is improper/unethical." (Id. Ex. 191.)

Ultimately, SAI transferred certain assets from Grand Avenue to Longshore. (Id. Ex. 42, Ex. 27 at 274:3-275:14, Ex. 12 at 327:19-328:2, 328:17-22, 332:21-333:9, 334:4-335:1.) SAI's James Burke testified that SAI only accepted into the Longshore portfolio the Grand Avenue assets that he and his team were comfortable with from a credit perspective, (Tambe Ex. 14 at

336:21-338:7, 343:22-344:8, 357:22-358:9.), though he "had made it very clear that these were not assets that I had purchased into my warehouse, and if I were going to take those assets into my warehouse today, I would want them to happen at the current market price." (Korpus Ex. 12 at 334:4-23.)

The Grand Avenue assets were transferred to Longshore at the prices at which they were originally acquired by TCW for Grand Avenue, not the lower current market prices. (Korpus Decl. Exs. 52, 136, 152-55, Ex. 12 at 362:18-363:2, 365:11-19, Ex. 27 at 275:12-23, 283:13-21.) IKB was advised of a slight decline in the value of the Longshore assets since they were acquired; specifically, that "the current weighted average price of the Longshore 3 portfolio is just under 99." (Tambe Ex. 55 at WF_LOR_000744280.) When IKB requested current "marks" of the portfolio, Wachovia sent a spreadsheet in which the current market prices of the transferred assets had been deleted. (*Id.* Ex. 144, 147-49, 153.)

### D. IKB's Recommendation

In an investment proposal, IKB recommended that Plaintiffs invest in Longshore, in part because of IKB's "positive judgment of the collateral manager" and the transaction's "strict eligibility criteria." (Tambe Ex. 52 at LORWFS0028818.) The proposal contained an evaluation of SAI based on in-person meetings with "James Burke and key staff of his team," and noted that the "close relationship to Wachovia gives SAI a somehow unique position in the market of ABS Managers." (*Id.* at LOR-WFS0028815.) The proposal characterized SAI as "an above average Manager according to the criteria crucial to us," noting that SAI had "a conservative view on the RMBS products" and a "critical opinion towards current market developments, which could affect their management possibilities." (*Id.*) In addition, it noted that Burke "seemed to be well aware of all the factors possibly influencing RMBS performance" and that SAI "recognize potential dangers, which they cannot gauge explicitly [but] they try to stay away from them."

13

(*Id.*) The proposal also included quantitative analysis of the portfolio that had been ramped to date, (*id.* at LOR-WFS0028817-18), but did not contain any disclosure regarding the slight decline in the value of the Longshore assets, as that information had not yet been sent from Wachovia to IKB, (*id.* Ex. 25 at 239:17-21). IKB's Investment Committee approved the investment proposal. (*Id.* Ex. 52 at LOR-WFS0028809.)

On April 26, 2007, LFJ 30 purchased $13.5 million in Longshore Class A-2 notes, LFJ 5 purchased $37.6 million in Longshore Class B notes, and LFJ 3 purchased $8 million in Longshore Class C notes. (Tambe Ex. 100; Hollywood Decl. ¶ 20.) Longshore suffered an event of default on February 8, 2008, and subsequently the notes became worthless. (Korpus Ex. 208 at 5.)

## VI. Magnetar's Strategy

In 2006 and 2007, the hedge fund Magnetar purchased the equity in a number of CDOs, including Octans and Sagittarius, and implemented a hedging strategy on those same investments. (Korpus Ex. 25 at 29:7-30:20.) According to Magnetar's James Prusko, Magnetar's goal on a portfolio-wide basis was to be $2 short mezzanine for every $1 long equity. (*Id.* at 128:11-22) Wachovia's Michael Thompson testified that Magnetar's willingness to purchase the equity of CDOs gave it leverage or negotiating ability with banks. (*Id.* Ex. 32 at 85:18-86:6.)

Magnetar pushed for structural terms in the CDOs it sponsored, including the suspension or elimination of certain tests (*i.e.* the OC Test and the IC Test) to ensure cash would continue to flow to its equity positions if returns slowed. (Korpus Ex. 25 at 40:25-42:2, 155:11-20.) As Prusko explained, "in order to buy the equity, we were very clear that the CDO had to have certain structural features and certain economic terms that would make it attractive." (*Id.* at 155:9-20.)

Magnetar invested a substantial amount in its overall CDO strategy (of which Octans and Sagittarius were just a part). The collapse of the U.S. housing market in 2007-2008 triggered massive losses in the type of collateral backing the CDOs. (*See* Tambe Ex. 166 at 148.) Octans, Sagittarius, and Longshore defaulted in the wake of the financial crisis. (FAC ¶¶ 119, 163, 191.) Magnetar achieved a return commensurate with its investment from its strategy when the financial markets collapsed. (Korpus Ex. 25 at 197:9-198:6.)

## A. Magnetar's Relationship with Wachovia

Wachovia personnel considered Magnetar a "huge account" and believed that Magnetar was "single-handedly driving the market" for CDOs in 2007. (*Id.* Ex. 130, Ex. 32 at 119:19-120:20, 218:5-14, 465:11-22, Ex. 27 at 146:16-147:9.)

Some Wachovia employees were aware that Magnetar had executed short trades in the collateral portfolios of CDOs that Wachovia arranged, (*id.* Ex. 97 at WF_LOR_000408253; Tambe Ex. 144), and facilitated for Magnetar at least two credit default swap trades (shorts) on Octans and two on Sagittarius, (Korpus Ex. 109 at WF_LOR_000413229, Ex. 110 at MAG_WACH 0024887, Exs. 162-65, 167, 185, 190, Ex. 77 at WF_LOR_000917410-11, Korpus Ex. 85 at WF_LOR_000455815).

## B. Magnetar's Relationship with Harding

Harding had a good working relationship with Magnetar prior to the Octans and Sagittarius CDOs. According to Wachovia's Brian Farrell, Harding's Wing Chau had "5 of the Octans deals planed [sic] with Magnetar and they are obviously very comfortable and impressed with his skills." (Korpus Ex. 86 at WF_LOR_000406439.)

Chau testified that he "knew that [Magnetar] would hedge. Hedge funds hedge. And part of their hedging strategy would include this, as well as other hedging instruments that were correlated for the underlying asset." (*Id.* Ex. 13 at 158:17-22.) Harding was aware that

Magnetar's hedging strategy included buying protection on senior tranches of the same CDOs that Magnetar was buying equity from, (*id.* at 158:12-159:3), and that it involved buying protection on constellation CDOs generally, (*id.* 265:6-25). Still, Chau testified that Magnetar's strategy was intended to be market neutral. (*See id.* 151:9-13.)

### C.    SAI's Relationship with Magnetar

Before Sagittarius closed, its collateral manager James Burke of SAI thought Magnetar was "just a long-only equity investor" and "had no reason to suspect anything else." (*Id.* Ex. 40 at 140:5-141:16, Ex. 12 at 180:8-12.) Burke testified that he was "shocked" when he learned, after Sagittarius closed, that Magnetar was taking short positions in CDOs in which it was sponsoring the equity, as Burke had "[n]ever heard of anyone doing that." (*Id.* Ex. 12 at 180:8-12, 183:16-25, 194:19-195:22, 271:12-21, 195:17-22, Ex. 40 at 140:5-141:16.)

At one point, Burke informed Magnetar's Prusko that Wachovia would not "accept assignment of . . . trades" from Magnetar and communicated this refusal to others at Wachovia. (Tambe Ex. 121.) On the same day, Burke complained to Wachovia's Michael Thompson and Dash Robinson that: "Prusko is under the impression that he can source credit risk (from names in the ABX) for this deal at whatever levels he wants. I specifically did not want this to occur." (*Id.* Ex. 122; Korpus Ex. 188.) Prusko of Magnetar expressed to Farrell of Wachovia "discomfort in dealing with Jim Burke and SAI." (Korpus Ex. 86.)

A few days later, Prusko wrote to Thompson, Burke, and others, saying "[t]hanks for the lunch, feel like we are now ready for action." (Tambe Ex. 120 at WF_LOR_000801086.) Prusko then stated that he wanted to buy protection from Sagittarius on the two original bonds that Burke had initially rejected, and indicated two additional bonds that he wanted to execute "cross" on with Sagittarius. (*Id.*) Burke responded to Prusko, copying Thompson, "For the avoidance doubt, all 4 CDS are approved," and asked Prusko to provide "full trade details and

counterparty info." (*Id.*) Subsequently, Burke instructed SAI employees to "treat Jim Prusko like royalty. He is an extremely important client." (Korpus Ex. 73 at WF_LOR_000526285.)

## DISCUSSION

### I. Motions to Exclude Proffered Expert Opinions[4]

#### A. Legal Standard

On a motion for summary judgment, it is appropriate for the Court to decide questions regarding the admissibility of expert opinion evidence. *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997). The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993), trial courts must act as gatekeepers to ensure that proposed expert testimony conforms to the requirements of Rule 702. "The objective . . . is to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Plaintiff has the burden to prove by a preponderance of the evidence that their expert's testimony is admissible. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

As a preliminary matter, the Court first examines whether the proposed witness qualifies as an expert. *See* Fed. R. Evid. 702 (requiring a witness to be "qualified as an expert by knowledge, skill, experience, training or education"); *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 352 (S.D.N.Y. 2003). Plaintiffs must also demonstrate that the expert's testimony is "based on sufficient facts or data," and "the product of reliable principles and methods," and that the expert has "reliably applied the principles and methods to the facts of the case." Fed. R.

---

[4] Dr. Jonathan Neuberger's May 29, 2018 expert report will be cited as "JN Rep.", his February 14, 2019 declaration will be cited as "JN Decl.", and the transcript of his September 25, 2018 deposition will be cited as "JN Tr." Mark Adelson's May 29, 2018 expert report will be cited as "MA Rep." and his February 14, 2019 declaration will be cited as "MA Decl."

Evid. 702. Finally, the expert's opinions must be relevant to the issues in the case and assist the trier of fact. *See* Fed. R. Evid. 702(a); *Raskin*, 125 F.3d at 55 n.5.

## B.    Dr. Jonathan Neuberger

The Court determines that Dr. Jonathan Neuberger qualifies as an expert financial economist. Dr. Neuberger has over thirty years' experience evaluating market structure, corporate conduct and financial performance. (JN Rep. ¶¶ 1, 6-11.)  He holds a Ph.D. in economics, has taught courses in economics and finance, and spent six years as an economist at the Federal Reserve Bank of San Francisco. (*Id.* ¶¶ 7-8.)  Dr. Neuberger has also held various private sector positions as an economist, and has been qualified multiple times as an expert economist in legal matters involving financial products and markets, including mortgage backed securities and CDOs. (*Id.* ¶ 11; JN Decl. 5-8.)  Indeed, Dr. Neuberger was qualified as an expert witness for the SEC in a case in this district, and testified regarding the selection of RMBS assets for a CDO created by Citibank.  *SEC v. Stoker*, 11 CV 07388 (JSR).  Dr. Neuberger is not being offered as an industry expert on CDOs, but his knowledge and experience allow him to testify on the general background of RMBS and CDO markets.

Dr. Neuberger devotes much of his report to general factual discussion of the Magnetar trade, (JN Rep. ¶¶ 45-57), and the collateral selection process for Octans, Sagittarius, and Longshore, (*id.* ¶¶ 58-69).  The report, however, does not purport to present the factual allegations the Court must take into consideration in deciding the summary judgment motion. Instead, it properly sets forth the facts on which his opinions are based.  The Court will consider Dr. Neuberger's factual statements as background for his expert analysis, but will rely on the evidence referenced in the parties' Rule 56.1 statements for the relevant facts.

The Court will also consider Dr. Neuberger's testimony regarding the materiality of the collateral selection process to investors of the CDOs as background only, as determinations

about the materiality of the alleged fraud are for the factfinder, not the Plaintiffs' expert. *See SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) (expert testimony on legal conclusions including materiality inadmissible); *United States v. Tomasetta*, No. 10-CR-1205(PAC), 2012 WL 1080293, at *4 (S.D.N.Y. Mar. 30, 2012) ("[T]estimony regarding whether the analysts thought that the disclosures would have been material to an investor . . . invades the province of the jury."). Plaintiffs conceded at oral argument that Dr. Neuberger's testimony is not necessary for proving materiality. (Dkt. 434 at 61:8-24.)

Defendants seek to strike Dr. Neuberger's testimony about what the ratings agencies would have done had certain information been disclosed, which is used to support Dr. Neuberger's calculation of out-of-pocket losses, because he lacks a background in ratings. But Plaintiffs are not relying on Dr. Neuberger's opinion for expert analysis on ratings—they have a ratings expert, Mr. Adelson, for that.

Defendants are free to challenge the accuracy of Dr. Neuberger's assumptions underlying his opinion on loss causation, but his testimony does not contain bare conclusions, relies on legitimate sources, and is admissible. *Cf. Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) (expert's bare conclusions on probability excluded where he did not explain statistical significance); *see Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 505 (S.D.N.Y. 2015) (allowing expert testimony that relied on articles and deposition testimony without performing any analysis of her own, where those sources were "clearly within the universe of those on which [she] could permissibly rely"). Critiques of the data supporting Dr. Neuberger's assumptions go to weight, not admissibility. *See In re: N. Sea Brent Crude Oil Futures Litig.*, No. 1:13-MD-02475(ALC), 2016 WL 1271063, at *7 (S.D.N.Y. Mar. 29, 2016)

("To the extent that [the expert's] conclusions are broader than supported by the data . . . that goes to weight rather than admissibility.").

Accordingly, the Court DENIES Defendants' motion to strike Dr. Neuberger's testimony, with one limited exception. Because rebuttal expert reports were not contemplated by the scheduling order, the motion to strike Dr. Neuberger's supplemental declaration is GRANTED.[5]

## C. Mr. Mark Adelson

Mr. Adelson is a qualified expert on ratings agencies. He has dozens of years of experience in structured finance and specifically with ratings agencies and their methodologies rating CDOs. (MA Rep. ¶¶ 13-22; MA Decl. ¶¶ 4-5, 18-26.) Mr. Adelson spent ten years as a senior analyst and managing director at Moody's, where he was involved with ratings of asset-backed security CDOs, (MA Rep. ¶ 17; MA Decl. ¶ 20), and was brought in as Chief Credit Officer of S&P following the financial crisis to overhaul their CDO rating criteria, (MA Rep. ¶ 19; MA Decl. ¶ 22). He has written and presented extensively on CDOs, and was involved with the investigation of the causes of the financial crisis by the Financial Crisis Inquiry Commission, a commission created by the United States Congress. (*See* MA Decl. ¶ 24-26; MA Rep. ¶ 22.)

Mr. Adelson's expert report is wholly admissible. It is limited to an assessment of what the ratings agencies would have done had there been full disclosure of relevant conflicts, based on a review of the ratings agencies' published criteria and Mr. Adelson's expertise in the field. Accordingly, Adelson's expert report will be considered by the Court.

---

[5] On July 24, 2018, the Court allowed Plaintiffs to submit a brief supplemental expert report to address a late document production that occurred after the initial expert report had been served. (*See* Dkt. 337.) Dr. Neuberger recognized that pursuant to that order, he was not permitted to serve as a rebuttal expert, but still attempted to rebut the claims of Defendants' expert report. (*See* JN Decl. ¶ 8.) Plaintiffs' deadline to serve all expert reports, other than the supplement that was permitted by the Court, was May 29, 2018. *See Advanced Analytics, Inc. v. Citigroup Glob. Markets, Inc.*, 301 F.R.D. 31, 42 (S.D.N.Y.), *objections overruled*, 301 F.R.D. 47 (S.D.N.Y. 2014) (recognizing that declarations containing merits-related expert testimony filed after disclosures were due pursuant to a court's scheduling order and/or Rule 26(a)(2) would lead to unjust results).

## I.      Summary Judgment Standard

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

## II.      Fraud Claim

In New York, the five elements of fraud are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) an intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006).  "At the summary judgment stage, a party must proffer enough proof to allow a reasonable jury to find by clear and convincing evidence the existence of each of the elements necessary to make out a claim for fraud in the inducement." *Waran v. Christie's Inc.*, 315 F. Supp. 3d 713, 718 (S.D.N.Y. 2018).

The elements of material misrepresentations or omissions and reliance are dispositive of the present motion for summary judgment.

### A.      Material Misrepresentations or Omissions

#### *Octans and Sagittarius*

Plaintiffs allege that Defendants made material representations and omissions in their marketing and offering materials for Octans and Sagittarius by representing that the assets for

these CDOs would be selected by their respective collateral managers, Harding and SAI, to "maximize returns and minimize losses" for noteholders. In particular, Plaintiffs point to the term sheet, marketing book, and offering circular for Octans and its representations that Harding, a skilled collateral manager, would invest in high quality assets, maximize returns, and monitor asset quality and performance. (*See* Korpus Ex. 1 at LOR-WF-IKB00002117, Ex. 2 at LOR-WF-IKB 00023431, Ex. 3, Ex. 118, Ex. 201.) Plaintiffs also note that the term sheet, marketing book, and offering circular for Sagittarius emphasized the expertise of collateral manager SAI, (Korpus Ex. 6 at LOR-WF-IKB 00513380, Ex. 120 at WF_LOR_000222231), SAI's close relationship with Wachovia "while maintaining strict separation from the trading and sales side of the broker/dealer," and SAI's approach to maximize returns and monitor asset quality and performance, (*id.* Ex. 5 at LOR-WF-IKB 00023199, 23135). According to Plaintiffs, it was not disclosed anywhere that another actor with materially different investment objectives (Magnetar) had substantial influence over the collateral selection process for Octans and Sagittarius.

Plaintiffs have not shown by clear and convincing evidence that these statements were misrepresentations. The Second Circuit previously found that Plaintiffs' pleadings were adequate to state a claim for fraud, *see Loreley II*, 797 F.3d at 178, but a review of the full record at the summary judgment phase shows that Plaintiffs' allegations are unsupported. On the contrary, representatives of Harding and SAI testified that they vetted all securities that went into Octans and Sagittarius, ensured that they met investment criteria, and monitored their performance. While the head of SAI, James Burke, testified that he objected to including certain bonds proposed by Magnetar in Sagittarius initially "on principle," because he thought that Magnetar was "asking to do something [he] didn't think [Magnetar] had any ability to do," he also admitted that a selection of the bonds were accepted when his team reviewed them and decided they were "okay with the credit risk." (Tambe Ex. 14 at 282:9-283:17.) Furthermore,

22

Harding's Wing Chau testified that all of Octans' collateral met the CDO's eligibility criteria. (*Id.* Ex. 21 at 253:24-254:4.)

In other words, the collateral managers for Harding and SAI acted independently and did what Wachovia represented they would. That SAI sometimes pushed back when Magnetar requested that Sagittarius include certain collateral is further evidence that SAI conducted rigorous analysis of collateral and maintained proper separation and independence in managing Sagittarius. Harding and Magnetar may have had a close relationship, but there is no evidence that Harding improperly caved into any demands by Magnetar. Rather, the evidence shows that Harding approved of collateral based on its compliance with Octans' investment criteria.

In addition, the structure of the Octans and Sagittarius CDOs was disclosed to IKB, and the fact that Magnetar sought certain structural modifications to these CDOs—such as the absence of triggers—was not a material omission. In fact, IKB factored in the absence of triggers into its modeling of Octans. In the risk analysis of Octans (which IKB did not share with Plaintiffs), IKB stated that "OC test and IC tests do not exist," but "[i]n return the rating agencies demanded a thicker equity tranche and therefore a higher subordination for the rated notes." (Tambe Ex. 45 at LOR-WF-IKB 00234613.)

Moreover, Defendants did not have a duty to disclose Magnetar's role in Octans and Sagittarius to Plaintiffs. *See First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 637 (S.D.N.Y. 2014) (to succeed under a material omission theory, a plaintiff must allege that "the defendant had a duty to disclose material information"). The parties were not in a fiduciary relationship, Plaintiffs were not acting on the basis of mistaken knowledge, and Defendants did not make any statements to Plaintiffs, let alone partial or ambiguous statements requiring "complete disclosure." *See id.*; *see also Dodona I v. Goldman Sachs & Co.*, 132 F. Supp. 3d 505, 517 (S.D.N.Y. 2015) (granting summary judgment because there was no duty to

disclose when defendants did not structure the CDO to fail or knew some "inside information" regarding the quality of the collateral).

In its claims relating to Octans and Sagittarius, Plaintiffs seek to pin blame for the financial crisis on Magnetar because of its CDO strategy. (*See* JN Rep. ¶ 154.) But Plaintiffs have not sued Magnetar, and are not bringing a class action or seeking a remedy to alleviate the vast losses suffered during the financial crisis. Plaintiffs sued Wachovia, a bank that engaged minimally with Magnetar in the grand scheme of Magnetar's overall strategy. The two CDOs Wachovia created are the focus here. With respect to those two CDOs, the Court finds that there is simply not evidence that Wachovia misrepresented the CDOs at issue or omitted a material fact to Plaintiffs, since the structural features of the CDOs were disclosed to IKB and the collateral managers fulfilled their duties in selecting collateral that satisfied the CDOs' investment criteria.

### *Longshore*

Plaintiffs claim that the marketing materials for Longshore contained false representations, such as: (1) Longshore's collateral would be selected by SAI to "maximize returns and minimize losses" for noteholders; (2) SAI would "maintain[] strict separation from the broker/dealer" side of its corporate parent, Wachovia; and (3) SAI would acquire assets "on an arm's length basis" and "at fair market prices." (Korpus Ex. 8 at LOR-WF-IKB 00023211, 218, Ex. 9 at LOR-WFS0006167, Ex. 122 at WF_LOR_000624377, Ex. 231 at LOR-WF-IKB00020231.) Plaintiffs assert that no version of the term sheet, marketing book, or offering circular mentioned that approximately one-third of Longshore's portfolio was comprised of assets transferred from the warehouses of other Wachovia-held CDOs, where the collateral had been selected by other collateral managers, and that the transfers took place at non-market prices.

SAI's unwillingness to transfer the assets from Grand Avenue to Longshore wholesale indicates that SAI persisted in maintaining independence and only approved the assets it felt comfortable with from a risk perspective. Even though Burke expressed to his wife that he felt he was "being asked/told to do something that [he] believe[d] is improper/unethical," (Korpus Ex. 191), Burke made clear in his deposition that he only accepted assets into Longshore that his "team was comfortable taking in from a credit perspective," (*id.* Ex. 12 at 334:4-23.)

The fact that the assets were not transferred from Longshore at current market prices, however, contradicts the marketing materials that IKB reviewed for Longshore. IKB was advised of a slight decline in the value of the Longshore assets since they were acquired. But that does not excuse Wachovia's transmission to IKB of a spreadsheet for the current "marks" of the portfolio that deleted the current market prices of the transferred assets. (*Id.* Ex. 144, 147-49, 153.) This act suggests that there could be a triable issue of fact regarding whether Wachovia made material misrepresentations or omissions with respect to Longshore. Still, for the reasons stated below, *see infra* Sect. II.B., Plaintiffs could not have reasonably relied on these statements.

### B. Reliance

"Justifiable reliance is a 'fundamental precept' of a fraud cause of action." *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 579 (2018). In evaluating justifiable reliance, courts consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them," *Century Pacific, Inc. v. Hilton Hotels Corp.*, 354 F. App'x 496, 498 (2d Cir. 2009), as well as "the investor's access to information and whether that investor engaged in due diligence before investing," *Abbey v. 3F Therapeutics, Inc.*, No. 06 CV 409, 2011 WL 651416, at *7 (S.D.N.Y. Feb. 22, 2011).

New York courts have historically disagreed on whether a defendant is liable for an injury suffered by a plaintiff who relied on misrepresentations provided by a third party associated with the defendant. Some courts have held that a plaintiff cannot make a common law fraud claim against a defendant under New York law based on allegations of third-party reliance, *see, e.g., Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 682 (S.D.N.Y. 1987); *Escoett & Co. v. Alexander & Alexander, Inc.*, 296 N.Y.S.2d 929, 929 (1st Dep't 1969), and others have recognized that "[w]hile the plaintiff alleging fraud must normally show that it reasonably relied upon a misrepresentation made by the defendant to its detriment, the doctrine of third-party reliance permits the plaintiff to show that a third-party relied upon a misrepresentation by the defendant, which resulted in injury to the plaintiff," *Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.*, 896 F. Supp. 2d 198, 203 (E.D.N.Y. 2012); *see also Ruffing v. Union Carbide Corp.*, 764 N.Y.S.2d 462, 465 (2d Dep't 2003).

The Second Circuit recognized this discrepancy in the law, and certified a question to the New York Court of Appeals to resolve it. *See Pasternack v. Lab. Corp. of Am. Holdings*, 807 F.3d 14 (2d Cir.), *as amended* (Nov. 23, 2015), *certified question accepted*, 26 N.Y.3d 1074, 44 N.E.3d 226 (2015), *and certified question answered*, 27 N.Y.3d 817, 59 N.E.3d 485 (2016). The Court of Appeals "decline[d] to extend the reliance element of fraud to include a claim based on the reliance of a third party, rather than the plaintiff," where the third party did not act as a conduit to relay the false statement to the plaintiff. 27 N.Y.3d at 828-29.

### *Octans and Sagittarius*

It is undisputed that Defendants never made any representations to Plaintiffs. Plaintiffs did not view documents from or communicate with Defendants. Rather, Plaintiffs depended only on the advice of IKB, their investment advisor, and the investment proposals sent to them by IKB. Plaintiffs cannot sustain a claim of actual reliance against Defendants, who did not

communicate with Plaintiffs directly. *Sec. Inv'r Prot. Corp. v. BDO Seidman, L.L.P.*, 95 N.Y.2d 702, 710 (2001) (Plaintiffs "cannot claim reliance on alleged misrepresentations of which it was unaware even by implication.").

IKB's investment proposals did not communicate any misrepresentations to Plaintiffs. *See Sec. Inv'r Prot. Corp.*, 95 N.Y.2d at 709 (even where investment adviser invests on behalf of institutional plaintiffs, "Plaintiff[s] cannot sustain a cause of action for fraud if [Defendants'] misrepresentation did not form the basis of reliance"). The only representations Plaintiffs allege were repeated in IKB's investment proposals for Octans and Sagittarius were those regarding the strength and independence of the collateral managers and collateral selection. As was discussed *supra*, those statements were true.

Furthermore, for Plaintiffs to have reasonably relied on statements communicated through a third party, Defendants must have intended for the misrepresentations to be communicated by the third party, IKB, to Plaintiffs. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 11 MDL 2262 (NRB, 2015 U.S. Dist. LEXIS 147561, at *261 (S.D.N.Y. Oct. 19, 2015) ("[A] [defendant] is liable for fraud when it falsely represents its economic condition to a [third party] in the expectation that [the plaintiffs] will rely on the [third party's] opinion."). Of course Defendants knew IKB was acting as Plaintiffs' investment advisor; but there is no evidence that Defendants intended their representations to be passed along to Plaintiffs. Indeed, the disclaimers of reliance contained in the draft and final marketing materials, term sheets, and offering circulars for Octans and Sagittarius suggest that Defendants did not intend for Plaintiffs to rely on their representations.[6]

---

[6] These disclaimers are likely "so general that we cannot be confident they bear on [Defendants' alleged] misrepresentations," *Loreley II*, 797 F.3d at 186 n. 19, but they still speak to Defendants' expectation that an investor with whom they never communicated could rely on them.

In the context of securities fraud, "courts may look to a non-party investment adviser's knowledge in determining reliance, where that investment adviser invests on behalf of institutional plaintiffs." *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 CIV. 2106 (ER), 2018 WL 2958361, at *4 (S.D.N.Y. June 13, 2018). Even under that standard, reliance would be unjustified here since IKB was "an independent contractor and not a general agent of" Plaintiffs," and did "not have authority to act for or represent" Plaintiffs. (Tambe Ex. 109 at LOR-WFS0003425, Ex. 112 at LOR-WFS0003490.)

Whether Plaintiff could have conducted due diligence to discover Defendants' alleged misrepresentations and omissions is irrelevant. Plaintiff cannot claim actual or justifiable reliance on Defendants' representations, because they were not communicated to Plaintiff, were not intended to be communicated to Plaintiff, and were true.

*Longshore*

SAI maintained independence and only approved assets for Longshore that it felt comfortable with from a risk perspective. The representations regarding the quality and independence of the collateral manager that were communicated in IKB's investment proposal to Plaintiffs were accurate.

Defendants' representations that the Longshore assets would be acquired at fair market value were not ultimately transmitted to Plaintiffs in IKB's written investment proposals. Thus, these statements did not form the basis for Plaintiff's reliance. *See Sec. Inv'r Prot. Corp.*, 95 N.Y.2d at 709. Plaintiffs were "unaware even by implication" of these alleged misrepresentations, and cannot claim reliance on them. *Id.* at 710; *see also Pasternack*, 27 N.Y.3d at 829. Moreover, even under the securities fraud standard, reliance would be unjustified since IKB was an independent contractor and had no authority to act for or represent Plaintiffs.

**C. Scienter and Intent to Defraud**

Under New York law, Plaintiffs must prove that Defendants had knowledge of their statements' falsity and intended to induce reliance. *Loreley II*, 797 F.3d at 176. "As scienter is generally a question of fact, '[t]he Second Circuit has been lenient in allowing scienter issues to withstand summary judgement based on fairly tenuous inferences.'" *Waran*, 315 F.Supp.3d at 719. Courts may grant summary judgment for lack of scienter where a plaintiff has failed to "present facts that are capable of supporting an inference of bad faith or an inference that defendants acted in intent to deceive." *In re Columbia Securities Litigation*, 155 F.R.D. 466 (S.D.N.Y. 1994).

Since Plaintiffs have not shown that there were any misrepresentations with respect to Octans and Sagittarius, they cannot establish scienter. *See Loreley II*, 797 F.3d at 177 (recognizing that where plaintiffs did not allege a misrepresentation, scienter would be inadequately pleaded).

The evidence suggesting that Wachovia deleted a spreadsheet column showing the current market prices of the assets transferred from Grand Avenue to Longshore could create an inference of scienter, but since Plaintiffs could not have relied on these statements, Plaintiffs cannot establish that Defendants intended to defraud them. *See id.*

### D.   Damages

In order to prevail on a fraud claim under New York law, a plaintiff must establish loss causation. *See id.* at 187 n.20. To prove loss causation, a plaintiff "must show that the economic harm that is suffered occurred as a result of the alleged misrepresentations." *Shanahan v. Vallat*, No, 03 Civ. 3496 (PAC), 2008 WL 4525452, at *4 (S.D.N.Y. Oct. 3, 2008). Plaintiffs cannot establish loss causation, since they cannot prove any misrepresentations caused their losses. *See Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Management Co.*, 48 N.Y.S.3d 654, 656 (2017).

## III.    Rescission

Plaintiffs' rescission claim fails, since they cannot prove the elements of common law fraud. *See Druck Corp. v. Macro Fund Ltd.*, 290 F. App'x 441, 445 (2d Cir. 2008) (dismissing rescission claim for failure to plead loss causation).

## IV.    Aiding and Abetting

Plaintiffs cannot sustain claims for aiding and abetting, since they have failed to establish fraud. *See Dodona I*, 132 F. Supp. 3d at 517 (granting summary judgment on aiding and abetting fraud claim for failure to show sufficient evidence of underlying fraud).

## <u>CONCLUSION</u>

For the reasons stated, the Court DENIES Defendants' motion to exclude Plaintiffs' experts, with one limited exception, and GRANTS Defendants' motion for summary judgment. The Clerk of Court is directed to enter judgment in Defendants' favor, close Dkts. 394 and 397, and close this case.

Dated: New York, New York
      September ⎵ 2019

SO ORDERED

_Paul Crotty_

PAUL A. CROTTY
United States District Judge